UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| **ESTHER WACHSMAN, INDIVIDUALLY AND AS PERSONAL REPRESENTATIVE OF THE ESTATE OF NACHSHON WACHSMAN, *et al.*,** | | |
| **Plaintiffs,** | | |
| **v.** | | **Civil Action No. 06-0351 (RMU)** |
| **ISLAMIC REPUBLIC OF IRAN and IRANIAN MINISTRY OF INFORMATION AND SECURITY,** | | |
| **Defendants.** | | |

PLAINTIFFS' PROPOSED FINDINGS
OF FACT AND CONCLUSIONS OF LAW

Plaintiffs Esther Wachsman, individually and as personal representative of the Estate of Nachshon Wachsman,  Menashe Yechezkel Wachsman, Yitzchak Shlomo Wachsman, Uriel Wachsman, Raphael Wachsman, Eliahu Wachsman, and Chaim "Hayim" Zvi Wachsman ("Plaintiffs"), by and through undersigned counsel, hereby submit the following proposed findings of fact and conclusions of law based on the sworn affidavits, exhibits, and other evidence submitted to the Court in this matter in support of the entry of a default judgment in this action.

**Procedural History**

1.     On February 28, 2006, Plaintiffs filed their Complaint in this Court seeking, *inter alia,* compensation for the wrongful death of Nachshon Wachsman ("Decedent"), his pain and suffering before his murder, and for the intentional infliction of emotional distress suffered by Plaintiffs as individual members of Decedent's family. Docket Entry No. 1.

2.      In accordance with 28 U.S.C. § 1608(a) and 22 C.F.R. § 93.2, Plaintiffs caused the Complaint, Summons and Notice of Suit, along with Farsi translations of each, to be served on each Defendant, namely the Islamic Republic of Iran, Iran's Ministry of Information and Security ("MOIS"), and the Islamic Revolutionary Guard Corp of Iran ("IRGC").

3.      Service of process was attempted by DHL on each Defendant pursuant to 28 U.S.C. § 1608(a)(3) on August 24, 2006.  It was refused on August 26, 2006, and the return receipt was returned unexecuted on August 28, 2006.  Docket Entry No. 5.

4.      The Summonses were reissued on November 1, 2006; and on December 7, 2006, the Clerk of the Court was requested to assist with service of process under 28 U.S.C. § 1608(a)(4).

5.      Service of process on the Islamic Republic of Iran and on MOIS was further attempted by diplomatic channels pursuant to 28 U.S.C. § 1608(a)(4) on January 23, 2007.  The documents were transmitted via the Embassy of Switzerland to Iran's Ministry of Foreign Affairs on April 22, 2007 under cover of diplomatic notes, numbers 1063-IE and 1064-IE.  The Ministry of Foreign Affairs returned the documents, but service was effected only  on the Islamic Republic of Iran and MOIS as of April 22, 2007 per 28 U.S.C. § 1608(c)(1).[1]  *See* Docket Entry No. 8.

6.      Defendants' Answer was due on June 21, 2007.  Defendants failed to enter any appearance and failed to respond by that date.  No responses have been filed  by any Defendant to date.

---

[1] There was no diplomatic service on the IRGC and thus this Defendant IRGC must be dismissed from this case.

7.    On July 2, 2007, Plaintiffs requested the entry of default, which was entered by the Clerk on July 6, 2007 against the Defendants Islamic Republic of Iran ("Iran") and MOIS. Docket Entry No. 10.

8.    On August 22, 2007, Plaintiffs moved for default judgment.  Docket Entry No. 11.  Notwithstanding Defendants' willful default, the Court must conduct an evidentiary hearing pursuant to 28 U.S.C. § 1608(e) to determine whether sufficient evidence has been presented to support a judgment by default.

## I.    <u>FINDINGS OF FACT</u>

1.    Plaintiff Esther Wachsman[2] is the mother of Decedent.  She is also the mother of co-Plaintiffs Menashe Yechezkel Wachsman, Yitzchak Shlomo Wachsman, Uriel Wachsman, Raphael Wachsman, Eliahu Wachsman, and Chaim "Hayim" Zvi Wachsman (collectively the "Siblings").  She was  raised in the State of New York and is a long-time naturalized  American citizen.  *See* Plaintiffs' Exhibit 1(a).  She is also a citizen of the State of Israel and resides there. She is married to Yehuda Wachsman, a citizen of Israel and thus not a party to this action. Yehuda Wachsman was professor of physics at a university until his retirement.

2.    Esther Wachsman formerly maintained  contact with the State of New York through business and personal contacts.  She  employed by a New York non-profit corporation and has many family members resident in New York.

3.    Esther Wachsman's six surviving sons, the Siblings of Decedent, are also citizens of the United States.  *See* Plaintiffs' Exhibits 1(b)-(g).  They are also citizens of Israel.

4.    Esther Wachsman is also the duly appointed representative of the estate of her son Nachshon Wachsman.  She was so appointed on October 10, 2005 by the Registrar of Succession in Jerusalem, Israel.  *See* Plaintiffs' Exhibit 2.   The Decedent died intestate.  <u>See</u>, <u>id</u>.

---

[2] Wachsman is sometimes translated from Hebrew into English as "Waxman."

5.     Esther Wachsman brings this action in her individual capacity for intentional infliction of emotional distress and, in her capacity as the administrator of her son's estate, for wrongful death recovery purposes and as legal representative of Decedent's estate for purposes of a survival action claim.  Each of the Siblings brings this action in his individual capacity and asserts a state law tort claim for intentional infliction of emotional distress. ("IIED").

6.     Decedent was born on April 3, 1975 in Jerusalem, Israel.  He was born a citizen of the United States.  *See* Plaintiffs' Exhibit 1(h).  He grew up and attended schools in Israel and had completed his high school studies in June 1993 with excellent grades.

7.     Upon reaching the age of 18 and prior to commencing his university studies, Decedent entered into his three-year compulsory service in the Israeli Defense Forces ("IDF").  He did well in the military and was assigned to the elite Golani Brigade.  At the time of his death, he had achieved the rank of Corporal. He was posthumously promoted to the rank of sergeant.

8.     On October 9, 1994, four Hamas terrorists, disguised as Orthodox Jews, abducted Decedent from a public street near Lod, Israel while he was waiting for a ride to visit a friend.  The four terrorists were part of the militant branch of Hamas known as the Iz a-Din al-Kasam Brigade.[3]  The four kidnappers were Salah A-Din Hassan Salem Jadallah ("Jadallah"), Hassan Natshe ("Natshe"), Abd El Karim Yassin Bader ("Bader") and Jihad Ya'amur ("Ya'amur").  *See Plaintiffs' Exhibit 3(a), Dr.* Shay's Report, pp. 4-5, (hereafter referred to as "Shay Report"); Plaintiffs' Exhibit 3(b) which is Dr. Shay's book "Islamic Terror Abductions in the Middle East" (hereafter referred to as "Shay Book"), pp. 35-37.[4]

---

[3] There are alternate ways this group's name is spelled in English including:  Izz Al-Din Al-Qassim Brigade and Izz el-Din al-Qassam Brigade.

[4] Dr. Shaul Shay holds M.A. and Ph.D. degrees from Bar Ilan University in Israel.  He served for 28 years in the Israeli Defense Forces, with most of those years in military intelligence.  He served for several

9.      Jadallah, Natshe and Bader, due to prior acts of terrorism against Israel, were wanted by Israeli security forces.  They recruited Ya'amur, who was not known to the Israeli police, to coordinate the logistics including (a) renting a commercial van with Israeli license plates (*see* Plaintiffs' Exhibit 7(a)), securing the disguises (black hats and yarmulkes), renting a video camera, and renting the house near Bir Naballah (north of Jerusalem) where the terrorists could hold their captive (*see* Plaintiffs' Exhibit 7(b)).  The safehouse was stocked with food and had radios and a television.  Shay Report  at 5-6; Shay Book, pp. 37-38, 40.[5]

10.     The terrorists were specifically seeking an Israeli soldier to be used for ransom in exchange for terrorists held in Israeli prisons.  The Decedent , at the time, was a corporal in the IDF.  He was carrying his IDF-issued M-16 assault rifle at the time of his kidnapping. Shay Report at 7;  Shay Book, p. 38.

