# PLAINTIFFS' EXHIBITS
# 8(a) - (b)

13

צ ב א ה ג נ ה ל י ש ר א ל

בבית המשפט הצבאי בלוד
בפני הרכב

תיק במל"ד 100/94
תיק פ.א. 15263/94 ת. הבירה
ת. פ"ת 8261/94
ת. רמאללה 5233/94

מתאים למקור

ב ע נ י ן

מדינת ישראל (ע"י התובע הצבאי)

המאשימה

כתב אישום זה הגיע למזכירות ביהמ"ש הצבאי במושבו לוד ביום 28/11/94
נרשם ביומן ביהמ"ש בתיק מס בש / לד 100/94
החתימה

נ ג ד

ג'יהאד מחמד שאכר יע'מור,
ת.ז. 80728868, יליד 15/7/1967, מבית חנינה, ירושלים
(במעצר מיום 14/10/1994)

הנאשם

## כ ת ב א י ש ו ם

הנאשם הנ"ל מואשם בזה בביצוע העבירות הבאות:

פרט אישום ראשון מוגדר דפעילות כחבר

מהות העבירה: חברות ופעילות בהתאחדות בלתי מותרת, עבירה לפי תקנה 85 (1) (א) לתקנות ההגנה (שעת חירום) 1945.

פרטי העבירה: הנאשם הנ"ל, מתחילת אוקטובר 1994 ועד ליום מעצרו, פעל כחבר בהתארגנות בלתי מותרת, משמע:

א. 1. ביום שלישי, בתאריך 5/10/94 או בתאריך סמוך לכך, עת נסע הנאשם לבנק הפועלים שברח' אלזהרה בירושלים על מנת להפקיד שם כסף לחשבונו, הגיעו אל בנק הפועלים שני אנשים במכונית וולוו אדומה.

5479 trn

12

2. מבין השניים ניגש אל הנאשם בחור, אשר כינה עצמו "סמי", בעוד שהשני, אשר מאוחר יותר הסתבר לנאשם, כי שמו הוא זכרייא נג'יב (המכונה "אבו עבדאללה") נשאר ליד הרכב הנ"ל.

סמי הסביר לנאשם, כי נשלח אליו ע"פ בקשתו של חסן תייסיר נטשה, ועל מנת לאשש את דבריו ציין סמי עובדה אודות הנאשם עצמו, אשר היתה ידועה לחסן בלבד; לאחר ציונה של העובדה הנ"ל השתכנע הנאשם, כי סמי אכן נשלח אליו במצוותו של חסן נטשה.

3. הנאשם שאל את סמי מדוע שלח אותו חסן אליו, וסמי הסביר לנאשם, כי חסן מעוניין לראותו.

4. הנאשם הסכים להתלוות אל זכרייא ואל סמי ונסע יחד עימם לשכם, למסגד רפידייה, שם התפלל הנאשם יחד עם השניים את תפילת הצהריים.

ב. 5. לאחר מכן השאיר זכרייא את מכוניתו במסגד בשכם, ויחד עם הנאשם נתלווה זכריא אל אדם אחר - צלאח א-דין נור א-דין רדא דראוזה, אשר כינה עצמו "אבו נור" - אשר לקח אותם למסגד אחר בג'בל-אלשימאלי, שם נפגשו הנאשם וזכרייא עם חסן תייסיר נטשה ועם צאלח סאלם חסן ג'דאללה העזתי, המכונה "אבו מחמד".

6. הנאשם למד מפי "אבו מחמד" ומפי חסן נטשה, כי השניים הפכו להיות מבוקשים ע"י כוחות הביטחון בגין היתקלותם לא מכבר עם כוחות משטרה ליד מוזיאון רוקפלר.

השניים הוסיפו, כי במהלך התקרית הנ"ל נורו יריות לעבר השוטרים וכן כי חסן נטשה נפגע ברגלו ובראשו.

כמו כן סופר לנאשם, כי לאחר מכן נמלטו חסן תייסיר נטשה וע/כרים בדר (מבוקש נוסף) ליריחו בסיועו של עיארב עבאדין (מבוקש נוסף שנהרג סמוך לאחר תקרית הירי ליד מוזיאון רוקפלר).

השניים המשיכו וסיפרו לנאשם, כי חסן וע/כרים שהו ביריחו כחודש ימים עד אשר עברו לשכם, שם נפגשו עם "אבו מחמד", שהגיע מעזה.

לנאשם הובהר ע"י השניים, כי פעילות זו וכן הפעילות העתידית אותה הם מתכוננים לבצע בסיועו של הנאשם הינה במסגרת החמאס ובמסגרת הזרוע הצבאית שלו, משמע גדודי עז-א-דין-אלקסאם.

...ק מתאים למקור
...

במהלך הפגישה אף הבחין הנאשם בכך כי בידי חסן מצויים אקדח שחור ומחסנית.

.7 חסן ו"אבו מחמד" המשיכו וסיפרו לנאשם ולזכרייא, כי הם מתעתדים בקרוב לחטוף חייל ישראלי במסגרת פיגוע-מיקוח, ולשם כך הם זקוקים לבית מסתור באיזור ירושלים וכן למכונית, בה ייסעו עת יבצעו את החטיפה.
הנאשם וזכרייא הסכימו לסייע לשניים להוציא את תכניתם לפועל.

.8 אבו מחמד הטיל על הנאשם לדאוג לשכירתה של מכונית, והדריך את הנאשם לשכור מכונית גדולה (טרנזיט, טרנספורטר או GMC) בעלת לוחיות זיהוי צהובות.
לשם כך נתן אבו מחמד לנאשם 1200 דולר.

.9 במעשיו אלו פעל הנאשם כחבר בהתאחדות בלתי מותרת.

הודאה

<u>פרט אישום שני</u>

<u>מהות העבירה:</u> מתן מקלט, עבירה לפי תקנה 64 לתקנות ההגנה (שעת חירום) .1945

<u>פרטי העבירה:</u> הנאשם הנ"ל, בתאריך 7/10/1994 או בתאריך סמוך לכך, נתן מקלט לאחרים, אשר פגעו בשלום הציבור ובסדר הציבורי, משמע:

א. .1 בתום הפגישה הנזכרת מעלה בפרט האישום הראשון עם חסן ואבו מחמד חזרו הנאשם וזכרייא אל ירושלים במכוניתו של זכרייא, שהוחנתה כאמור מעלה במסגד ברפידייה.
בדרך לשם העלה זכרייא בפני הנאשם את האפשרות להשתמש בביתו של אחיינו, זיאד נג'יב (המכונה "אבו עלא"), בית המצוי בכפר ביר נבאללה.
השניים אף עברו דרך הבית בדרכם חזרה לירושלים כדי לסוקרו.