11.     After Nachshon was lured into the van, the terrorists attempted to secure him with handcuffs and chains.  Nachshon Wachsman resisted but was bashed in the head with a rifle butt and overpowered.  His abductors continued to beat him in the van even after he was handcuffed and blindfolded.  Shay Report at 6; Shay Book, p. 40.

12.     The four terrorists drove Nachshon Wachsman to the safehouse near Bir Naballah and carried him inside.  A videotape was filmed where Nachshon Wachsman was seen along with Jadallah whose face was concealed with a kefiyah.  Plaintiffs' Exhibit 5(a).  Decedent's IDF identify card and his M-16 rifle were shown in the video.   Jadallah read a list of conditions for

---

years in Lebanon, the West Bank, and Gaza on counterterrorism missions.  In the 1990s, he served as the head of Israeli Military Intelligence, Counterterrorism Branch.  He currently serves as a senior research fellow at the International Policy Institute for Counterterrorism at the Interdisciplinary Center in Herzliya, and is a lecturer at Bar Ilan University and the IDF War College.  He has published many books and articles regarding international terrorism including Plaintiffs' Exhibit 3(b), "Islamic Terror Abductions in the Middle East", Sussex Academic Press, 2007.("Shay Book")

[5] As explained below, Ya'amur was arrested by Israeli security forces while Decedent was still being held hostage.  He gave complete statements as to all events and was later indicted and prosecuted for his role in the abduction. Plaintiffs' Exh. 8.

the release of Nachshon Wachsman.   Jadallah advised that if the conditions were not met by Friday (October 14, 1994) at 9:00 p.m., Nachshon Wachsman would be executed. Shay Report at 6-7; Shay Book, pp.  41-43; Plaintiffs' Exhibits 5(a) (video tape); 5(b); 5 (c).

13.     The list of demands included, *inter alia,* the release of the founder of Hamas, Sheikh Ahmed Yassin, who was in an Israeli prison.  It further requested the release from prison of Hamas leader Sheikh Salah Shehada and Hezbollah cleric Sheikh Abdel Karim Obeid.  The list further demanded the release of numerous additional prisoners who were members of Hamas, publicly the PLO, the Islamic Jihad, the Popular Front for the Liberation of Palestine ("PFLP"), and all Palestinian women prisoners.  Shay Report at 10, 24-28; Shay Book at 41-43.

14.     Ya'amur was directed to take the videotape to Hamas officials in charge of the operation in the Gaza Strip.  These officials were to do the negotiations with Israel.  On October 10, 1994, Ya'amur delivered the video to "Abu Ali," an assistant to Muhammad Dif.[6]  Hamas took responsibility for the kidnapping of Nachshon Wachsman and delivered copies of the videotape and pamphlets with their list of demands to the media.  Shay Report at 7; Shay Book, p. 41.

15.     On October 13, 1994, Ya'amur was arrested by Israeli security forces.  In his interrogation, he provided information about the kidnapping of Nachshon Wachsman and the location where he was held.  Ya'amur advised that he had seen Nachshon Wachsman alive on October 12 (Wednesday), 1994.  Shay Report at 9; Shay Book, p. 36.

16.     Preparations for a rescue operation were commenced.  On Friday, October 14, 1994, an Israeli military commando unit forced entry into the safehouse after blowing open the steel outer doors with explosive charges.  The unit's soldiers engaged in  gun battles with the

---

[6] Dif, also spelled "Dief," was the Hamas commander of terrorist operation who remained in Gaza during the kidnapping.  He was in charge of negotiations with Israel.  Dif was later arrested by Israeli forces in 2000.  *See Weinstein v. Islamic Republic of Iran,* 184 F.Supp.2d 13, 19 (D.D.C. 2002).

three kidnappers – Jadallah, Natshe, and Bader.  Explosive devices were also deployed inside the apartment by the soldiers.  The three kidnappers were killed as well as a Captain with the IDF commando unit.  Several soldiers were wounded.  Shay Report at 9; Shay Book 3 at pp 48-53; Plaintiffs' Exhibits 7(c) through 7(j).

17.     Nachshon Wachsman was found dead in a back room of the house.  His hands and feet were bound and chained.  He had been shot numerous times at close range by one or more of the terrorists, shortly before or during the rescue attempt.[7] Shay Report  at 9; Shay Book pp. 52-53; Plaintiffs' Exhibits 7(k) through 7(s) (photos).

18.     The crime scene  photographs of Nachshon Wachsman also showed that he had been beaten and tortured prior to his execution.  His body had numerous bruises and hemorrhages, bite marks on his back and arms, and burns on his abdomen and leg. Shay Report at 9; Plaintiffs' Exhibits 7(k) through 7(s) (photos).

19.     As a result of the death of Nachshon Wachsman, his estate suffered a loss of accretions which would have been expected to occur during the course of his life expectancy. Nachshon was a bright student who repeatedly articulated his goal of becoming a medical doctor. Plaintiffs have produced affidavit testimony by Israeli CPA Dov Weinstein detailing the reasonably determined loss of accretions, discounted to present value.  In accordance with Mr. Weinstein's sworn report, the  calculated loss, reduced to present value, to the Estate of Nachshon Wachsman is $3,040,289.  *See* Exhibit 11, Report of Dov Weinstein, CPA.

20.     As the result of the death of Nachshon Wachsman, his mother Esther and his six brothers have suffered and will continue to suffer severe mental anguish and emotional distress. All of the Plaintiffs saw the videotapes released by Hamas and his photographs on the front page

---

[7] The commandos placed charges on the hinges of the metal doors that secured the residence.  Some  of charges failed to blow the hinges, so there was a time delay after the initial explosion while additional charges were placed and detonated. Shay Book, pp. 50.

of many newspapers in which the Decedent was shown being held captive and threatened with

death.  Plaintiffs' Exhibits 5(a) and 6(b).  Esther Wachsman responded through the media,

including television, where she pleaded for her son's life. Plaintiffs Exhibit 5 (c).

**Iran's Provision of Material Support and Resources to Hamas**

21.     Hamas, which is the popular name for the Islamic Resistance Movement (Harakat

al-Muqawama al-Islamiya), is an organization that has been supported over the years by the

Islamic Republic of Iran, primarily through Iran's Ministry of Information and Security

("MOIS"), and its Revolutionary Guard Corps.  There are numerous opinions by judges of this

Court which have found that Iran not only is a major source of support for Hamas, both

financially and in terrorist training, but also that Iran fully knew of the purposes and objectives

of Hamas and approved of them.  Shay Report at 14-15; Shay Book, pp. 21-22, 83-85;  s*ee, e.g.,*

*Bennett v. Islamic Republic of Iran*, 507 F. Supp. 2d 117, 124 ¶ 16; *Campuzano v. Islamic*

*Republic of Iran,* 281 F.Supp.2d 258, 262 (D.D.C. 2003); *Stern v. Islamic Republic of Iran,* 271

F.Supp.2d 286 (D.D.C. 2003); *Mousa v. Islamic Republic of Iran*, 238 F.Supp.2d 1, 3 (D.D.C.

2001); *Weinstein v. Islamic Republic of Iran,* 184 F.Supp.2d 13 (D.D.C. 2002); *Eisenfeld v.*

*Islamic Republic of Iran*, 172 F.Supp.2d 1, 5 (D.D.C. 2000);[8] *see also In re Abu Marzook,* 924 F.

Supp. 565 (S.D.N.Y. 1996).

22.     The Hamas terrorist organization was established in December 1987 by Sheik

Ahmad Yassin[9] and other Islamic militants.  Hamas views Muslims as an oppressed minority.