.2 הרעיון נשא חן בעיני הנאשם, והשניים סיכמו טלפונית, כי זכרייא יעביר לנאשם את המפתחות לבית שלושה ימים לאחר מכן, ביום שישי, בתאריך 7/10/94, לאחר תפילת הצהריים במסגד אל אקצה.

.3 ביום שישי, בתאריך 7/10/1994, קיבל הנאשם את מפתחות הבית בביר נבאללה מאת זכרייא נג'יב .

העתק מתאים למקור
ציון
חתימה

10

4. מייד לאחר מכן נסע הנאשם ברכבו של אחיו לשכם, שם נפגש עם חסן נטשה, אבו מחמד ו/או כרים בדר, כפי שתיאם עימם מראש טלפונית.
הנאשם הודיע לבני החבורה, כי מצא עבורם בית, בו יוכלו לשהות וכי הבית מצוי בביר נבאללה.

5. בני החבורה סיכמו ביניהם, כי הנאשם ייסע לפניהם במכוניתו של אחיו, ואילו שלושת בני החבורה ייסעו אחריו ברכב טרנספורטר לבן בעל לוחיות זיהוי כחולות בעלות הכיתוב "ש" (לוחיות זיהוי שכמיות); במכונית הטרנספורטר נהג צלאח א-דין דראוזה, שעימו נפגש הנאשם קודם לכן כאמור מעלה בפרט האישום הראשון.
הנאשם ראה, כי כל אחד מבני החבורה לקח עימו תיק כחול וכן שקית ניילון שחורה, שם הסתירו את כלי הנשק שנשאו עליהם.

ב. 6. בני החבורה נסעו בשני רכבים כאמור עד לצומת א-ראם, שם החליף הנאשם את הנהג של הטרנספורטר הלבנה, וביקש ממנו, כי ימתין לו בצומת במכונית האופל-אסקנה השייכת לאחי הנאשם.

7. מצומת א-ראם הסיע הנאשם את שלושת בני החבורה אל הבית בביר נבאללה, לשם הגיעו בסביבות השעה 18:30 בערב.
במקום המתין אחיינו של זכרייא, אשר קיבל את פניהם של השלושה ושיכן אותם בחדריהם.

8. לאחר מכן סב הנאשם על עקבותיו וחזר בטרנספורטר אל צומת א-ראם, שם החליפו הוא והנהג את הרכבים ביניהם.
הנאשם חזר לאחר מכן לביר נבאללה אל הבית, הפעם כשהוא נוהג בשנית ברכבו של אחיו.

הודה

__פרט אישום שלישי__

__מהות העבירה:__ מתן שירות להתאחדות בלתי מותרת, עבירה לפי תקנה 85 (1) (ג) לתקנות ההגנה (שעת חירום) 1945.

__פרטי העבירה:__ הנאשם הנ"ל, בתאריכים 8-9/10/1994, נתן שירות להתאחדות בלתי מותרת, משמע:

א. 1. לאחר האירועים המתוארים מעלה חזר הנאשם כאמור אל הבית בביר נבאללה, שם שוחח עם שלושת בני החבורה האחרים.

העתק מתאים למקור

9

2. בשיחתם זו האיצו שלושת בני החבורה בנאשם לשכור רכב גדול בעל לוחיות זיהוי צהובות, כפי שנדברו קודם לכן.
הנאשם הסביר לבני החבורה, כי כיוון שהיום למחרת הינו שבת כל משרדי השכרת הרכב בירושלים יהיו סגורים, אולם הנאשם הבטיח לבני החבורה לדאוג לעניין זה ביום ראשון בשעות הבוקר.

3. כמו כן סיכמו בני החבורה ביניהם, כי במהלך החטיפה יתחזו ליהודים דתיים, וזאת על מנת שחייל ישראלי יתפתה לעלות לרכבם ביתר קלות.
לצורך כך סיכמו בני החבורה ביניהם כי הנאשם יקנה אף כיפות.
בתום הפגישה הנ"ל שב הנאשם לביתו.

ב. 4. למחרת, ביום שבת בתאריך 8/10/94, נסע הנאשם לעיר העתיקה, שם רכש באחת החנויות ארבע כיפות קטנות סרוגות וכן שני כובעים שחורים (כדוגמת אלו של הדתיים החרדים), תמורתם שילם 100 ש"ח.
כמו כן רכש הנאשם שלשלאות ברזל ומנעולים.

5. ביום שבת בשעות הלילה נסע הנאשם אל ביר נבאללה ומסר את הפריטים שנרכשו על ידו לשלושת בני החבורה - אבו מחמד, ע/כרים בדר וחסן נטשה.

6. עת שהה במחיצתם התעניין הנאשם באם הם זקוקים לדבר מה נוסף.
תשובתם היתה שלילית, אולם הם הזכירו לנאשם את הבטחתו לדאוג לשכירתו של הרכב כבר למחרת היום, והנאשם שב והבטיח להם, כי אכן יעשה כך וידאג לשכור רכב גדול.

ג. 7. ביום ראשון, בתאריך 9/10/1994, בשעה 14:00 לערך, שכר הנאשם מחברת "שאקו לנד" בירושלים רכב טרנספורטר בצבע בורדו, מס' רישוי 2491358.

8. הנאשם השאיר פיקדון בסך 1000 דולרים במזומן, והבטיח להחזיר את הרכב תוך ימים ספורים.



8

מודים בנשיאת אקדח נ.ל.ל. ידע להמעילן
נ.ל. החזיק קיחות כלי הנשק

**פרט אישום רביעי**

**מהות העבירה:** נשיאת נשק, עבירה לפי תקנה 58 (ג) לתקנות ההגנה (שעת חירום) 1945.
חיזוק ידיהם של מי שנושאים נשק, עבירה לפי תקנות 58 (ג) ו - 66 לתקנות ההגנה (שעת חירום) 1945.