The charter of Hamas, first published in 1988, states "there is no solution to the Palestinian

problem except by Jihad."  Hamas is dedicated to waging Jihad (a holy war) by employing

---

[8] The expert testimony in the above-cited cases that established Iran's extensive support to Hamas came
from Dr. Patrick Clawson, Dr. Reuven Paz, Yigal Pressler, Mr. Ronni Shaked, and Dr. Bruce Tefft.
[9] Sheikh Ahmad Yassin was incarcerated in an Israeli prison at the time of Nachshon Wachsman's
kidnapping and was one of the key persons whom Nachshon Wachsman's kidnappers tried to free.

terrorism with the object of seizing leadership and control over all Palestine, including the State of Israel. Hamas opposes any peaceful resolution of the Middle East conflict and views the United States and Israel as the greatest enemies of Islam.[10] Shay Report at 17; Shay Book, pp 21-23; *Stern*, 271 F.Supp.2d at 290-291.

23.     Relations between Iran and Hamas were formalized in 1988, when Iran agreed to accept as Hamas delegation to Iran and to establish an official representation in that country. Hamas stationed an "ambassador" in Iran. Hamas' creator Sheikh Yassan and its then military leader Musa Abu Marzook traveled to Iran to coordinate relations. Shay Report at 18-19; Shay Book, pp. 24*; Stern,* 271 F.Supp.2d at 291-292.

24.     In 1992, Israel deported approximately 400 Hamas operatives from the Gaza Strip to Lebanon. While in Lebanon, the Islamic Revolutionary Guards as well as Iranian trained and sponsored Hizbollah members provided military and terrorist training to these Hamas deportees. Hamas members in Lebanon were trained in ambush techniques, kidnapping, methods of subterfuge, and a broad range of firearms and weapons training. This Iranian training continued for nearly a year, until late 1993, when nearly all of the newly-trained Hamas terrorists returned to the West Bank and Gaza. These specially trained Hamas members served as leaders and teachers to new Hamas recruit to the organization. Shay Report at 20-21; Shay Book, pp. 26-29. *see Stern,* 271 F.Supp.2d at 292.

Many of these deportees who were trained by Iran and who later returned to the West Bank and Gaza from Lebanon were in the chain of command over Nachshon Wachsman's abduction and murder and had connections to Iran. Salah-a-din Drawza, one of the commanders of the Wachsman abduction, was one of the 400 deportees to Lebanon. Muhammad Dif, the

---

[10] Subsequent to the kidnapping and murder of Corporal Nachshon Wachsman in October 1994, Hamas was designated in 1997 as a "Foreign Terrorist Organization" ("FTO") by the State Department.

Hamas military commander in Gaza, himself had visited Iran and had close ties to Sheik Khalil, another deportee.  Salah Jadallah, one of Wachsman's actual kidnappers and who was killed during the rescue attempt of Wachsman, was the son of one of the deportees.  Salah Jadallah's brother, Ahmad Jadallah, was involved in the preparation of the video tape of Wachsman.  Shay Report at 10; Shay Book , pp 102-103.

25.     Iran has sought out and developed a close relationship with Hamas since 1988. Ideologically, both Iran and Hamas have the same goals of an Islamic revolution through Jihad. By supporting Hamas, Iran sought to strengthen the influence of Islamic fundamentalists within Palestinian society.  Hamas needed financing and training from Iran in order to effectively conduct its armed struggle against Israel.  Hamas began to increase its terroristic attacks after April 1994, shortly after Hamas leaders and operatives had received training and support from regular and proxy forces in Lebanon in Iran.  Shay report at 18, 21; Shay Book, pp. 83-84;  *see* Plaintiffs Exhibit 4, Patterns of Global Terrorism 1994.

26.     Iran also trained Hamas operatives at a large military camp near Tehran called "Al Quds."  In 1994, a group of 19 Hamas members spent three and one-half months in intensive military exercises.  The Al Quds camp is operated by MOIS and the IRGC.  Other Hamas operatives spent several years in Iran and took courses at the Iranian Army College.  Shay Report at 19; Shay Book, pp. 85; *Stern,* 271 F.Supp.2d at 292 (describing same training regime by Hamas in Iran); *Mousa,* 238 F.Supp.2d at 4 (same); *Eisenfeld,* 172 F.Supp.2d at 5-6 (same).

27.     Beginning in the early 1990s, Iran began to give large sums of money to Hamas to build an operational infrastructure from which to carry out terroristic activities in Israel.  Since the 1990s, Iran has provided tens of millions of dollars to Hamas for terrorism activities.  In 1996

and 1997, Iran provided Hamas with between $25 million and $50 million dollars.[11]  Numerous

sources, including sources in Iran, state that Iran rewarded Hamas financially after terrorists'

actions occurred, particularly those of a spectacular nature such as suicide bombings.  Shay

Report  at 21; Shay Book, pp. 83-84.

28.    The current government of Iran was formed on April 1, 1979 following the

Islamic revolution wherein the Shah of Iran was deposed and a new fundamentalist government

was created under the rule of then Supreme Leader Ayatollah Ruhollah Khomeini.  Defendant

Iran is a foreign state that has been designated as a state sponsor of terrorism under § 6(j) of the

Export Administration Act of 1979 (50 U.S.C. App. § 2405(j)) and § 620A of the Foreign

Assistance Act of 1961 (22 U.S.C. § 2371) since January 19, 1984. *See also* 22 C.F.R. § 126.1(d)

and 31 C.F.R. § 596.201.  At the times relevant to this action, Iran provided material support and

resources to the Hamas, a terrorist organization operating throughout the Middle East.  Iran

sponsored terrorist activities undertaken by Hamas within the meaning of 28 U.S.C. § 1605(a)(7)

and 28 U.S.C. § 1605 note, by providing it with funding, direction and training for its terrorist

activities. Shay Report at 21;  s*ee Bennett,* 507 F. Supp. 2d at 123-124, ¶¶ 15-17; *see also*

*Campuzano,* 281 F.Supp.2d at 262, *Stern,* 271 F.Supp.2d at 293; *Weinstein,* 184 F.Supp.2d at 19-

20.

29.    Defendant MOIS, has at all times relevant to this action, operated Iran's

intelligence service and functioned both within and beyond the borders of Iran, including within

Lebanon.  Iran has long funneled through Defendant MOIS most of the funding it makes

available to support terrorism.  MOIS, acting within the scope of its agency, performed acts and

---

[11] These dollar figures are similar to those provided by Dr. Tefft, Dr. Clawson, and Dr. Paz.  Drs. Clawson and Paz described how Iran gave at least $25-50 million to Hamas in 1995 and 1996.  *See Weinstein,* 184 F.Supp.2d at 19, ¶ 26.  Dr. Tefft has testified that Iran's support of Hamas in 1995 was $30,000,000.  *See Campuzano*, 281 F.Supp.2d at 262.  Dr. Clawson explained that Iran supported Hamas with $20-50 million annually over the past decade.  *Id.; see Stern,* 271 F.Supp.2d at 294.

caused the performance of acts by Hamas, including hostage taking, torture, personal injury, and

infliction of emotional distress as described below, within the meaning of 28 U.S.C.

§§ 1605(a)(7) and 1605 note.  At all times relevant to this action, the MOIS acted as a conduit

for Iran's provision of funds, training, and direction to the Hamas for its terrorist activities,

including the torture and murder of Nachshon Wachsman. Shay Report at 15-17;  *See Stern,* 271

F.Supp.2d at 292 and n. 4.

**I.      CONCLUSIONS OF LAW**

    **Jurisdiction**

In the United States, the Foreign Sovereign Immunities Act provides the sole basis for

asserting jurisdiction over foreign sovereigns.  *Argentine Republic v. Amerada Hess Shipping

Corp.*, 488 U.S. 428, 434-34 (1989).  A party may not generally bring an action for money

damages in U.S. courts against a foreign state.  28 U.S.C. § 1604.  The "state-sponsored

terrorism" exception, however, removes a foreign state's immunity to suits for money damages

brought in U.S. courts where plaintiffs seek damages against the foreign state for personal injury

or death caused by "an act of torture, extrajudicial killing, aircraft sabotage, hostage taking, or

the provision of material support or resources (as defined in Section 2339A of Title 18) for such

an act if such act or provision of material support is engaged by an official, employee, or agent of

such foreign state while acting within the scope of his or her office, employment or agency."  28

U.S.C. § 1605(a)(7). *Bennett*, 507 F. Supp. 2d at 124-125.