**פרטי העבירה:** הנאשם הנ"ל, בתאריך 9/10/1994, נשא על גופו נשק בלא היתר ממפקד צבאי או מטעמו וכן חיזק את ידיהם של אחרים, הנושאים נשק בלא היתר מהמפקד הצבאי או מטעמו, משמע:

א. 1. לאחר ששכר הנאשם את הרכב כמתואר בפרט האישום דלעיל, מילא הנאשם את מיכל הדלק בבנזין ונסע לביר נבאללה על מנת לאסוף את שאר בני החבורה - ע/כרים בדר, אבו מחמד וחסן נטשה.

2. הנאשם ראה, כי חסן נטשה לוקח עימו רובה גליל ואקדח, ע/כרים בדר לוקח עימו רובה מסוג עוזי ואבו מחמד לוקח עימו אקדח, אזיקים, שרשראות ברזל, מנעולים ושקיות ניילון בצבע שחור.

3. הנאשם עצמו נשא על גופו אקדח שחור, שניתן לו ע"י חסן נטשה.
טרם שנתן חסן את האקדח לנאשם, אמר הנאשם לחסן, כי אינו יודע כיצד מתפעלים את האקדח; חסן הראה לנאשם על אתר כיצד יש לעשות זאת, והסביר לו את אופן השימוש והירי באקדח.

4. כמו כן לקחו עימם בני החבורה מחסניות וכדורים לכלי הנשק שהיו איתם.

5. הנאשם, ששם את אחת הכיפות שקנה על ראשו, שימש כנהג הטרנספורטר; ליד הנאשם ישב ע/כרים בדר, אשר חבש את אחת המגבעות השחורות על ראשו; מאחורי הנאשם ישב אבו מחמד, אשר שם על ראשו מגבעת שחורה; חסן נטשה ישב מאחורי ע/כרים בדר, כשהוא חבוש בכיפה.
את כלי הנשק לקחו עימם הסתירו בני החבורה בבגדיהם; הנאשם חגר את האקדח הנ"ל על מותנו.

ב. 6. בני החבורה נסעו מביר נבאללה אל כביש ירושלים-ת"א, משם המשיכו לכיוון מחלף בן גוריון, ושם פנו לכיוון פתח תקווה.

העתק מתאים למקור
סלמנודה ... ציון ... עורך דין לערעורים



הואיל ובמקום היה פקק תנועה, חזר הנאשם על עקבותיו והחל נוסע לכיוון תל אביב.

7. כעבור זמן מה שוב חזר הנאשם על עקבותיו ונסע לכיוון שדה התעופה בן גוריון; בכביש יהוד - בן גוריון ראו בני החבורה מכונית סובארו אפורה המורידה חייל לשולי הכביש וממשיכה בנסיעתה לכיוון האיזור המסחרי של יהוד.
הנאשם צפה בחייל, וראה כי הוא נעמד בתחנת האוטובוס ומושיט את ידו בבקשו טרמפ.

8. החייל בו הבחינו בני החבורה היה נחשון וקסמן ז"ל (להלן "המנוח"), אשר תכנן להגיע ביום זה לבסיס ברמלה, בו שירתה ידידתו.
המנוח היה חבוש כיפה סרוגה, לבוש מדי א צה"ליים בצבע זית, על כתפו היתה כומתת גולני חומה וכן היה ברשותו רובה M-16 ומחסנית.
כמו כן היו ברשותו מספר בגדים אזרחיים להחלפה, הואיל ובלילה הקודם לן מחוץ לביתו בביתו של ידיד.

9. בני החבורה עצרו את הרכב ליד המנוח, והנאשם שאל אותו בעברית "לאן?"; המנוח השיב, כי פניו מועדות לכיוון רמלה. הנאשם השיב למנוח "תעלה", והמנוח התיישב לימינו של חסן נטשה, דהיינו בין הדלת האחורית לבין חסן נטשה.

10. כעבור מספר דקות שאל המנוח את חסן נטשה מהיכן הוא, אולם חסן נטשה לא השיב; כעבור דקות מעטות, משהגיעו לאיזור שדה התעופה וסמוך לכביש ת"א-ירושלים, כרך חסן נטשה את זרועו סביב צווארו של המנוח והוריד אותו לתנוחת ישיבה אל רצפת הרכב.

12. המנוח ניסה להתנגד ואף ניסה להכניס את המחסנית שהיתה ברשותו אל תוך הרובה M-16, אולם בשלב זה התנפל עליו ע/כרים בדר וחטף ממנו את נשקו והרחיק אותו.
כדי להפסיק את התנגדותו של המנוח היכה ע/כרים בדר את המנוח מספר פעמים בראשו בקת הרובה.

13. חסן נטשה ואבו מחמד כבלו את ידיו של המנוח באזיקים ממתכת, כבלו את רגליו בשלשלאות ברזל אותם סגרו במנעולים, כיסו את עיניו בבד שחור ושמו על ראשו שקית ניילון שחורה, בהשאירם פתח לנשימה.
המנוח הוטל על רצפת הרכב, כשאבו מחמד וחסן נטשה ממשיכים להכותו.
כל אותו זמן המשיך הנאשם בנהיגה לכיוון ביר נבאללה.

העתק מתאים למקור
חתימה
2317476

12. בני החבורה נסעו לבית המסתור בביר נבאללה, שם הוריד הנאשם את שלושת בני החבורה.
הנאשם סייע להם להעביר את המנוח, כשהוא כבול וקשור עדיין ועיניו מכוסות, לתוך אחד מחדרי השינה בבית.
בבית עצמו הוכן מבעוד מועד מזון וכן היו מכשירי רדיו וטלוויזייה.

13. לאחר מכן חזר הנאשם עם הרכב השכור והחנה אותו בחניון בתשלום בירושלים על מנת שלבני משפחתו לא ייודע דבר אודות כך ששכר רכב.

מוזה

<u>פרט אישום חמישי</u>

<u>מהות העבירה:</u> מתן שירות להתאחדות בלתי מותרת, עבירה לפי תקנה 85 (1) (ג) לתקנות ההגנה (שעת חירום) 1945.