In order to subject a foreign sovereign to suit under section 1605(a)(7), a plaintiff must

show that:  (1) the foreign sovereign was designated by the U.S. State Department as a "state

sponsor of terrorism"; (2) the victim or plaintiff was a U.S. national at the time the acts took

place; and (3) the foreign sovereign engaged in conduct that falls within the ambit of the statute.

*Heiser v. Islamic Republic of Iran,* 466 F.Supp.2d 229, 254 (D.D.C. 2006), *citing Prevatt v. Islamic Republic of Iran*, 421 F.Supp.2d 152, 158 (D.D.C. 2006) .

Each of the requirements is satisfied in this case.  First, Defendant Iran has been designated a state sponsor of terrorism continuously since January 19, 1984, and was so designated at the time of the abduction and killing of the Decedent .  *See* 31 C.F.R. § 596.201 (2001); *Flatow v. Islamic Republic of Iran,* 999 F. Supp. 1, 11 ¶ 19 (D.D.C. 1998) .  Second, all of the Plaintiffs were United States citizens at the time the kidnapping and murder of Decedent occurred.  Finally, Defendants' persistent financial and organizational support of Hamas, the entity whose members  committed an extrajudicial killing preceded by kidnapping and torture squarely falls within the ambit of the statute.  Defendant MOIS is considered to be a division of the State of Iran, and is therefore treated as a member of the State of Iran itself.  *Roeder v. Islamic Republic of Iran,* 333 F.3d 228, 234 (D.C. Cir. 2003), *cert. denied*, 542 U.S. 915 (2004); *see also Salazar v. Islamic Republic of Iran,* 370 F.Supp.2d 105, 116 (D.D.C. 2005) (analogizing the IRGC to MOIS for purposes of liability, and concluding that both must be treated as the state of Iran itself).  Therefore, the same determinations that apply to MOIS' conduct apply to the conduct of Iran.

Personal jurisdiction exists over a non-immune sovereign as long as service of process has been made under section 1608 of the FSIA.  *See Stern,* 271 F.Supp.2d at 298 .  In this case, service of process has been effectuated  under that provision. See Procedural History ¶ 5, supra at 2.  Accordingly, this Court has *in personam* jurisdiction over Defendants Iran and MOIS.

### Legal Standard for FSIA Default Judgment

As previously mentioned, in an action over which subject matter jurisdiction exists by virtue of the "terrorism exception" of  28 U.S.C. § 1605(a)(7) "[n]o judgment by default shall be entered by a court of the United States or of a state against a foreign state … unless the claimant

establishes his claim or right to relief by evidence satisfactory to the court." 28 U.S.C.

§ 1608(e); *Roeder,* 333 F.3d at 232-33.  In default judgment cases, plaintiffs may present such

evidence in the form of affidavits.  *Campuzano*, 281 F.Supp.2d at 268.  Upon evaluation, the

court may accept any uncontroverted evidence presented by Plaintiffs as true.  *Heiser*, 466

F.Supp.2d at 255 *citing Campuzano*, 281 F.Supp.2d at 268.  This Court accepts and credits the

uncontested evidence and testimony submitted by Plaintiffs as true in light of the fact that the

Defendants in this action have not objected to it or even appeared in this action to contest it.

**Liability**

1. *Proper Causes of Action Under the FSIA*

The FSIA does not itself provide a cause of action, but rather "acts as a 'pass-through' to

substantive causes of action against private individuals that may exist in federal, state or

international law."  *Blais v. Islamic Republic of Iran*, 459 F.Supp.2d 40, 54 (D.D.C. 2006)  *citing*

*Dammarell v. Islamic Republic of Iran*, 2005 WL 756090, at *8-10, 2005 U.S. Dist. LEXIS

5343, at *27-32 (D.D.C. Mar. 29, 2005 (Bates, J.) ("*Dammarell II*").

In this case, with one possible exception, state law provides a basis for liability.[12]  In

order to determine the  applicable state law , the Court must look to the choice of law rules of the

forum, in this case, those of the District of Columbia.  *See Blais,* 459 F.Supp.2d at 54.

**Choice of Law**

2. *Direct Claims of Esther Wachsman and the Siblings*

The applicable state substantive law which applies to the Plaintiffs' IIED claims and his

representative's survival action claim in this action is that of the District of Columbia.  As the

---

[12] Obviously, the law of the United States should apply rather than the law of the place of the tort
or any other foreign law because the United States has a "unique interest" in having its domestic
law apply in cases involving terrorist attacks on United States citizens. *See Dammarell II,* 2005
WL 756090, at *20, 2005 U.S. Dist. LEXIS 5343, at *63.

forum state, the District of Columbia's choice of law rules apply to determine which states' law shall govern. *Bodoff v. Islamic Republic of Iran*, 424 F.Supp.2d 74 (D.D.C. 2006); *Blais*, 459 F. Supp. 2d at 54. District of Columbia courts apply a so-called "refined government interest analysis," pursuant to which they "evaluate the government policies underlying the applicable laws and determine which jurisdiction's policy would be most advanced by having its law applied to the facts of the case under review." *Bodoff*, 424 F.Supp.2d at 83, *quoting Hercules & Co. v. Shama Rest. Corp.*, 566 A.2d 31, 41 (D.C. 1989); *see also Haim v. Islamic Republic of Iran*, 425 F.Supp.2d 56, 68-69 (D.D.C. 2006) (Lamberth, J.). When this test is applied it "typically leads to the application of the law of plaintiff's domicile, as the state with the greatest interest in providing redress to its citizens." *Id.,* 425 F.Supp.2d at 69, *citing Dammarell II,* 2005 U.S. Dist. LEXIS 5343 at *66-67.

Each of the Plaintiffs has asserted an IIED claim against the Defendants. These are direct claims which are not derivative through the Decedent ("Direct Claims"). None of the Plaintiffs have a current United States domicile. Nor did any of the Plaintiffs have a U.S. domicile at the time when the Decedent was abducted, tortured and killed in October 1994. Where, as here, the family members of a U.S. citizen victim of terrorism who have asserted IIED claims are United States citizens with no domicile in the United States, the District of Columbia has "the greatest interest" for choice of law purposes and its substantive law will be applied. *See, e.g.*, *Bodoff*, 424 F.Supp.2d at 83-84; *Haim*, 425 F.Supp.2d at 69. Therefore, as to the Direct Claims of each of the Plaintiffs, District of Columbia law shall apply,

## Substantive Vicarious Liability For The Torts Committed by Hamas

The substantive basis of the Defendants' liability is that they at a minimum engaged in the "provision of material support" to Hamas, which carried out the terrorist kidnapping of

Decedent, his mistreatment including torture and murder.  The acts of another may render a party liable "under theories of vicarious liability, such as conspiracy, aiding and abetting and inducement."  *Haim*, 425 F.Supp.2d at 69.  The Court will examine the applicability of each of these theories, as deemed necessary.[13]

1.    *Vicarious Liability*

The asserted basis of Defendants' liability for the actionable conduct of Hamas is that they provided material financial support and resources to Hamas, the terrorist organization whose members kidnapped, abducted, mistreated, and murdered the Decedent.  Under a theory of vicarious liability, a party may be liable for the acts of another, under rubrics including conspiracy, aiding and abetting, and inducement.  Accordingly, this Court concludes  that at a minimum, civil conspiracy provides a basis of liability in this case against Defendants Iran and MOIS  under District of Columbia law.

2.    *Civil Conspiracy*

Civil conspiracy is recognized under District of Columbia law not as an independent tort, but as a theory for imposition of vicarious liability for civil torts.  It exists when the following elements are present:  (1) an agreement between two or more persons (2) to participate in an unlawful act in an unlawful manner (3) an injury or death caused by an unlawful overt act performed by one of the parties to the agreement, and (4) pursuant to or in furtherance of the common scheme.  *Griva v. Davison*, 637 A.2d 830, 848 (D.C. 1994), *citing Halberstam v. Welch*, 705 F.2d 472, 477 (D.C. Cir. 1983).