<u>פרטי העבירה:</u> הנאשם הנ"ל, בתאריך 9/10/1994, נתן שירות להתאחדות בלתי מותרת, משמע:

1. לאחר שהחנה הנאשם את הטרנספורטר בחניון בתשלום ברח' סלאח א-דין בירושלים כאמור בפרט האישום דלעיל, ניגש הנאשם לרמזי סלהב, ממנו שכר מצלמת וידיאו ל - 24 שעות תמורת 150 ש"ח, כשהוא מסביר לרמזי, כי המצלמה נחוצה לו לצילום חתונת אחות חברו.
כמו כן קנה הנאשם שתי קלטות וידיאו ריקות בנות 180 דקות האחת.

2. מצוייד במצלמת הווידיאו ובקלטות שב הנאשם לביר נבאללה.
הנאשם דיבר עם המנוח בעברית, ולמד לדעת כי שמו הוא נחשון וקסמן, וכי הוא מתגורר בשכונת רמות בירושלים.
המנוח סיפר לנאשם, כי הוא משרת בגולני וכי קודם שירת בדרום לבנון כשלושה חודשים.
המנוח הסביר את נסיעתו לרמלה בכך שהוא נסע לבקר שם ידידה המשרתת בסביבה.
הנאשם אמר למנוח, כי מטרת חטיפתו הינה פיגוע-מיקוח וכי הינם מעוניינים להחליף אותו בעצורים פלסטיניים.
הנאשם שוחח עם המנוח בעברית, והסביר לו כי חטיפתו מיועדת לשחרור אסירים פלסטיניים; הנאשם אמר למנוח, מהם הדברים עליו לומר מול המצלמה.



5

3. "אבו מחמד" הוא שמסר את ההודעה בערבית,כשהוא רעול פנים. בדבריו אמר "אבו מחמד", כי החייל הישראלי נחטף ע"י גדודי עז-א-דין-אלקסאם וכי הינם דורשים את שחרורם של:
   (1) השיח' אחמד יאסין וכן פעיל בכיר נוסף בארגון החמאס;
   (2) שיח' עוביד;
   (3) מוצטפא דיראני;
   (4) מאות אסירים נוספים מארגון החמאס ומארגוני טרור אחרים השפוטים אף הם למאסרים כבדים או למאסר/י עולם.
4. "אבו מחמד" הבהיר בדבריו מול המצלמה, כי החייל הישראלי ישוחרר אם ורק אם בקשתם של החוטפים תיענה.
5. אבו מחמד אף הציג מספר שאלות בעברית, עליהן חוייב המנוח לענות.
   הנאשם ישב כל אותה עת מול המנוח, וסייע לאבו מחמד בניסוח חלק מהשאלות ותרגומן לעברית.

מודה

**<u>פרט אישום שישי</u>**

**<u>מהות העבירה:</u>** מתן שירות להתאחדות בלתי מותרת, עבירה לפי תקנה 85 (1) (ג) לתקנות ההגנה (שעת חירום) 1945.

**<u>פרטי העבירה:</u>** הנאשם הנ"ל, בתאריך 10/10/94, נתן שירות להתאחדות בלתי מותרת, משמע:

1. מייד לאחר תום הקלטת המסר הנ"ל, כתב אבו מחמד איגרת בה פירט את מהלך החטיפה.
   את האיגרת צירף לקלטת הווידיאו וכן צירף לכך את תעודת זהותו של המנוח.
2. הנאשם נתבקש להעביר את הקלטת וצרופותיה אל אדם המכונה "אבו עלי" והמתגורר בשכונת ירמוק בעזה, סמוך למפעל הבלוקים.
   אבו מחמד צייד את הנאשם אף במספר הטלפון של אותו אבו עלי, והסביר לו, כי משם תועבר הקלטת אל אחר, המכונה "אבו חאלד" ואשר הינו אחד מהאחראים בגדודי עז-א-דין-אלקסאם, ואשר אמור לנהל את המשא ומתן לשחרורם של העצורים הפלסטיניים.

העתק מתאים למקור



3. למחרת היום, ביום שני ה - 10/10/94, נסע הנאשם ברכב השכור לעזה ומסר את הקלטת וצרופותיה לאבו עלי.
הנאשם סיכם עם אבו עלי הנ"ל כי ייצור עימו קשר בשנית בשעה 21:00 על מנת לוודא, כי הקלטת אכן הגיעה לידי אבו חאלד.

4. בעת שהותו של הנאשם בעזה, סיכמו ביניהם הוא ו"אבו עלי" הנ"ל מילות קוד מוסכמות להמשך הפעלתם של בני החוליה מעזה: השניים סיכמו, כי אם יאמר אבו עלי את המילים "חיסמת סומסנמיה" המשמעות תהא להמתין, ואם יאמר, לעומת זאת, אבו עלי "חיסמת פולייה" המשמעות תהא כי המשא ומתן עם ממשלת ישראל נכשל, ועל בני החבורה - ובכללם הנאשם - לרצוח את המנוח.

5. הנאשם שוחח עם אבו עלי בערב כפי שסוכם, ואבו עלי ביקש מהנאשם להגיע למחרת לעזה לקבלת הנחיות אותן לא ניתן להעביר בטלפון.
הנאשם הסביר לאבו עלי, כי לא יוכל להגיע למחרת, וסיכם עימו כי יגיע לעזה בימים הקרובים.

6. ביום רביעי, ה - 12/10/94, נסע הנאשם לביר נבאללה ודיווח לבני החבורה האחרים, כי הקלטת הועברה לעזה; כן הודיע הנאשם לבני החבורה את מילות הקוד עליהן הסכים עם אבו עלי הנ"ל.
הנאשם התעתד לחזור לעזה ביום שישי, ה - 14/10/1994, אולם נעצר קודם לכן.
הנאשם קיים קשר טלפוני רצוף עם אבו עלי בעזה מיום ביקורו שם ועד ליום מעצרו; הקשר הנ"ל נתקיים מטלפונים ציבוריים, הואיל ובבית בביר נבאללה אין מכשיר טלפון.

7. על סמך הקלטת שהעביר הנאשם לעזה צולמה קלטת נוספת, בה הובהר, כי החייל הישראלי עתיד להירצח אם לא ימולאו דרישות החוטפים עד ליום שישי, ה - 14/10/94, בשעה 21:00.

<u>פרט אישום שביעי</u> כפירה

אין מחלוקת לגבי מות החייל
הטענה שמותו של וקסמן נגרם דגל וכו'

<u>מהות העבירה:</u> חיזוק ידיהם של מי שיורים לעבר אדם, עבירה לפי תקנות 58 (א) ו - 66 לתקנות ההגנה (שעת חירום) 1945.