It is axiomatic that the "agreement" element "may be inferred from conduct."  *Bodoff*, 424 F.Supp.2d at 84, *citing Weishapl v. Sowers*, 771 A.2d 1014, 1023 (D.C. 2001); *see also*

---

[13] Where the facts found by the Court suffice to establish only one of these bases of vicarious liability, the Court need not go further.  *See, Haim*, 425 F. Supp. 2d at 69.

*Haim*, 425 F.Supp.2d at 69.  Plaintiffs have established, based on the evidence submitted to this Court, most notably the Shay Report and the Shay Book (which is a learned treatise recently authored by Dr. Shay and published both in the United States and in the United Kingdom) that Iran, MOIS, and Hamas acted in concert because they had agreed to commit high profile terrorist activities to promote Iran's brand of revolutionary Islamic ideology and to further the goal of damaging Israel and its citizens as well as United States interests whenever possible.  Findings of Fact ¶¶ 21-29, pp. 8-11, <u>supra</u>.  Such agreement may also be inferred from the substantial financial support and training that Iran and MOIS provided to Hamas.  *See, id.,* ¶ 27, p. 10, <u>supra</u>. Judge Lamberth has also very succinctly and correctly opined that the very "'sponsorship of terrorist activities inherently involves a conspiracy to commit terrorist attacks." *Bodoff*, 424 F.Supp.2d at 84 *quoting Flatow,* 999 F. Supp. at 27.

The evidence also clearly establishes that Hamas carried out the sequence of tortious conduct which killed Decedent.  *See* Shay Report and ¶¶ 8-16, pp. 4-7, supra. .  Dr. Shay's Report and the Shay Book  also demonstrate to the satisfaction of this Court that the torts alleged by Plaintiffs were carried out in "furtherance of the scheme" between Hamas, Iran and MOIS. *See, id.* ¶¶ 22, 25-28.  For these reasons, each of the four elements of civil conspiracy is established under District of Columbia law, with regard to the Defendants and the Hamas perpetrators.  *See also Valore v. Islamic Republic of Iran*, 478 F.Supp.2d 101, 108-109 (D.D.C. 2007) (Lamberth, J.) (civil conspiracy basis for vicarious liability established with respect to Iran and MOIS' provision of "material support and resources to Hezbollah" to bomb U.S. Marine barracks in Beirut).

3.      *Other Bases of Vicarious Liability*

Nor is there any paucity of evidence here for adjudicating Iran and MOIS as liable under vicarious liability theories which are separate and distinct from civil conspiracy.  Iran has provided initiative, approval, training, funding and other forms of material support to the Hamas perpetrators.  *See Shay* Report, pp 14-21.  As a result of these actions, the Defendants are also liable for aiding and abetting as well as inducement of the deadly terrorist bombing.  *See* 18 U.S.C. §§ 2(a), 2(b); s*ee also Bodoff,* 424 F.Supp.2d at 84.  In addition to conspiracy, aiding and abetting and inducement are legal theories upon which a court may predicate vicarious liability. *See Halberstam,* 705 F.2d at 481-486.

Lastly, a common law agency relationship between the terrorist perpetrators and the state sponsor Defendants may also serve as a legal basis for imposition of liability on the Defendants. *See*, <u>Kilburn v. Socialist People's Libyan Arab Jamahiya</u>, 376 F. 3d 1123, 1130 (D.C. Cir. 2004) (for § 1605(a)(7) jurisdictional purposes, Libya "is responsible for the acts of its agent, 'within the scope of [its] agency'."); s*ee also,* <u>Foremost - McKesson v. Iran</u>, 905 F. 2d 438, 445 (D.C. Cir. 1990). The record here contains ample evidence of an agency relationship between Hamas, acting as agent within the scope of its agency, on behalf of the Defendants.  *See* Shay Report  p. 18-21.  Indeed, Dr. Shay even  opines specifically as to the existence and supporting rationale of such agency relationship.  <u>*See*</u>, <u>*id*</u>.

In conclusion, there exist multiple legal bases for the imposition of vicarious liability on Defendants Iran and MOIS for the torts of Hamas including kidnapping, torture and extra judicial killing.

II.     **THE MERITS OF THE IIED CLAIMS AGAINST HAMAS AS DIRECT TORTFEASOR**

**The Direct  Claims**

District of Columbia law governs as to the IIED claims asserted by each of the Plaintiffs. The elements of the IIED tort under District of Columbia law are "(1) extreme and outrageous conduct on the part of the defendant which (2) intentionally or recklessly (3) causes the Plaintiff severe emotional distress.  *Bodoff*, 424 F.Supp.2d at 85, *citing Howard Univ. v. Best*, 484 A.2d 958, 985 (D.C. 1984).  Based on the evidence submitted in this case, these elements are satisfied here.  It is well established that "a terrorist attack constitutes extreme and outrageous conduct." *Bodoff,* 424 F.Supp.2d at 85; *see also Stethem v. Islamic Republic of Iran*, 201 F.Supp.2d 78, 89 (D.D.C. 2002) (Jackson, J.) ("[A]cts of terrorism are by their very definition extreme and outrageous and intended to cause the highest degree of emotional distress, literally terror.")  The second element of the IIED tort is also established here as the acts of kidnapping, torture and extra judicial killing were not only extreme and outrageous, but were also intentional.  *See*, *e.g.*, *Dammarell v. Islamic Republic of Iran*, 404 F.Supp.2d 261, 275 (D.D.C. 2005) (*Dammarell IV*) (elements of District of Columbia IIED found to be  satisfied in 1983 bombing of U.S. Embassy in Beirut); *see also Bodoff*, 424 F. Supp. 2d at 85.

The third element of causing the plaintiff severe emotional distress is amply demonstrated here.  Each of Decedent's immediate relatives who are Plaintiffs in this action has established in detail the severe emotional distress that resulted from the terrorist kidnapping and murder of their loved one.

Finally, the Court notes that the District of Columbia's highest Court is among a number of state supreme courts which have yet to address the question of whether in a terrorist attack case, a plaintiff's physical presence is required to permit immediate family members to recover

IIED damages.  *See*, *Peterson v. Islamic Republic of Iran,* 2007 U.S. Dist. LEXIS 65820 (D.D.C. Sept. 7, 2007) at * 21-22.  In *Heiser,* the court held that even under the law of a jurisdiction which has not decided the presence issue in a terrorist attack context, presence is not required. *Id.,* 466 F.Supp.2d at 305; *see also Peterson* at 20-21, n.11.  A similar conclusion was reached in *Beaty v. Republic of Iraq,* 480 F. Supp. 2d 60, 93-99 (D.D.C. 2007).

*Heiser* reached this conclusion to dispense with a presence requirement "in light of the severity of [a terrorist attack] and the obvious range of potential grief and distress that directly results from such a heinous act" and because "a terrorist act - by its nature - is directed not only at the victims, but also the victims' families."  466 F. Supp. at 328-29; *accord Dammarell IV,* 404 F. Supp. 2d at 283; *Burnett v. Al Baraka Inv. and Dev. Corp.*, 274 F. Supp. 2d 86, 108 (D.D.C. 2003); *Salazar*, 370 F. Supp. 2d at 115 n. 12.  As the Court noted in *Beaty*, "[i]n treating close relatives of victims as themselves direct victims of the terrorist attacks, the courts have unmistakenly (but only implicitly) applied § 46(1) of the Restatement, which governs direct victims and which has no presence requirements." *Id.* at 94.

It should be noted, however, that the Plaintiffs herein were virtually present throughout the time their son/brother was being held hostage.  The evidence shows that Decedent's captors, brought Decedent's  kidnapping, detention and resulting plight directly into the homes of Decedent's family, while he was alive by providing the media with videotapes of him being held hostage as his captivity was occurring. The Wachsman family watched their son and brother being threatened with death while he was actually being held captive.  Plaintiffs knew he was to be executed in a matter of  days if the Hamas kidnappers' extreme demands were not met.  The kidnappers wanted to motivate the Decedent's family and Israel's citizenry as an extreme form

of pressure to plead with  the Israeli government to save this young soldier in the prime of his life, by having Israel succumb to their demands.