<u>פרטי העבירה:</u> הנאשם הנ"ל, בתאריך 14/10/1994, חיזק ידיהם של אחרים היורים לעבר בני אדם וזאת מתוך כוונה לגרום מוות לאחרים, משמע:

אין ידיעה מה גרם למותו

העתק מתאים למקור

3

1. לאחר מעצרו של הנאשם ולאחר שנודע היכן מוחזק המנוח, ביצעה יחידה מובחרת של צבא הגנה לישראל בערבו של יום שישי, ה - 14/10/94, פעולה צבאית שמטרתה היתה חילוצו של המנוח בשלום מהבית בו הוחזק בביר נבאללה.
2. במהלך הפעולה הגיעו המחלצים עד לחדר, בו הוחזק המנוח. שותפיו של הנאשם הנזכרים לעיל ירו במנוח מטווח קצר בראשו ובחזהו וגרמו למותו, והודיעו זאת לחיילי הכוח, אשר פרצו לתוך החדר בכוח.
3. כמו כן נהרג בפעולה כתוצאה מחילופי הירי סרן ניר פורז ז"ל ונפצעו 11 איש נוספים.
4. בתוך הבית נמצאו רובה עוזי, רובה גליל ושני אקדחים. כן נמצאו מחסניות לכלי הנשק הנ"ל ותחמושת.
5. כמו כן נמצאו בבית רובהו האישי של המנוח והמחסנית לרובה.

זינה מודזגברישווילי סגן

תובעת צבאית

העתק מתאים למקור
חתימה
ק/28317476
קצין בית הדין

2

<u>עדי התביעה</u>

1. רס"ב אבי ששון, מ.א. 29756 - מ"י - משטרת ירושלים,מפלג המיעוטים.
2. סמ"ש אבי פנחסי, מ.א. 96719 - מ"י - משטרת ירושלים,מפלג המיעוטים.
3. רפ"ק דניאל עשור, מ.א. 45514 - מ"י - מעבדה ניידת מז"פ - מטא"ר י-ם.
4. פקד עופר שלוש - מ"י - מעבדה ניידת מז"פ - מטא"ר י-ם.
5. מפקח ואיל חיזראן, מ.א. 91056 - מ"י - משטרת ירושלים,מפלג המיעוטים.
6. לילה טלואר, רח' הר צוף, 581/34 גילה ירושלים.
7. יונית מלכאי, מפקדת רמ - 2 הדסה עין כרם, טל' 414462 - 02.
8. אייל ניתאי, ע' קב"ט בי"ח הדסה עין כרם. ה.
9. אבי זיגדון, צה"ל - יחס"פ, טל' 9375555 - 03.
10. יאיר שמחון, מ.א. 5122383 - בח"א 27.
11. משה קפר, ויצמן 28/4, יהוד.
12. אריק סררו, עובד "שאקו לנד", רח' דוד המלך 18, ירושלים, טלפון 252585 - 02.
13. ברוך שאקו, עובד "שאקו לנד", רח' דוד המלך 18, ירושלים, טלפון 252585 - 02.
14. מחמד עדילה, עובד "שאקו לנד", רח' דוד המלך 18, ירושלים, טלפון 252585 - 02.
15. רמזי בדווי יחיא סלהב, ת.ז. 80626377, בית חנינה החדשה, ירושלים, טל' 859418 - 02, בעבודה טל' 836293 - 02.
16. ראמז בדווי יחיא סלהב, ת.ז. 23471683, בית חנינה החדשה, ירושלים, טל' 859418 - 02, בעבודה טל' 836293 - 02.
17. ד"ר היס, המכון לרפואה משפטית באבו כביר - חוות דעת מומחה.
18. ד"ר ק.ח. (יזומן ע"י התביעה).
19. ד"ר יואל דונחין, בי"ח הדסה ירושלים.
20. פרופ' י' בר זיו, בי"ח הדסה ירושלים.
21. ל.ל. (יזומן ע"י התביעה).
22. צ.נ. (יזומן ע"י התביעה).
23. נ.כ. (יזומן ע"י התביעה).
24. י.מ. (יזומן ע"י התביעה).
25. תעודות פטירה.
26. זכרייא לוטפי נג'יב, ת.ז. 8063194 (עצור בבמל"ד 94/ 101 )
27. צאלח א-דין נור א-דין רדא דראוזה, ת.ז. 92517613 (עצור בבית המשפט הצבאי בשכם).

28. מוצג 115\94 - ת. רמאללה - פריטיו יוצגו ע"י העדים הרלוונטיים.
29. מוצג 1047\94 - ת. הבירה - פריטיו יוצגו ע"י העדים הרלוונטיים.

ש - ג'יהאד

**Translation from Hebrew**

Israeli Defence Force

In the Law-Courts in Lod
In front of an assemble

Case of Appeal Court 100/94
Case no. 15263/94 Jerusalem station
8261/94 Petach-Tikva station
5233/94 Ramalla station

In the matter of

The state of Israel (by the Military Prosecutor)

against

Jihad Machmad Shaker Ya'amoor
ID 80728868, birth date 15/7/1967 from Beit chanina, Jerusalem
(In arrest since 14/10/1994)

Indictment

The above is hereby accused of performing the following offences:

First charge item

(1) (a) of

membership and activity in an illegal gathering, an offence by regulation 85 of the defence regulations (time emergency) 1945.

The accused above, from the beginning of October until the day of his arrest, acted as a member in an illegal gathering, as follows:

a.1. On Tuesday, on 5/10/94 or on an approximate date, as the accused was traveling to "Hapoalim" Bank on Elzahara street in Jerusalem, inorder to deposit money in his account, arrived two men at "Hapoalim" Bank in a red Volvo car.

EXHIBIT 8(b)
ALL-STATE LEGAL®

2.  Out of the two approached him a young man, which called himself "Sammy", as the second one, which later turned out to the accused to be Zecharia Nagib (also known as "Abu Abdalla") stayed by the above car. Sammy explained to the accused, that he had been sent to him by the request of Chassan Tyassir Natasha, and inorder to confirm his words Sammy pointed a fact about the accused that was only known to Chassan; after pointing out that fact the accused was convinced that Sammy was sent to him by the order of Chassan Natasha.