In light of this media exposure directed at the Defendants' immediate family and the various courts analysis concerning presence, there exists compelling reasons for this Court to adopt the rationale of *Beaty*, *Peterson and Heiser* with regard to presence not being an issue in terrorism cases.  The Court is persuaded that their analytical underpinnings are well founded. *See also In re Terrorist Attacks on September 11, 2001*, 349 F.Supp.2d 765, 829-30 (S.D.N.Y. 2005) (dispensing with physical presence requirement in an action brought by victims of the September 11, 2001 terrorist attack on the World Trade Center and Pentagon). Hence, each of the Plaintiffs is entitled to an IIED based recovery for damages suffered by each on his or her Direct Claim.

### B.    The Wrongful Death Claim

The determination of which body of substantive must be applied to the wrongful death claim asserted in this action requires its own analysis.  In the post *Cicippio-Puleo* cases, different judges of this Court have applied separate and distinct rationales to this choice of law analysis. *Compare*, *Holland v. Islamic Republic of Iran*, 496 F. Supp. 2d 1, 24 (D.D.C. 2005) (Kollar Kotelly, J. ) (the claims of a decedent's estate "are traditionally governed by the laws of the decedent's domicile") quoting *Dammarell II*, 2005 WL 756090, at *21[14] with *Dammarell IV*, 404 F. Supp. 2d. at 281 [15] (applying  Georgia law to the wrongful death claim arising out of the death of decedent Janet Lee Stevens whose immediate family resided in Georgia, and whose estate was probated in Georgia).  In *Dammarell IV*, however, Judge Bates did not specifically

---

[14]    See also In *re Air Crash Disaster*, 948 F. Supp. 747, 758 (N.D. Ill. 1996); *Datskow v. Teledyne Cont'l Motors Aircraft Prods.*, 807 F. Supp. 941, 944 (W.D. N.Y. 1992).

[15]    In *Dammarell IV*, Judge Bates expressly stated that his conclusions of law in that opinion "supersede any contrary conclusion contained in the Court's September 8, 2003 memorandum opinion [*Dammarell I*]" 404 F. Supp. 2d at 274.

find or otherwise determine that the decedent's domicile was in fact in Georgia at the time of the fatal terrorist attack.  See, 404 F. Supp. 2d  at 281-82.  Instead, the critical focus was on where the statutory beneficiaries, i.e., the immediate family members were domiciled.  Id.   A third approach to this choice of law issue was employed in Bodoff, where Judge Lamberth applied the wrongful death statute of the District of Columbia in a situation identical to the one in the instant action,  i.e., that the decedent there, who was a U.S. citizen, did not have a U.S. domicile at the time of the fatal terrorist bombing and who died  in Israel.  See, 424  F. Supp. 2d at 83, 85.

A fourth approach was used in the  most recent decision in Peterson v. Islamic Republic of Iran, 2007 U.S. Dist. LEXIS 65820 at * 11.  There, Judge Lamberth applied North Carolina wrongful death law as to a U.S. serviceman killed in Beirut, who had been born a Philippine citizen, never became a U.S. citizen but had a "closest and most substantial connection" with North Carolina because he had been stationed there last before being sent to Lebanon.  Id. at *12.

With the exception of Bodoff and Haim, each of these prior decisions is distinguishable from the case subjudice.  The Decedent here, while a United States citizen from birth, does not appear to have ever had a U.S. state domicile at any time prior to his death.  Nor did the Siblings or Esther Wachsman have such a domicile at the time of Decedent's death.  Therefore, either the District of Columbia as the forum state, a la Bodoff, or the State of Israel (as the location where Decedent died), are the two remaining jurisdictions from whose wrongful death laws this Court must choose.  Unfortunately, the choice of the District of Columbia's law is not free of difficulty, insofar as its  Wrongful Death Act is, by its terms, limited to a death producing injury which occurs within the District of Columbia.  See D.C. Code § 16-2701(2001) which begins: "When by an injury done or happening within the limits of the District …." (emphasis added).

Although not cited by any of the wrongful death choice of law decisions mentioned above in § 1605(a)(7) terrorism cases, the District of Columbia's choice of law determination as to wrongful death claims where the decedent died outside of the District of Columbia as a result of injuries which were inflicted outside of this forum is controlled by _Lewis v. Reconstruction Fin. Corp._, 177 F.2d 654, 655-656 (D.C. Cir. 1949).  _Lewis_ continues to be good law and requires that the law of "the state where the fatal injuries occurred should govern, unless the public policy of the forum is clearly opposed."  _Smith v. Hope Village, Inc._, 481 F. Supp. 2d 172, 205-206 (D.D.C. 2007) (Walton, J.) quoting, _Lewis_, 177 F 2d at 656.  On the strength of _Lewis_, as explained by Judge Walton in _Smith_, where, as here, the fatal injuries were inflicted on the Decedent in Israel, the substantive wrongful death law of Israel applies, unless it contravenes the public policy of the District of Columbia.  _See also_, _Stewart v. Balt. and Ohio Railroad Company_, 168 U.S. 445, 450 (1897).

As in _Smith_, where Maryland's substantive law was applied to fatal injuries inflicted on the decedent in Maryland, here the interests of the District are substantially advanced by the application of Israeli law to the plaintiff's claim.  _Smith_, 481 F. Supp 2d at 206.  By its terms, the District of Columbia's wrongful death statute applies only to cases where by "an injury happening or done within the limits of the District," the death of a person is caused by the wrongful act, neglect or default of a person or corporation.  _Id_. at 206 quoting D.C. Code.  § 16-2701 (emphasis added); _see also_, _Lewis_, 177 F. 2d at 656 ("[t]he District of Columbia] wrongful death statute and the limitations thereof [,] are confined to deaths resulting from injuries suffered within the District of Columbia").  The Supreme Court has construed the District of Columbia's predecessor to § 16-2701, which contained the same limitation to the District, as the place of the

injury, in a fashion identical to _Smith_. _See, Stewart_ 168 U.S. at 447; _Jones v. Prince George's County_, 202 F.R.D. 39, 40-41 (D.D.C. 2001).

By its very terms, the District of Columbia's wrongful death statute could not apply to the Plaintiff Esther Wachsman's wrongful death claim. _Stewart,_ 168 U.S. at 447. But as the forum state, the District of Columbia has no interest whatsoever in the application of its law in such a way as to frustrate the public policy of either the United States or Israel of attempting to deter terrorism through awards of money damages against designated state sponsors of terrorism like Iran. _See,_ _Smith_, 481 F. Supp. 2d at 206. For these reasons, the wrongful death law of Israel cited below does not impinge upon, let alone controvert, any public policy of this forum. In reality, the contrary is true, in that both the District of Columbia and Israel have a legitimate interest in compensation for the victims of terrorism, including the statutory beneficiaries of a decedent so as to deter terrorism-sponsoring sovereigns through the force of appropriate and well deserved monetary judgments for compensatory damages.

Israel has a wrongful death statute whose terms and underlying compensatory policy and structure are consistent with District of Columbia law and public policy on this issue:

> Where death is caused by a civil wrong and such person could, had death not ensued, have been entitled at time of his death to recovery compensation in respect to bodily injury caused to him by such civil wrong, the husband, wife, parent and child of such deceased person may recover compensation from person responsible for such civil wrong.

Martindale-Hubbell International Law Digest, Israel Law Digest, Estates And Trusts, ISR-9 (Death).[16]

_____

[16] In Beaty v. Republic of Iraq, 480 F. Supp. 2d 60, 91(D.D.C. 2007), Judge Bates recognized that "even the law of a foreign state" can properly function, as the decisional law under which a plaintiff's claim may in a § 28 U.C.S. § 1605(a)(7) terrorism case, after Cicippio-Puleo.

Where, as here, the foreign law on wrongful death is not inconsistent with or contrary to the public policy of the District of Columbia, application of the Israeli law, as a matter of comity is appropriate. *See Stewart,* 168 U.S. at 450. Based upon these principles, the Court applies Israeli law as giving rise to the wrongful death claims by reason of the fact that the Decedent was killed in Israel. His statutory wrongful death beneficiaries under Israeli law are his parents, one of whom Esther is a United States citizen and a Plaintiff in this action. The measure of damages or the remedial aspects of the wrongful death claim are discussed hereafter in the Damages portion of the Conclusions of Law.