3.  The accused asked Sammy why Chassan sent him to him, and Sammy explained to the accused, that Chassan is interested in seeing him.

4.  The accused agreed to join Zecharia and Sammy, and traveled with them to Nablus, to the Mosque of Rafidia, where the accused prayed with the two the noon-prayer.

5.  Then, Zecharia left his car in the Mosque in Nablus, and together with the accused they were accompanied by another man - Tsalach A-Din Nur A-Din Rada Drauza, which called himself "Abu Nur" - which took them to a different Mosque in Gabel-Alshimali, where the accused and Zecharia met Chassan Tyassir Natasha and Tsalach Salem Chassan Gadalla Ha'azatti, also known as "Abu Machmad".

6.  The accused heard from "Abu Machmad" and Chassan Nastasha, that the two of them had become wanted by the Defence-Forces

because of an encounter not long ago with Police forces near the Rockfeller Museum.

The two added, that during that encounter there were gun shots fired towards the Policemen and that Chassan Natasha was heart in his leg and in his head.

Also, the accused was told, that afterwards Chassan Tyassir Natasha and Acrim Bader (another wanted criminal) escaped to Jericho with the assistance of Areb Abadin (another wanted criminal killed shortly after the encounter near the Rockfeller Museum).

The two continued and told the accused that Chassan and acrim stayed in Jericho about a month until they moved to Nablus, where they met "Abu Machmad" that arrived from Gaza.

The two made it was made clear to the accused, that that activity and the future activity which they are planning to carry out with the assistance of the accused is in the framework of the Chamass and in the framework of it's military force, meaning the regiments of Az-A-Din-Elkasam.

also, during the meeting, the accused noticed that Chassan possessed a black pistol and a gun-magazine.

7. Chassan and "Abu Machmad" continued and told the accused and Zecharia, that they intend on soon kidnapping an Israeli soldier in the framework of an exchange-terror-attack, which  for they need a hiding-house in the area of Jerusalem, and a car in which they will travel while they carry out the kidnapping.

8. Abu Machmad ordered the accused to take care of renting a car, and guided the accused to rent a big car (Transit, Transporter or GMC) with yellow number plates.
For that Abu Machmad gave the accused 1200 dollars.
9. In those actions the accused acted as a member of an illegal gathering.

Second charge item

_______________ Giving shelter, an offense by regulation 64 of the defence regulations time of emergency) 1945.

The details of the offence: The above accused, on 7/10/1994 or on a near date, gave shelter to others, which harmed the well-being of the public and the public order, meaning:

a.1. At the end of the above mentioned meeting from the first charge item with Chassan and Abu Machmad, the accused and Zecharia returned to Jerusalem in Zecharia's car that was parked, as mentioned, up in the Mosque in Rafidia.
On the way there, Zecharia brought up to the accused the possibility of using his nephew's, Ziad Nagib's (also known as "Abu Ala") house, a house situated in the village Bir Naballa.
The two even went through the house on their way back to Jerusalem, inorder to inspect it.
2. The accused liked the idea, and the two agreed on the telephone, that Zecharia would bring the keys to the accused's house, three days later, on

Friday, 7/10/94, after the noon-prayer in the El-Aktsa mosque.

3.     On Friday, 7/10/94. the accused received the keys of the house in Bir Naballa from Zecharia Nagib.

4.     Soon afterwards the accused traveled in his brother's car to Nablus, where he met up with Chassan Natasha, Abu Machmad and Acrim Badar, as he coordinated with them before, by phone.

The accused announced to the party that he found a house for them, in which they can stay, and that the house is in Bir Naballa.

5.     The party members agreed among themselves, that the accused would drive in front of them in his brother's car, and the three party members will drive behind him in a white Transporter-car with blue number-plates that are marked "Sh" (Nablus number-plates); The Transporter-car was driven by Tsalach-A-Din Drauza, which the accused had met before, as mentioned above in the first charge item.

The accused saw that each of the party members carried a blue bag and also a black nylon-bag, in which they hid the weapons that they carried on themselves.

b. 6.     The party members drove in two cars, as mentioned ,till A-Ram junction, in which the accused replaced the driver of the white Transporter, and asked him, to wait for him at the junction in the Opel-Ascona belonging to the accused's brother.

7.     From A-Ram junction, the accused drove the three party-members to the

house in Bir Naballa, to which they arrived around 18:30 in the evening. There waited Necharia's nephew, who welcomed the three and showed them to their dwellings in the rooms.

8. Then the accused returned in the Transporter to A-Ram junction, where he and the driver exchanged vehicles.

Then the accused returned to the house in Bir Naballa, this time driving his brother's car.

Third charge item

Granting service to an illegal gathering, an offence by regulation 85 (1) (c) of the defence regulations (time of emergency) 1945.

The details of the offence: The accused above, on the dates 8-9/10/1994, granted service to an illegal gathering, meaning:

a.1. After the events described above, the accused returned, as mentioned, to the house in Bir-Naballa, where he had a conversation with the three other party members.

2. In that conversation, the three party members urged the accused to hire a big car with yellow number-plates, as t they had settled before.

The accused explained to the party members that as the following day was Saturday, all the car-rental offices in Jerusalem will be closed, but the accused promised the party members to take care of the matter on Sunday in the morning hours.

3. Also, the party members agreed among themselves that during the

kidnap they would disguise themselves as religious Jews, inorder that an Israeli soldier would be easily tempted to get in their car.

For that matter the party members agreed that the accused would also buy skull-caps ( regularly worn by religious     Jews).

At the end of that meeting, the accused returned to his home.

b.4. The next day, on Saturday 8/10/94, the accused traveled to Jerusalem's old city, where he bought four small crocheted skull-caps in one of the shops, and also two black hats (as those worn by ultra-religious Jews), for which he paid 100 NIS.

The accused also bought iron chains and locks.

5.  On Saturday, at the night hours, the accused drove to Bir Naballa and delivered the bought items to the three party members - Abu Machmad, acrim Bader and Chassan Natasha.

6.  While he was with them, the accused was interested weather they needed anything else.

Their answer was negative, but they reminded the accused of his promise to take care  of renting the car the following day, and the accused repeated his promise to them, that he would actually do so and will take care of renting a big car.

c.7. On Sunday, 9/10/1994,  at about 14:00, the accused rented from the "Shacko Land" company in Jerusalem a dark-red Transporter-car, registered 2491358.