### III. THE SURVIVAL ACT CLAIM

### 1. Decedent's Survival of Rights Cause of Action

The District of Columbia General Tort Survival Act § 12-201 D.C. Code (2001) ("Survival Act") provides:

> On the death of the person in whose favor or against whom a right of action has accrued for any cause prior to his death, the right of a action for all such cases, survives in favor of or against the legal representative of the deceased.

The Survival Act "preserves for the benefit of the Decedent's estate a right of action the decedent had before death". *Lewis v. Lewis.* 708 A. 2d 249, 252 (D.C. 1998). Unlike a wrongful death claim which inures to the benefit of designated statutory beneficiaries, a Survival Act Claim, although brought by the legal representative of the decedent's estate, has a different ultimate result i.e., "all proceeds recovered by the representative pass to the decedent's estate. Id. As assets of the estate the proceeds of the survival action recovery would be subject to distribution in accordance with the decedent's will or the laws of intestacy." Id.

The record demonstrates that the Decedent died intestate in Israel. *See* Findings, ¶ 4 , p. 3, <u>supra</u>. Upon his death, his mother Esther was named Executor of his estate and the inheritance order named his two living parents as his lawful heirs. *See*, Plaintiffs Exhibit No. 2. This is consistent with Israeli law on descent and distribution which provides that in the event of intestate succession the legal heirs are "(1) spouse of the deceased, (2) children and their descendants and parents of deceased and their descendants." *Knox v. Palestine Liberation Organization*, 442 F. Supp. 2d 62, 74 (S.D.N.Y.), quoting *Ungar v. Palestinian Authority*, 304 F. Supp. 2d. 232, 261 (D.R.I., 2004).

Unlike the District of Columbia's Wrongful Death Act, the District's Survival Act contains no express limitation on where the decedent's underlying injury, before his death, has to occur. Therefore, the Decedent, who was at all relevant times (i.e., from the kidnapping through his  subsequent murder) a United States citizen, could have sued the Defendants during his lifetime  in this Court under the jurisdictional grant of 28 U.S.C. § 1605(a)(7). His tort claims for kidnapping, assault and battery would have been governed by the District of Columbia law. *See, Bodoff supra* and *Haim supra.* The District of Columbia's Survival Act merely passes on Decedent's  claims by operation of law to his mother, who as the  legal representative for Decedent's  statutory heirs, bring this action. Esther Wachsman is one of those statutory heirs. Her claims in this capacity thus can arise under District of Columbia law.

As legal representative of the Israeli heirs, Plaintiff Esther Wachsman is entitled to a Survival Act damages award for all coguzable injuries and damages suffered by the Decedent up to the moment of his death. The measuring yardstick of such Survival Act recovery is discussed hereafter, in thethe Damages section.

**IV.**     **DAMAGES**

**Compensatory Damages**

It is a tragic fact that since the enactment of § 1605(a)(7), this District has served as the venue for scores of actions brought by Plaintiffs who are the survivors of U.S. and non-U.S. nationals killed in heinous terrorist attacks. These attacks have ranged from suicide bombings involving civilians, to vehicular bombings of United States embassies and military facilities, to U.S. servicemen and civilians being killed during the course of the hijacking of an airplane. The events at issue in this action are sadly only another episode in this gruesome saga of devastated or significantly damaged lives of victims of international terrorism. Every Plaintiff here is a United States citizen for whose protection Congress enacted § 1605(a)(7) by vesting United States courts with subject matter jurisdiction over claims brought by such aggrieved United States citizens.

Due to the multiplicity of such cases in this District, this Court is by no means writing on a proverbial "clean slate" in fashioning a damages remedy for each Plaintiff. To the contrary, this Court is guided by remedial approaches and formulas, utilized in similar cases for different types of injuries. For example, generally in IIED cases, courts in the District of Columbia have generally awarded damages of $2.5 million to each sibling of a terrorism caused fatality and $5 million to each surviving parent. *Eisenfeld v. Islamic Republic of Iran*, 172 F. Supp. 2d 1, 8 (D.D.C. 2000). Spouses of deceased victims generally receive more than siblings and parents, generally in the $8 million to $12 million dollar range. *Heiser,* 466 F. Supp. 2d at 293; *Kerr v. Islamic Republic of Iran,* 245 F. Supp. 2d 59, 64 (D.D.C. 2003) (award of $10 million to the widow of a torture and hostage taking victim.

### A.      Individual IIED Damage Awards

Based upon the wealth of cases involving immediate family members of civilians and service personnel killed in terrorist attacks, this Court awards IIED damages of $2.5 million to each of the six Siblings and $5 million to Esther Wachsman in her individual capacity as the mother of the Decedent.

### B.      Wrongful Death Damages Award

Israel's Supreme Court held in *Estate of the late Michael Ettinger,* CC 4/95 (decided on March 15, 2004) that in an Israeli wrongful death action, the estate is entitled to compensatory damages for the loss of his earning capacity in the "last years" which his death caused. *See,* a copy of <u>Ettinger</u> is attached hereto as Exhibit 13.  Here, Plaintiffs have submitted a report from forensic expert Dov Weinstein ("Weinstein Report").  The Weinstein Report bases its calculations on reasonable and well founded assumptions about the likely career track of the Decedent had he survived. *Id.*, Exhibit 11.  It utilizes the  legally required  present value calculation of Decedent's anticipated future earnings.  Accordingly, based upon this forensic evidence, judgment for so-called "loss of accretions" to Decedent's estate is awarded in the sum of $3,040,289.00, in the name of Esther Wachsman, for her ultimate benefit.

### C.     Survival Act Damages

It is well established that individuals who experience pain and suffering at the hands of terrorists and their later die as the result of the terrorist act are entitled to recover for that pain and suffering. <u>*Peterson,*</u> 2007 U.S. Dist. LEXIS 6582 at * 2; *Heiser,* 466 F. Supp. 2d at 1-356 (D.D.C. 2006). It is further well established that the trier of fact has broad discretion in calculating damages for pain and suffering. <u>*Taylor v. Washington Terminal Co.,*</u> 409 F. 2d 145

(D.C. Cir. 1969), *cert denied*. 396 U.S. 835 (1969); *Flatow v. Islamic Republic of Iran*, 999 F.

Supp. at 28.

In an effort to maintain some consistency in the amount of such awards, judges of this

court have set out to a general formula taking into consideration such factors as the length of

time the individual survived the severity of the injuries.  *See*, *e.g.*, *Heiser*, 466 F. Supp. 2d at

271-356.

In most of these cases, the facts involved terrorist bombings where individuals were

seriously injured lived for a period of time, and then  died.  In *Peterson*, which involved the 1983

bombing of the Marine barracks in Beirut, Lebanon, the court dealt with injured individuals who

survived anywhere from a few minutes to up to eight (8) days after the bomb blast.  For injured

individuals who suffered for fifteen (15) minutes or less, the Court generally awarded the estate

$500,000.  *Id*. at 29, 30-31. *Accord, Heiser,* 466 F. Supp. 2d at 338.  However, in *Eisenfeld,* 172

F. Supp. 2d at 8, an award of $1 million dollars was given to a bombing victim who survived for

several minutes before dying.

Where a victim endured extreme pain and suffering for up to six (6) hours or less, the

courts have generally awarded One Million Dollars ($1 million) to that person's estate.

*Peterson*, at 29-30, *accord*, *Haim*, 425 F. Supp. 2d at 71-72; *Flatow,* 999 F. Supp. at 28-24.  ($1

million awarded for three to five hours of pain and suffering).  Where individuals suffered pain

for seven (7) days and close to eight (8) days, courts have awarded $7 million and $7.5 million

respectively.  *Peterson* at 29-30.

In the instant matter, there was no massive bombing which caused the injuries to

Decedent which shortly thereafter resulted in his death.  Rather Nachshon Wachsman was

physically beaten at the time of his abduction and at some point bitten multiple times by his

captors and burned on his abdomen and thigh.  He was shackled hand and foot throughout his six

(6) days of captivity, and was obviously fully conscious and aware that he was about to be shot

and killed by his captors when the rescue attempt began. It is not known how many times

Nachshon was shot  before he actually died.