8.  the accused left a deposit of 1000 Dollars in cash, and promised to return the car in a few days.

Fourth charge item

Carrying a weapon, an offence by regulation 58 (c) of the defence regulations (time of emergency) 1945. Supporting of people holding weapons, an offence by regulations 58 (c) and 66 of the defence regulations (time of emergency) 1945.

The details of the offence: The accused above, on the 9/10/1994, carried on himself a weapon, without a permit from a military commander, and also supported others carrying weapons without a permit from the military commander or on his behalf, meaning:

a.1. After the accused hired the car described in the above charge, he filled the petrol container with gasoline and drove to Bir Naballa inorder to collect the rest of the party members - Acrim Bader, Abu Machmad and Chassa Natasha.

2. The accused saw that Chassan Natasha took with him a Galil gun and a pistol, Acrim Bader took with him an Uzi gun, and Abu Machmad took with him a pistol, handcuffs, iron chains, locks and black nylon bags

3. The accused himself carried on him a black pistol, given to him by Chassan Natasha.
Before Chassan gave the pistol to the accused, the accused told Chassan that he doesn't know how to use the pistol; Chassan showed the accused on the spot how to do it, and explained to him the operating and shooting from the pistol.

4. The party members also took with them gun-magazines and bullets for the weapons they had with them.

5. The accused, that put on his head one of the caps he bought, acted as driver of the Transporter; Near the accused sat Acrim Bader, who wore one of the black hats on his head; behind the accused sat Abu Machmad, who put a black hat on his head; Chassan Natasha sat behind Acrim Bader, wearing a cap. The weapons that the party took with them were hidden in their clothes; The accused had the gun girded on his waist.

b.6. The party members drove from Bir Naballa to the Jerusalem-Tel-Aviv highway, from which they continued to the direction of Ben-Gurion interchange, and there turned to the direction of Petach-Tikva. As there was a traffic-jam where they were, the accused returned and started driving towards Tel-Aviv.

7. After a while the accused returned and drove to the direction of Ben-Gurion airport; On the Yahud-Ben-Gurion road the party members saw a gray Subaro car letting-off a soldier on the side of the road, and continuing to the direction of the industrial area of Yahud. The accused watched the soldier, and saw that he went to stand in the bus-stop, with his hand out requesting a lift.

8. The soldier that the party members noticed was Nachshon Wachsman (Further "the deceased"), which planned on that day to get to a base in

Ramle', in which a friend of his was doing her army service.

The deceased was wearing a crocheted skull-cap, IDF olive-coloured uniform, on his shoulder was a brown "Golani" (an IDF infantry unit) cap and had an M-16 gun and a magazine.

He also had a few civilian changing clothes, as the night before he had slept out of his home, in the house of a friend.

9.   The party members stopped the car near the deceased, and the accused asked him in Hebrew "Where to"?; The deceased answered that he was heading to the direction of Ramle'. The accused answered to the deceased "get in", and the deceased sat to the right of Chassan Natasha, meaning between the back door and Chassan Natasha.

10.  A few minutes later the deceased asked Chassan Natasha where he was from, but Chassan Natasha did not answer; A few minutes later, when they arrived to the area of the airport and near the Jerusalem-Tel-Aviv highway, Chassan wrapped his arm around the neck of the deceased and forced him down to a sitting position on the floor of the car.

11.  The deceased tried to resist and even tried to insert the gun-magazine he had into the M-16 gun, but at this point Acrim Bader attacked him, grabbed his weapon and pulled it away from him.

to stop the resistance of the deceased, Acram Bader hit the deceased a few times on the head, using the stock of the gun.

12. Chassan Natasha and Abu Machmad chained the hands of the deceased with metal handcuffs, chained his legs with iron chains which they closed with locks, covered his eyes with black cloth and put on his head a black nylon bag, leaving an opening for air.
The deceased was cast on the floor of the car, as Abu Machmad and Chassan Natasha continued to hit him.
All that time the accused continued driving in the direction of Bir Naballa.
13. The party members drove to the hiding-house in Bir Naballa, where the accused dropped the three party members.
The accused helped them move the deceased, still chained and tied and with his eyes covered, into one of the bedrooms in the house.
Ahead of time were prepared n the house itself food, and radio and television sets.
14. Afterwards the accused returned with the rented car and parked it in a payment-car-park in Jerusalem so that his family members won't know anything about him renting a car.

Fifth charge item

Giving service to an illegal gathering, an offence by regulation 85 (1) (c) of the defence regulations (emergency time) 1945.

The accused above, on 9/10/1994, gave services to an illegal gathering, meaning:

1.   After the accused parked the Transporter in a payment-car-park on Salach-A-Din street in Jerusalem, as written in the above charge item, the accused turned to Ramzy Salhav, from who he hired a video-camera for 24 hours, for the cost of 150 NIS, explaining to Ramzy, that the camera is necessary to him for videoing the wedding of a friend's sister.
     Also, the accused bought two empty video cassettes, each 180 minutes long.

2.   Equipped with the video-camera and the cassettes, the accused returned to Bir Naballa.
     The accused spoke to the deceased in Hebrew, and learned that his name was Nachshon Wachsman, and that he    lived in the neighborhood of Ramot in Jerusalem.
     The deceased explained his journey to Ramle' in the reason of visiting there a friend that was doing her army-service in the area.
     The accused told the deceased that the purpose of kidnapping him was an exchange-terror-attack, and that they are interested in exchanging him for Palestinian detained.
     The accused spoke with the deceased in Hebrew, and explained to him that his kidnapping was aimed at releasing Palestinian prisoners; The accused told the deceased what he should say in front of the camera.

3.   "Abu Machmad" is the one who gave the message in Arabic, with his face covered. In what he said "Abu Machmad" mentioned that the Israeli Soldier was kidnapped by the Az-A-

Din-Elkasam regiments, and that they demand the release of :

(1) The Sheich Achmed Yassin and another high-ranked activist in the Chamass organization.

(2) Sheich Ubeid

(3) Mutstafa Dirani

(4) Hundreds of extra prisoners from the Chamass organization and from other terror-organizations which are sentenced to heavy imprisonments and to life sentences.

4.  "Abu Machmad' made it clear, in his words to the camera, that the Israeli soldier will be released only if the request of the kidnappers will be granted.