This case is in many respects closer to several cases that occurred in Lebanon where

Hezbollah terrorists captured individuals, held them for a period of time and then caused their

deaths.  In *Higgins v. Islamic Republic of Iran*, 2000 WL 336743112000, U.S. Dist. Lexis 22173

(D.D.C. Sept. 21, 2000), Col. Higgins was captured, held for 529 days, tortured while  in

captivity and then murdered.  There, the Court awarded Thirty Million Dollars ($30,000.000) for

his pain and suffering and murder, most of which appears attributable to his mistreatment and

murder.  An apt comparison is with David Jacobsen, who was held for the same period of time

and also mistreated while in captivity, but who survived, was awarded approximately Six Million

Dollars ($6 million) for his captivity, and mistreatment.  *Ciccipio v. Islamic Republic of Iran*, 18

F. Supp. 2d 62, 70 (D.D.C. 1998).  While Corporal Wachsman was not held for as long as Col.

Higgins, and his mistreatment not as severe, Higgins nonetheless demonstrates that pain and

suffering experienced by hostages prior to their murder should be amply  compensated.

In *Surrette v. Islamic Republic of Iran*, 231 F. Supp. 2d 260 (D.D.C. 2002),  CIA agent

William Buckley was abducted in Lebanon held in captivity for fourteen (14) months until he

died from severe illness that went untreated.  In considering an award for his ante-morten pain

and suffering, and specifically for enduring his final moments alone physically and

psychologically, the court awarded Buckley's estate an additional $1 million.  *Id. at 268-269.*

A case which is probably most similar factually is *Stethem v. Islamic Republic of Iran,*

201 F. Supp. 2d at 78.  In *Stethem*, the decedent, a U.S. Navy petty officer, was taken hostage

during a 1985 airline flight from Athens, Greece.  He was bound and beaten over a fifteen (15) hour period for which the Court awarded Five Hundred Thousand Dollars ($500,000.00 dollars). Id. at 89. The Court awarded an additional One Million Dollars ($1 Million Dollars) for his final several minutes of anguish and pain while he anticipated certain death and the pain of being shot. Id. Stethem had been selected by the terrorist to be executed and was escorted to the door of the plane and show in the head. Id.

While no two cases are alike, Wachsman had to know for the six (6) days of his captivity that his death was highly likely.  It was well known that ther kidnapped Israeli soldiers had been found shot and murdered.  When the noise from the rescue attempt started and he was alone with his kidnappers, he had to have known that he was about to die.

Taking into consideration these prior bombing cases and the kidnapping cases, the Court concludes that the Decedent's estate is entitled to Two Million Dollars ($2 million dollars) for his pain and suffering during the six (6) days of confinement and for the pain and anguish which he suffered immediately prior to and during the time that he was shot.

### D.   Punitive Damages

Punitive damages are no longer awardable against Iran and MOIS by virtue of 28 U.S.C. § 1606.  See, e.g., Bodoff, 424 F. Supp. 2d at 88, n.5.; Prevatt, 421 F. Supp. 2d at 162; Salazar, 370 F. Supp. 2d at 116; Campuzano, 281 F. Supp. 2d at 277; Dammarell v. Islamic Republic of Iran, 281 F. Supp. 2d 105, 200-202 (D.D.C. 2003) ("Dammarell I").

### E.   Prejudgment Interest

It is axiomatic that when a complaint filed after Cicippio-Puleo presents state law causes of action, the issue of whether any Plaintiff may recover prejudgment interest is one of state law. Under District of Columbia law, the decision whether to award prejudgment interest even in

cases where there is no underlying contractual relationship rests in the discretion of the trial court.  *See, e.g., House of Wines, Inc. v. Sumter,* 510 A.2d 492, 499 (D.C. 1986)*; Blake Const. Co., Inc. v. C.J. Coakley Co., Inc.,* 431 A.2d 569, 580 (D.C. 1981)*.*  The rate of interest and date from which it runs are also within the sound discretion of the trial court.  *Id.*  The allowance of prejudgment interest is compensatory in nature.  *See Suiter v. Mitchell Motor Coach Sales Inc.,* 151 F.3d 1275, 1289 (10th Cir. 1998).  It this goal by compensating a plaintiff "for being deprived of the monetary value of his [or her] loss from the time of the loss  to the payment of [the] judgment."  *Id.* at 1288; *see also Paper Converting Mach. Co. v. Magna Graphics Corp.* 745 F.2d 11, 23 (Fed. Cir. 1984).  In *Osterneck v. Ernst & Whinney,* 489 U.S. 169 (1989) the Supreme Court opined that prejudgment interest has been traditionally considered part of the compensator award to the Plaintiff.  *Id.* at 175.  District of Columbia law also clearly affords the trier of facts the ability to award prejudgment interest where it is necessary to compensate the Plaintiff.  *House of Wines*, 510 A.2d at 499.  *Compare, Ungar, Ex. Rel Strachman v. Palestinian Authority,* 304 F.Supp.2d 232, 237-240 (D.R.I. 2004) (prejudgment interest disallowed as a matter of  federal law in suit asserting  federal claims brought under the Anti-Terrorism Act of 1990 which provides for treble damages).

An award of prejudgment interest is also appropriate where, as here, punitive damages are as a mater of law unavailable to Plaintiffs.  Nor are the Plaintiffs here entitled to any treble or multiple damages.  *Compare Ungar,* 304 F.Supp.2d at 239-40.  Unlike punitive damages and treble damages which are intended to punish and thus deter, prejudgment interest is purely compensatory in nature.  Moreover, the non-availability of punitive and multiple damages to the Plaintiffs eliminates the situation presented in *Ungar* where superimposing prejudgment interest, in light of the available statutory treble damages, would have overcompensated plaintiffs there to

32

the point of giving them an underserved windfall.  No such situation exists here.  Indeed, here an award of prejudgment interest is necessary to compensate Plaintiffs, as the following discussion will point out.

The application of these principles convinces the Court to exercise its discretion to award prejudgment interest computed on a simple interest basis at a six (6)  rate per annum which is eminently reasonable.  *See Blake Construction*, 431 A.2d at 580.  The rationale for compensating all of the Plaintiffs here is compelling in that (i) more than  (13) years will have elapsed from the time of the kidnapping and murder of Decedent through the date this Court renders final judgment, and (ii) Plaintiffs' purchasing power had they been compensated in 1994 with 1994 dollars would have been significantly greater than their much diminished purchasing power using the cheaper dollars as of the date of judgment, let alone further diminution or devaluation by the time a final judgment satisfied in whole or in part.  This significant economic erosion most notably for Esther Wachsman and the six Siblings of Decedent amply justifies an award of prejudgment interest at 6% per annum beginning from the Decedent's death (October 14, 1994) until the entry of final judgment herein.

### F.   Other Causes of Action Asserted in the Complaint

In light of these Findings of Fact and Conclusions of Law, it is not necessary for the Court to address the other causes of action asserted by the Plaintiffs in the Amended Complaint under Israeli law namely Counts V though VII.

## CONCLUSION

A judgment in accordance with these findings and conclusions shall issue with this memorandum opinion awarding $2,500,000 to each of the brothers of Nachson Wachsman, the

Siblings, and $5,000,000 to Esther Wachsman for Intentional Infliction of Emotional Distress. 2007.

Under the Wrongful Death cause of action, an award of $3,040,289 in lost accretions shall be awarded.  Under the Survival Act claim, an award of $2,000,000 shall be awarded to the statutory heirs for Nachson Wachsman's pre-death pain and suffering.

We regret that the Court enter findings and conclusions with these proposed findings award the amounts suggested herein.


Dated:  November 30, 2007                    Respectfully submitted,


                                     _____/s/_____
                                     Emil Hirsch (D.C. Bar #903479)
                                     Paul L. Knight (D.C. Bar #911594)
                                     O'Connor & Hannan, LLP
                                     1666 K Street, NW, Suite 500
                                     Washington, DC  20036
                                     Telephone:  (202) 887-1400
                                     Facsimile:  (202) 466-3215

                                     *Attorneys for Plaintiffs*


151717_1.DOC