5.  Abu Machmad also posed a few questions in Hebrew which the deceased was forced to answer. The accused sat opposite the deceased all that time, and helped Abu Machmad in formulating the questions and translating them to Hebrew.

Sixth charge item

Giving service to an illegal gathering, an offence by regulation 85 (1) (c) of the defence regulations (emergency time) 1945.

The accused above, on 10/10/1994, gave services to an illegal gathering, meaning:

1.  Soon after the end of recording that message, Abu Machmad wrote a letter containing the details of the kidnapping.

The letter was attached to the video-tape and he also attached to it the deceased's ID card.

2.   The accused was asked to deliver the tape and it's attachments to a man called "Abu Ali", who lived in the Yarmok neighborhood in Gaza, near the brick factory.

3.   Abu Machmad equipped the accused also with the phone number of this Abu Ali, and explained to him, that from there the tape would be transferred to another, known as "Abu Chaled", which is one of the liables in the Az-A-Din Elkasam regiments, and who is supposed to manage the negotiation of releasing the Palestinian prisoners.

4.   The following day, on Monday 10/10/94, the accused drove in the rented car to Gaza and delivered the tape and it's attachments to Abu Ali. the accused agreed with this Abu Ali that he will contact the accused again at 21:00 inorder to confirm that the tape  was actually reached by Abu Chaled.

5.   While the accused was in Gaza, he agreed with that Abu Ali on agreed code-words to continue the regiment members from Gaza: The two agreed, that if Abu Ali would say the words "Chismat Sumsumia" the meaning would be to wait, and if Abu Ali would say the words "Chismat Foolia" the meaning would be that the negotiation with the Israeli government failed, and that the party members - including the accused - should kill the deceased.

5.   The accused spoke with Abu Ali in the evening, as they had settled, and Abu Ali asked the accused to get to Gaza

the following day, to get instructions that could not be passed over the phone.
The accused explained to Abu Ali that he could not arrive the following day, and settled with him that he would get to Gaza in the next few days.

6. On Wednesday, 12/10/94 the accused drove to Bir Naballa and reported to the other party members, that the tape was delivered to Gaza; The accused also informed the party members about the code-words that he agreed on with the above Abu Ali. the accused intended on returning to Gaza on Friday 14/10/1994, but was arrested beforehand.
The accused kept a continuos telephone connection with Abu Ali from the day he visited there until the day of his arrest. That connection was made from public-phone-boxes, as the house in Bir Naballa had no phone.

7. According to the tape that the accused delivered to Gaza, there was another tape made, in which it was made clear that the Israeli soldier would be murdered if the demands of the kidnappers wouldn't be fulfilled until Friday 14/10/94 at 21:00.

Seventh charge item

______________________ Supporting whoever is shooting towards a person, an offence by regulation 58 (a) and 66 of the defence regulations (time of emergency) 1945.

______________________ The accused above, on 14/10/1994, supported others shooting towards

people in the intention of causing death of others, meaning:

1. After the arrest of the accused, and after it was discovered where the deceased was healed, a top-unit of IDF on late Friday 14/10/94 performed a military action with the of purpouse rescuing the deceased from the house in which he was held in Bir Naballa.

2. During the action the rescuers reached the room in which the deceased was held.
   The allies of the above accused shot the deceased from a short distance in his head and in his chest, and caused his death, and announced that to the soldiers of the force that broke into the room with force.

3. As a result of the shooting, lieutenant Nir Poraz r.i.p. was killed and 11 others were injured.

4. In the house were found an Uzi gun, a Galil gun and two pistols.
   Also were found gun-magazines for those weapons and ammunition.

5. Also the deceased's personal gun and his gun-magazines were found in the house.

The Prosecution witnesses

. Chief Sergeant Avi Sasson, personal number 29756 - Jerusalem Police, department of minorities.
. Sergeant Avi Pinchassi, personal number 96719 - Jerusalem Police, department of minorities.
. Chief Inspector Daniel Asor, personal number 45514 - Jerusalem Police, mobile criminal identification lab - the national headquarters, Jerusalem.
. Inspector Offer Shlush - Jerusalem Police, mobile criminal identification lab - the national headquarters, Jerusalem.
. Inspector Vail Chisran, personal number 91056 - Jerusalem Police, department of minorities.
6. Layla Taluar, 581/34 Har-Tsuf st., Gilo, Jerusalem.
. Yonit Malca'ee, commander of Ram2 Hadssa Ein-Karem, phone number: 02-6414462.
. Eyal Nitai, helper of security-inspector in Hadassa Ein-Kerem hospital.
. Avi zigadon, IDF - Bomb removing unit, phone number: 03-9375555.
10. Yair Simchon, personal number 5122383 - Air-Force base 27.
11. Moshe Kaper, 28/4 Waitzman st., Yahud.
. Aric Serero, worker of "Shako Land", 18 King David st., Jerusalem, phone number: 02-6252585.
. Baruch Shako, worker of "Shako Land", 18 King David st., Jerusalem, phone number: 02-6252585.
. Muchamad Adila, worker of "Shako Land", 18 King David st., Jerusalem, phone number: 02-6252585.
. Ramzy Bedui Yechia Salhav, ID No. 80626377, new Beit-Chanina, Jerusalem, phone number 02-5859418, at work - 02-5836293.
. Ramzy Bedui Yechia Salhav, ID No. 23471683, new Beit-Chanina, Jerusalem, phone number 02-5859418, at work - 02-5836293.
. Dr. Hiss, The Medical-Law Institute in Abu Kabir - a professional counsel.
18. Dr. K.Ch (will be called in by the prosecution).
19. Dr. Yoel Donchin, Hadassa hospital.
20. Prof. Y. Bar-Ziv, Hadassa hospital.
21. L.L. (will be called in by the prosecution).
22. Ts. N. (will be called in by the prosecution).
23. N.C. (will be called in by the prosecution).

24. Y.M. (will be called in by the prosecution).
25. Death certificates.
    - Zecharia Lutfi Nagib, ID No 8063194 (arrested in the Lod guard housr 10/94).
    - Tsalach A-Din Nur A-Din Rada Drauza, ID No. 92517613 (arrested in the military court in Nablus).
    - Item 115/94 - Ramalla Police station - It's items will be presented by the relevant witnesses.
    - Item 1047/94 - jerusalem Police station - It's items will be presented by the relevant witnesses.

Sh-Jihad

54798trn