PLAINTIFFS' EXHIBITS
13

CA 140/00
CA 550/01

**1. Estate of the late Michael Ettinger deceased**
**2. Chaya Ettinger**
**3. Yosef Ettinger**
**4. Yael Ettinger**
v
**1. Company for the Reconstruction and Development of the Jewish Quarter**
**2. Jerusalem Fund**
**3. Jerusalem Municipality**
**4. Reuven Shalom**
**5. Yitzhak Feitliss**

6.  Mordechai Borochov

-

-

The Supreme Court sitting as the Court of Civil Appeal

[15 March 2004]
*Before President A. Barak, Vice-President T. Or and Justices E. Mazza, D. Dorner, E. Rivlin*

Appeal on the judgment of the Jerusalem District Court (Justice Y. Adiel) on 18 November 1999 in CC 4/95.

**Facts:** The late Michael Ettinger died after falling into an unfenced pit at an archaeological site located near a playground in the Old City of Jerusalem. He was twelve years old. The appellants, his estate and family, sued the respondents for compensation in the District Court. The main issue considered in the Supreme Court on appeal was whether the estate was entitled to compensation for loss of the deceased's earning capacity in the 'lost years' — the years of working life that the deceased lost because he died as a result of the respondents' negligence. This issue had been considered more than twenty years earlier, in *Estate of Sharon Gavriel v. Gavriel*, where the majority held that legislation was required to allow an award of compensation for loss of earning capacity in the 'lost years.' But no legislation to this effect had been enacted in the interim.
A second issue that was considered in the appeal was whether the respondents should have been found liable to pay punitive damages.

**Held:** The time had come to reconsider the issue of compensation for loss of earning capacity in the 'lost years.' The Supreme Court held that:
Where a person suffers a reduction of life expectancy as a result of a tortious act, he is entitled to compensation for the loss of earning capacity in the 'lost years.'
Where a person dies as a result of a tortious act, his claim to compensation for the loss of earning capacity in the 'lost years' passes to his estate. If the deceased has dependants who are awarded compensation for loss of support in the 'lost years,' this compensation is deducted from the compensation payable to the estate for loss of the deceased's earning capacity in the 'lost years,' to prevent double liability being imposed on the tortfeasor.
The Supreme Court left undecided the question of whether Israeli courts have the power to award punitive damages, since the facts of this case did not warrant an award of punitive damages in any case.

Appeal allowed in part.

**Legislation cited:**
Basic Law: Human Dignity and Liberty.
Enforcement Law, 5727-1967, s. 12.
Liability for Defective Products Law, 5740-1980.



Patents Law, 5627-1967, s. 183.
Penal Law, 5737-1977, ss. 304, 309(5).
Road Accident Victims Compensation Law, 5735-1975, ss. 4, 6.
Road Accident Victims Compensation (Calculation of Compensation for Non-Pecuniary Loss) Regulations, 5736-1976, r. 4.
Road Accident Victims Compensation (Periodic Payments) Regulations, 5738-1978, r. 3.
Torts Ordinance [New Version], ss. 19, 19(a), 19(b), 19(d), 76, 78, 78-81, 79, 80, 81(1).

**Israeli Supreme Court cases cited:**

[1]     CA 295/81, *Estate of Sharon Gavriel v. Gavriel* [1982] IsrSC 36(4) 533.
[2]     CA 22/49 *Levy v. Mosaf* [1950] IsrSC 4 558.
[3]     CA 357/80, *Naim v. Barda* [1982] IsrSC 36(3) 762.
[4]     FH 29/83, *Sahar Insurance Co. Ltd v. Cahanka* [1985] IsrSC 39(1), 833.
[5]     CA 95/55 *Salomon v. Adler* [1955] IsrSC 9 1905.
[6]     CA 116/81 *Estate of Aharon Knafo v. Arnon Tussia-Cohen* [1982] IsrSC 36(4) 580.
[7]     CA 248/86 *Estate of Lily Hananshwili v. Rotem Insurance Co. Ltd* [1991] IsrSC 45(2) 529.
[8]     CA 642/89 *Estate of Meir Schneider v. Haifa Municipality* [2002] IsrSC 56(1) 470.
[9]     CA 4022/98 *The Technion, Israel Technological Institute v. Twister*, Takdin (SC) 99(2) 255.
[10]    CA 110/86 *Gevaram v. Heirs of the late Shalom Manjam* [1988] IsrSC 42(2) 193.
[11]    HCJ 693/91 *Efrat v. Director of the Population Register at the Ministry of Interior* [1993] IsrSC 47(1) 749.
[12]    CA 2939/92 *General Federation Medical Fund v. Rachman* [1995] IsrSC 49(2) 369.
[13]    CA 70/52 *Grossman v. Roth* [1952] IsrSC 6 1242.
[14]    CA 79/65 *Israel Steel Enterprises Ltd v. Malca* [1965] IsrSC 19(2) 266.
[15]    CA 5794/94 *Ararat Insurance Co. Ltd v. Ben-Shevach* [1997] IsrSC 51(3) 489
[16]    CA 44/76 *Atta Textile Co. Ltd v. Schwartz* [1976] IsrSC 30(3) 785.
[17]    CFH 7794/98 *Ravid v. Clifford* [2003] IsrSC 57(4) 721.
[18]    CA 30/80 *State of Israel v. Asher* [1981] IsrSC 35(4) 788.
[19]    CA 722/86 *Youness v. Israel Car Insurance Pool* [1989] IsrSC 43(3) 875.
[20]    CA 541/63 *Reches v. Hertzberg* [1964] IsrSC 18(2) 120.
[21]    CA 773/81 *Estate of Robert Freilich v. State of Israel* [1982] IsrSC 36(4) 816.
[22]    CA 237/80 *Barsheshet v. Hashash* [1982] 36(1) 281.
[23]    CA 141/89 *Mahmoud v. Shamir Insurance Co. Ltd*, Takdin (SC) 91(3) 1329.
[24]    CA 384/74 *Estate of David Azoulay v. Vulcan Casting Enterprises Ltd* [1976] IsrSC 30(1) 374.
[25]    CA 2376/93 *Estate of Michal Kedar v. HaSneh Insurance Co.* [1995] IsrSC 49(1) 594.
[26]    CA 148/53 *Penetz and Egged Operative Group Ltd v. Feldman* [1955] IsrSC 9(3) 1711.
[27]    CA 482/89 *Estate of Sarah Abir v. Ferber* [1993] IsrSC 47(3) 107.
[28]    CA 506/82 *Sontag v. Estate of David Mendelsohn* [1986] IsrSC 40(3) 113.
[29]    CA 64/89 *Gabbai v. Lausanne* [1994] IsrSC 48(4) 673.
[30]    CA 206/87 *General Federation Medical Fund v. Estate of Dr Meir Edison* [1991] IsrSC 45(3) 72.
[31]    FH 24/81 *Honovitz v. Cohen* [1984] IsrSC 38(1) 413.
[32]    CA 32/60 *Felixberg v. General Manager of the Railway* [1960] IsrSC 14 1629.
[33]    CA 778/83 *Estate of Sarah Saidi v. Poor* [1986] IsrSC 40(4) 628.
[34]    CA 489/79 *Eliyahu Insurance Co. Ltd v. Estate of Violet Tzaig* [1981] IsrSC 35(2) 123.
[35]    CA 5/84 *Yehezkel v. Eliyahu Insurance Co. Ltd* [1991] IsrSC 45(3) 374.
[36]    CA 471/93 *Estate of David Hyams v. Hyams*, Takdin (SC) 97(2) 969.
[37]    CA 1503/94 *Israeli Phoenix Insurance Co. Ltd v. Estate of Baruch Berman*, Takdin (SC) 96(2) 796.
[38]    CA 154/70 *Bida v. Rubin* [1971] IsrSC 25(2) 43.
[39]    CA 682/69 *Hamudot v. Shapira* [1970] IsrSC 24(1) 686.
[40]    CA 501/84 *Migdal Insurance Co. Ltd v. Miron* [1988] IsrSC 42(2) 89.
[41]    CA 610/75 *Rotem v. Nof* [1978] IsrSC 32(1) 799.
[42]    CA 1299/92 *Estate of Aliza Mor v. Rom* [1996] IsrSC 50(1) 697.
[43]    CA 541/88 *Protection of Nature Society v. Estate of Ora Forman* [1992] IsrSC 46(1) 133.
[44]    CA 204/85 *State of Israel v. Mizrahi* [1988] IsrSC 42(2) 113.
[45]    CA 587/87 *Malca v. Aktin* [1990] IsrSC 44(4) 168.

[46]   CA 311/85 *Efraimov v. Gabbai* [1988] IsrSC 42(3) 191.
[47]   CA 634/88 *Attiya v. Zaguri* [1991] IsrSC 45(1) 99.
[48]   CA 209/53 *Weizman v. Zucker* [1954] IsrSC 8 1428.
[49]   CA 685/79 *Atrash v. Maalof* [1982] IsrSC 36(1) 626.
[50]   CA 335/59 *Reichani v. Tzidki* [1961] IsrSC 15 159.
[51]   CA 326/88 *Zimmerman v. Gavrielov* [1992] IsrSC 46(1) 353.
[52]   CA 142/89 *Gamliel v. Oshiot Insurance Co. Ltd*, Takdin (SC) 90(3) 683.
[53]   CA 1977/97 *Barzani v. Bezeq, the Israel Telecommunication Corp. Ltd* [2001] IsrSC 55(4) 584.
[54]   LCrimA 2976/01 *Assaf v. State of Israel* [2002] 56(3) 418.
[55]   CA 216/54 *Schneider v. Glick* [1955] IsrSC 9 1331.
[56]   CA 81/55 *Kochavi v. Becker* [1957] IsrSC 225.
[57]   CA 277/55 *Rabinowitz v. Sela* [1958] IsrSC 12 1261.
[58]   CA 30/72 *Friedman v. Segal* [1973] IsrSC 27(2) 225.
[59]   CA 670/79 *HaAretz Newspaper Publishing Ltd v. Mizrahi* [1987] IsrSC 41(2) 169.
[60]   CA 711/72 *Meir v. Governors of the Jewish Agency for Israel* [1974] IsrSC 28(1) 393.
[61]   CA 3654/97 *Kartin v. Ateret Securities (2000) Ltd* [1999] IsrSC 53(3) 385.
[62]   CA 372/65 *Dehan v. Francis* [1965] IsrSC 19(4) 192.
[63]   CA 15/66 *Shinar v. Hassan* [1966] IsrSC 20(2) 455.
[64]   CA 283/89 *Municipality of Haifa v. Moskowitz* [1993] IsrSC 47(2) 718.
[65]   CA 235/78 *Hornstein v. Ohavi* [1979] IsrSC 33(1) 346.
[66]   CA 184/80 *Eigler v. HaMagen* [1981] IsrSC 35(3) 815.
[67]   CA 2801/96 *El-Al Israel Airlines Ltd v. Yifrach* [2001] IsrSC 55(1) 817.
[68]   CA 675/82 *Asadi v. Cohen*, IsrSC 38(4) 449.
[69]   CA 180/88 *Ozeri v. Sarufi*, Takdin (SC) 90(3) 606.
[70]   CA 3843/90 *Ohayon v. State of Israel, Ministry of Defence*, Takdin (SC) 93(3) 428.
[71]   CA 286/55 *Wolfovitz v. Fisher* [1957] IsrSC 11(1) 379.
[72]   CA 402/75 *Estate of Yisrael Mashiach v. Rosenblum* [1976] IsrSC 30(3) 97.
[73]   CA 2517/93 *A v. Katahin*, Takdin (SC) 94(2) 335.
[74]   CA 6978/96 *Amar v. General Federation Medical Fund* [2001] IsrSC 55(1) 920.
[75]   CA 2055/99 *A v. Israel Chief Rabbinate*, Takdin (SC) 2001(2) 240.
[76]   CA 163/99 *Estate of Diav Mizawi v. Dori Engineering Works Co. Ltd*, Takdin (SC) 2000(1) 187.
[77]   CA 5938/97 *Peleg v. Tardiman*, Takdin (SC) 2000(1) 187.

**Israeli District Court cases cited:**
[78]   CC (TA) 1549/96 *Levy v. Hadassah Medical Organization*, Dinim (DC) 32(1) 622.
[79]   CC (Hf) 1581/94 *Hattib v. State of Israel*, Dinim (DC) 32(7) 163.

**American cases cited:**
[80]   *Doe v. United States*, 737 F. Supp. 155 (1990).
[81]   *Prairie Creek Coal Mining Co. v. Kittrell*, 153 S.W. 89, 94 (1912).
[82]   *Littman v. Bell Telephone Co. of Pennsylvania*, 315 Fa. 370, 172 A. 687 (1934).
[83]   *In re Joint Eastern & Southern District Asbestos Litigation*, 726 F. Supp. 426 (1989).
[84]   *United States v. Carroll Towing Co.*, 159 F. 2d 169 (1947).
[85]   *Mclaughlin v. Chicago, Milwaukee, St. Paul & Pacific Ry. Co.*, 143 N. W. 2d 32 (1966).
[86]   *Morrison v. State*, 516 P. 2d 402 (1973).
[87]   *Borcherding v. Eklund*, 55 N.W.2d 643 (1952).
[88]   *Crecelius v. Gamble-Skogmo, Inc.*, 13 N.W. 2d 627 (1944).
[89]   *Burke v. United States*, 605 F. Supp. 981 (1985).
[90]   *Fein v. Permanente Medical Group*, 695 P.2d 665 (1985).
[91]   *Sea-Land Services, Inc. v. Gaudet*, 414 U.S. 573 (1974).
[92]   *Ehlinger v. State*, 237 N.W.2d 784 (1976).
[93]   *Hughes v. Chicago, R.I. & P. Ry. Co.*, 129 N.W. 956 (1911).
[94]   *Olivier v. Houghton County St. Ry.*, 101 N. W. 530 (1904).

[95]   *Hindmarsh v. Sulpho Saline Bath Co.*, 187 N.A. 806 (1922).
[96]   *Balmer v. Dilley*, 502 P. 2d 456 (1972).
[97]   *Runyon v. District of Columbia*, 463 F. 2d 1319 (1972).
[98]   *Weaver v. Ford Motor Co.*, 382 F. Supp. 1068 (1974).
[99]   *Hope v. Seahorse, Inc.*, 651 F. Supp. 976 (1986).
[100]  *Murray v. Philadelphia Transp. Co.*, 58 A. 2d 323 (1948).
[101]  *Ferne v. Chadderton*, 69 A. 2d 104 (1949).
[102]  *Greene v. Texeira*, 505 P. 2d 1169 (1973).
[103]  *Prunty v. Schwantes*, 162 N. W. 2d 34 (1968).
[104]  *Sanderson v. Steve Snyder Enterprises, Inc.*, 491 A. 2d 389 (1985).
[105]  *B.M.W. of North America Inc., v. Gore*, 116 S. Ct. 1589 (1996).

**Australian cases cited:**
[106]  *Skelton v. Collins*, 115 C.L.R. 94 (1996).
[107]  *Sharman v. Evans* (1977) 138 C.L.R. 563.
[108]  *Rose v. Motor Vehicle Insurance Trust* (1974) 48 A.L.J.R. 352.
[109]  *Fitch v. Hyde-Cates*, 150 C.L.R. 482.
[110]  *Uren v. John Fairfax & Sons Pty Ltd* (1966) 117 C.L.R. 118.
[111]  *Lamb v. Cotogno* (1987) 74 ALR 188.

**Canadian cases cited:**
[112]  *Andrews v. Grand & Toy Alberta Ltd.* [1978] 2 S.C.R. 229.
[113]  *The Queen in right of Ontario v. Jennings* [1966] 57 D.L.R. 2d 644.
[114]  *Sigouin (Guardian in litem of) v. Wong* (1992) 10 C.C.L.T. 2d 236.
[115]  *Dube v. Penlon Ltd.* (1994) 21 C.C.L.T. 2d 268.
[116]  *Toneguzzo-Norvell v. Burnaby Hospital* (1994) 1 S.C.R. 114.
[117]  *Semenoff v. Kokan* (1991) 84 D.L.R. (4th) 76.
[118]  *Duncan (Estate of) v. Baddeley* (2000) A.B.C.A. 277.
[119]  *Brown v. University of Alberta Hospital* (1997) 145 D.L.R. 4th 63; [1997] 4 W.W.R. 645 (Alta. Q.B.).
[120]  *Granger v. Ottawa General Hospital* (1996) 7 O.T.C. 81; (1996), 63 ACWS (3d) 1278, [1996] OJ No. 2129 (Ont. Gen. Div.).
[121]  *Duncan (Estate of) v. Baddeley* (1997) 196 A.R. 161.
[122]  *Marchand v. Public General Hospital of Chatham* (2000), 51 O.R. (3d) 97 (C.A.).
[123]  *Saint John Regional Hospital v. Comeau* (2001) MBCA 113.
[124]  *Balkos v. Cook* (1991) 75 O.R. 593.
[125]  *Rayner v. Knickle* (1991) 88 Nfld. & P.E.I.R 214.
[126]  *Woollard v. Coles*, 85 A.C.W.S. (3d) 564 (1998).
[127]  *Galand Estate v. Stewart* (1992) 135 A.R. 129.
[128]  *Brooks (Estate of) v. Stefura* (1998) 2000 ABCA 276.
[129]  *Vorvis v. Insurance Corp. of British Columbia* (1989) 1 S.C.R. 1085.
[130]  *Muir v. Alberta* (1996) 132 D.L.R. (4th) 695.
[131]  *Hill v. Church of Scientology of Toronto* [1995] 2 S.C.R. 1130.
[132]  *Coughlin v. Kuntz* (1989) 42 B.C.L.R. (2d) 108.

**English cases cited:**
[133]  *Pope v. D. Murphy & Son Ltd* [1961] 1 Q.B. 222.
[134]  *Oliver v. Ashman* [1962] 2 Q.B. 210; [1961] 3 All ER 323.
[135]  *Pickett v. British Rail Engineering Ltd* [1980] A.C. 136; [1979] 1 All ER 774.
[136]  *Lim Poh Choo v. Camden & Islington Area Health Authority* [1980] A.C. 174.
[137]  *Croke v. Wiseman* [1981] 3 All ER 852.
[138]  *Phillips v. London & South Western Railway Co.* [1879] 5 Q.B.D. 78.
[139]  *Roach v. Yates* [1938] 1 K.B. 256.
[140]  *Harris v. Brights Asphalt Contractors Ltd* [1953] 1 Q.B. 617.

[141]   *Wise v. Kaye* [1962] 1 Q.B. 638; [1962] 1 All ER 257.
[142]   *McCann v. Sheppard* [1973] 1 W.L.R. 540; [1973] 2 All ER 881.
[143]   *Harris v. Empress Motors Ltd* [1983] 3 All ER 561; [1984] 1 W.L.R. 212.
[144]   *Phipps v. Brooks Dry Cleaning Services Ltd* [1996] P.I.Q.R. Q100; 140 SJ LB 173.
[145]   *Connolly v. Camden & Islington Area Health Authority* [1981] 3 All ER 250.
[146]   *Adsett v. West* [1983] 2 All ER 985.
[147]   *Gammell v. Wilson* [1982] A.C. 27; [1981] 1 All ER 578.
[148]   *White v. London Transport Executive* [1982] Q.B. 489; [1982] 1 All ER 410.
[149]   *Sullivan v. West Yorkshire Passenger Transport Executive* [1985] 2 All ER 134.
[150]   *Kandalla v. British European Airways Corp.* [1981] Q.B. 158; [1980] 1 All ER 341.
[151]   *Khodaparast v. Shad* [2000] 1 W.L.R 618; [2000] 1 All ER 545.
[152]   *Kuddus v. Chief Constable of Leicestershire Constabulary* [2001] 3 All ER 193.
[153]   *Cassell & Co. Ltd v. Broome* [1972] A.C. 1027; [1972] 1 All ER 801.
[154]   *Loudon v. Ryder* [1953] 2 Q.B. 202; [1953] 1 All ER 741.
[155]   *Rookes v. Barnard* [1964] A.C. 1129; [1964] 1 All ER 367.
[156]   *A.B. v. South West Water Services Ltd* [1993] Q.B. 507; [1993] 1 All ER 609.
[157]   *Australian Consolidated Press v. Uren* [1969] 1 A.C. 590; [1967] 3 All E.R. 523.
[158]   *A. v. Bottrill* [2002] 3 W.L.R. 1406.
[159]   *Heil v. Rankin* [2000] 2 W.L.R. 1173; [2000] 3 All ER 138.

**Irish cases cited:**
[160]   *Doherty v. Bowaters Irish Wool Board Ltd* [1968] I.R. 277.
[161]   *Conley v. Strain* [1988] I.R. 628.
[162]   *Conway v. INTO* [1991] 2 I.R. 305.

**New Zealand cases cited:**
[163]   *Taylor v. Beere* [1982] 1 N.Z.L.R. 81.

**South African cases cited:**
[164]   *Goldie v. City Council of Johannesburg*, 1948 (2) S.A. 913 (W.).
[165]   *Lockhat's Estate v. North British and Mercantile Insurance Co. Ltd* (1959) 3 S.A. 295 (A.)).

For the appellants — Y. Neeman, B. Katzman.
For respondents 1-3 — Carmeli Arnon & Co.
For respondents 4-5 — M. Kaplinsky.
For respondent 6: Adv. Tz. Noach.


JUDGMENT


**Justice E. Rivlin**
*Introduction*

1.   The main issue that requires a determination in the distressing case before us concerns the right of a person, who is injured as a result of a tort and whose life expectancy is shortened, to compensation for the loss of his earning capacity in the 'lost years,' i.e., those years by which his working life expectancy was reduced as a result of his death. This very question was considered by this court in CA 295/81 *Estate of Sharon Gavriel v. Gavriel* [1]. The majority opinion in that case (President Y. Kahan, Vice-President M. Shamgar and Justice M. Bejski) held that in Israeli law the injured person is not entitled to compensation for this head of damage. The minority (Justices A. Barak and S. Levin) were of the opinion the court should recognize the right of an injured person to compensation.

Approximately twenty years have passed since the judgment in *Estate of Sharon Estate v. Gavriel*

[1] was given, and the issue of the 'lost years' has come before us once again.

*Background*

2.   The late Michael Ettinger (hereafter — the deceased), who was born in 1976, was playing with a friend of the same age at a playground, close to his home, in the Jewish Quarter of the Old City of Jerusalem. He fell into the 'Nea Archaeological Site,' an unfenced pit, which has a concrete floor at the bottom, that was situated nearby (hereafter — the accident). The deceased suffered injuries to his head and was taken to hospital, where he died the next day. He was only twelve years old.

The appellants in CA 140/00 — the estate, parents and sister of the deceased — filed an action in the District Court, in which they argued that the estate should be awarded compensation for the lost earning years of the deceased. The appellants also asked that the respondents be found liable for punitive damages, in view of the conviction of respondents 1, 4, 5 and 6 in a criminal trial that was brought against them, on a charge of negligently causing the death of the deceased (an offence under ss. 304 and 309(5) of the Penal Law, 5737-1977). The appellants also asked that they should be awarded damages for the non-pecuniary damage of the reduction of the deceased's lifespan.

According to a procedural arrangement reached between the parties, which was given the force of a court decision, the factual basis that was determined in the judgment in the criminal trial was submitted to the trial court, and it was submitted to us also. Within the framework of that arrangement, it was agreed also that the respondents waive any contention of contributory negligence on the part of the deceased or negligence on the part of his parents.

3.   The Jerusalem District Court (his honour Justice Y. Adiel) held that the rule in *Estate of Sharon Gavriel v. Gavriel* [1], which as aforesaid does not recognize the entitlement of an injured person to compensation for the loss of earning capacity in the 'lost years,' is still valid today, after the enactment of the Basic Law: Human Dignity and Liberty. Therefore the District Court dismissed the claim on this head of damage. The court also held that there was no basis for awarding punitive damages in this case. Nonetheless, in view of the fifty-nine years by which the life expectancy of the deceased was shortened, the District Court awarded compensation in favour of the estate for non-pecuniary damage, in an amount of NIS 350,000, with interest from the date on which the deceased died.

4.   The two appeals before us are directed against the judgment of the District Court. CA 140/00 is directed against the decision of the trial court on the issue of the 'lost years' and the punitive damages. The appellants argue that the changes that have taken place in Israeli law, since the rule in *Estate of Sharon Gavriel v. Gavriel* [1] was decided — including the enactment of the Basic Law: Human Dignity and Liberty — justify a re-examination of that decision. Earning capacity — so the appellants claim — falls within the constitutional property right, and an infringement of this right, by way of a reduction of life expectancy, requires, in their opinion, an award of compensation. According to the appellants, recognition of a right to compensation for the lost earning years is consistent with the remedial purpose that underlies the law of torts, and is consistent with considerations of justice, in that it can prevent a situation in which wrongfully causing death leads to lesser financial consequences than that causing personal injury. Such compensation is also required, in the appellants' opinion, in view of policy considerations that require an effective deterrent. The appellants also point to the fact that the rule in *Estate of Sharon Gavriel v. Gavriel* [1] addressed the provisions of the Road Accident Victims Compensation Law, 5735-1975 (hereafter — the Compensation Law), whereas here we are dealing with a claim under the Torts Ordinance [New Version] (hereafter — the Ordinance or the Torts Ordinance). According to them, the two are not the same in so far as the justification for compensation for the loss of earning capacity in the 'lost years' is concerned.

The appellants complain, as aforesaid, also about the decision of the trial court not to find the respondents liable for the payment of punitive damages. In this matter they argue that the conduct of the respondents, as expressed in the criminal judgment against them, indicates apathy, indifference and blatant contempt for human life. This conduct led to a tragic result. Therefore, the appellants are of the opinion that the respondents should be found liable for the payment of punitive damages.

The respondents, for their part, are of the opinion that no intervention is required in the District Court decision not to award the appellants compensation for the loss of the deceased's earning capacity in the 'lost years.' According to them, there is no justification for departing from the rule determined in

*Estate of Sharon Gavriel v. Gavriel* [1], and in essence they relied on the reasons given there. The respondents also claim that no intervention is required in the decision of the District Court not to award the appellants punitive damages. In this respect, the respondents argue that it is doubtful whether the court, under the provisions of Israeli law, has jurisdiction to award punitive damages, and that in any event in their case there was no element of intention or deliberateness, which is a condition for awarding such damages.

In the counter-appeal, the respondents argue that the court was excessive in the amount that it awarded for the non-pecuniary damage arising from the reduction of the deceased's life expectancy. In their opinion, the amount that was awarded for this head of damage is inconsistent with the abundant case law, and in this case, so they claim, the fixed tariff in the Compensation Law should be used, for the non-pecuniary damage, as the criterion for awarding compensation.

5.   An additional dispute between the parties broke out within the framework of the enforcement of the judgment given by the trial court, and it concerns the question of what is the date as of which the amount awarded for the reduction of life expectancy should be calculated. The Chief Enforcement Officer applied, in this regard, to the District Court, by virtue of his power under section 12 of the Enforcement Law, with a request for clarification. The District Court clarified that the amount that was awarded was calculated and determined as of the date of the judgment. The appellants in CA 550/01 object to this decision, and they also claim that the amount that was awarded for the reduction of life expectancy is too little, does not reflect the damage caused and is inconsistent with prevailing case law.

The appellants also complain, within the framework of CA 550/01, that the District Court did not award the estate compensation for pain and suffering. The honourable registrar of this court, Justice B. Okun, granted the appellants an extension of the time for filing the appeal in this matter.

6.   We will consider the questions in the appeals before us in the following order. First we will consider the fundamental question concerning the right to compensation for the loss of earning capacity in the 'lost years,' and the specific question concerning the entitlement of the deceased's estate to compensation for this head of damage. Next we will consider whether there were grounds, in the circumstances of this case, to award the appellants punitive damages. Finally we will decide the other arguments raised before us. In the final analysis, we will recommend that the appeal in CA 140/00 should be allowed, in so far as the question of the 'lost years' is concerned, and that there are no reasons for intervention in the other determinations of the trial court.

*The issue of the 'lost years'*

*Presentation of the issue*

7.   The awarding of compensation in the law of torts has the primary purpose of placing the injured person in the position he would have been in had it not been for the wrongful act, in so far as it is possible to do this by means of a pecuniary payment (CA 22/49 *Levy v. Mosaf* [2], at p. 564; CA 357/80, *Naim v. Barda* [3], at p. 772; A. Barak, 'Assessing compensation in personal injury: the law of torts as it is and as it should be,' 9 *Tel-Aviv University Law Review (Iyyunei Mishpat)* 243 (1983)). The compensation for the loss of earning capacity is also intended to achieve this purpose. This compensation — which belongs to the category of pecuniary heads of damage — takes into account the harm to the earning capacity of the injured person as a result of the wrong that was done to him. Therefore, if a person suffers personal injury as a result of a tortious act, and he is no longer able to continue working as before, the court will award him compensation for the loss of earning capacity. The amount of the compensation will be determined in accordance with the capitalized value of the difference between the potential earning capacity of the injured person, had the damage not occurred, and his actual earning capacity after his injury (see FH 29/83, *Sahar Insurance Co. Ltd v. Cahanka* [4], at p. 836).

The loss of earning capacity is examined, of course, also by taking into account the working life expectancy of the injured person. 'Indeed, it is well-known that when formulating a "compensation equation," for the purpose of the loss of earning capacity in the future, the length of the period for which the calculation is made is one of the main elements' (D. Katzir, *Compensation for Personal Injury* (fourth edition, 1998), at p. 241). But the question is — and this is the main focus of the appeal before us — does the reduction of the working life expectancy of the injured person, as a result of a tortious

act, have any effect on the compensation that will be awarded for the head of loss of earning capacity?

The question before us therefore concerns those cases in which the life expectancy of the injured person is shortened, as a result of the tortious act, to less than the retirement age that he would have had if it had not been for that act. Sometimes the reduction of life expectancy is partial, i.e., the injured person does not die shortly after the accident, but he is expected to live a shorter period of time as a result of the accident. In other cases, the reduction of the life expectancy is total, meaning that the injured person dies in the accident or shortly thereafter, with the result that he is unable to file a claim for his damage. Whichever is the case, the question arises as to whether the injured person (whose life expectancy was partially reduced and who files a claim when he is still alive) or his estate (when the injured person dies before filing a claim) is entitled to compensation for the loss of earning capacity in the 'lost years' — those years in which he was expected to earn from his labour, had his life not been shortened by the wrong. This question was left undecided in CA 95/55 *Salomon v. Adler* [5], at p. 1912, and it was decided by a majority, as aforesaid, in the decision of the Supreme Court in *Estate of Sharon Gavriel v. Gavriel* [1]. We will first focus on the ruling that was decided in that case.

*The ruling in Estate of Sharon Gavriel v. Gavriel*

8.    The late Sharon Gavriel was killed in a road accident, when she was approximately eight years old. Her estate filed a claim under the Compensation Law, *inter alia* for the loss of earning capacity.

The majority opinion in that case was that whether the case involves an injured person who is alive and whose life expectancy has been shortened, or the estate of an injured person who has died, the court should not recognize damage, nor award compensation, for the loss of earning capacity during the 'lost years.' President Y. Kahan, who wrote the leading majority opinion, said that an award of compensation for this head of damage meant a 'minor revolution' in the law of torts, and it was of significant economic consequences. President Kahan recognized that denying compensation to an injured person who is living for the 'lost years' may lead to an unjust result from the viewpoint of dependants, where at the time of death of the injured person he would not be entitled to compensation (either because he had been awarded compensation or because he received it in another way). This was because the provisions of s. 78 of the Torts Ordinance make the awarding of compensation to dependants conditional upon the injured person being entitled to compensation, when he passed away. However, President Kahan was of the opinion that there were no grounds for resolving this injustice by awarding compensation for the 'lost years,' since this, in itself, leads to other injustices that are even more serious. Consequently President Kahan held that the issue should be left to the legislature.

President Kahan further held that regarding earning capacity in the 'lost years' as an asset was 'artificial,' and so too was the reasoning making the award of the compensation conditional upon the injured person being unable to accumulate wealth and to make use of it as he sees fit. In President Kahan's view, the 'idea that a child who is killed in an accident suffers damage by being deprived of the possibility of working and earning throughout the whole period of a normal working life divorces the terms 'pecuniary damage' and 'loss of an asset' from their normal meaning and gives them an unrealistic meaning.' President Kahan further thought that there were no grounds for extending the circle of supported persons beyond those persons specified by the legislator (namely the dependants), and he warned against a double payment to the estate and to the dependants and against a situation in which the compensation would fall into the hands of persons who suffered no damage, as an unjustified windfall. In summarizing his remarks, President Kahan said that 'it is possible that the compensation for the head of damage of loss of life expectancy should be increased, and in this way expression should be given to the feeling of outrage against a situation in which, when the injury results in the death of the injured person, often the compensation does not at all reflect the seriousness of the injury.' He further said that 'it is possible that we should award, under the head of damage of pain and suffering, compensation for an injured person who is alive, for the suffering he endures as a result of his not being able to receive income and to make use of it as he sees fit.'

Vice-President M. Shamgar and Justice M. Bejski. each in his own words, joined with the opinion of President Y. Kahan.

9.    The opinion of Justice A. Barak, with which Justice S. Levin agreed, was different. Justice Barak

thought that the court should recognize an entitlement to compensation under a head of damage of 'the lost years' — both in a claim of a living injured person and in a claim of the estate. Earning power, he said, is an asset that belongs to its owner, and a reduction in the working life expectancy of the living injured person amounted to an injury to this asset — an injury that ought to give rise to an entitlement to compensation. In this regard, Justice Barak thought, it makes no difference, nor is it the concern of the tortfeasor, whether the injured person can enjoy the compensation money or not. Even an injured person who as a result of a tort is in a permanent vegetative state — he emphasized — cannot enjoy any of the material benefits of this world, but he is entitled, according to case law, to compensation for loss of earnings. Policy considerations also, he held, support a conclusion that the loss of earnings of a living injured person in the 'lost years' should be recognized as damage that is compensatable. In this regard Justice Barak mentioned the case of dependants and persons who are supported without being dependants for whom the award of compensation for the 'lost years' will ensure that they are supported.

With regard to the estate, Justice Barak held that recognition of the right of the living injured person to compensation for the 'lost years' also leads, under prevailing law, to the recognition of the right of the estate to compensation under this head of damage. Moreover, the award of compensation to the estate for the 'lost years' means supporting various persons who are 'dependants.' The concern that the tortfeasor may be found liable to pay twice can be allayed — so Justice Barak held — by subtracting the amounts paid to dependants for loss of support from the compensation to the estate.

10. Since then, the issue of the 'lost years' has not been considered in this court on its merits, but the courts have relied on *Estate of Sharon Gavriel v. Gavriel* [1] in several cases (see, for example, CA 116/81 *Estate of Aharon Knafo v. Arnon Tussia Cohen* [6]; CA 248/86 *Estate of Lily Hananshwili v. Rotem Insurance Co. Ltd* [7]; CA 642/89 *Estate of Meir Schneider v. Haifa Municipality* [8]; CA 4022/98 *The Technion, Israel Technological Institute v. Twister* [9] (in this judgment the question of compensation did not arise with regard to the lost years of earnings, but with regard to other heads of damage in the 'lost years'); see also CA 110/86 *Gevaram v. Heirs of the late Shalom Manjam* [10], at p. 199, in which Justice H. Ariel mentioned the rule in *Estate of Sharon Gavriel v. Gavriel* [1], and said that in that case he tended towards the minority view). It seems to me that the passage of time, the new trends in awarding compensation in Israeli law and the changes that have occurred in other legal systems all justify a re-examination of the rule that was decided in *Estate of Sharon Gavriel v. Gavriel* [1] by a majority of three judges to two. Indeed, the 'book of judicial case law is open, and new chapters are written in it all the time. These are built on the past, reflect the present and form a basis for the future. Movement is unceasing. Change is perpetual' (HCJ 693/91 *Efrat v. Director of the Population Register at the Ministry of Interior* [11], at p. 796).

Let us turn, therefore, to examine the reasons and the arguments that have been made — both for and against — with regard to the awarding of compensation for the loss of earning capacity in the 'lost years,' and let us begin with the claim of a living injured person.

*Compensation for the 'lost years' of earning: claim of a living injured person*

11. The opinion of Justice Barak in *Estate of Sharon Gavriel v. Gavriel* [1] was based both on 'technical' considerations — looking at the issue from the viewpoint of the injured person — and 'policy' considerations — mainly concerning persons supported by, and dependent on, the injured person. We too will follow this path that Justice Barak delineated.

*The viewpoint of the injured person*

*Restitutio in integrum*

12. It is not unusual that the life expectancy of a person, who is injured as a result of a tortious act, is shortened to less than the retirement age that he would have anticipated had the damage not occurred. In the past, medicine had difficulty in providing a diagnosis, with the degree of proof required in a civil trial, to the effect that the life expectancy of an injured person was shortened as a result of the accident. Consequently, compensation was awarded according to the normal life expectancy of the injured person. The significance of this is that, in practice, compensation was awarded also for the loss of earning capacity in the 'lost years,' although this was not for substantive reasons of principle but rather for reasons that were mainly technical and evidential.

The tools that are today at the disposal of scientists and doctors led to a significant change in this regard, and they often make it possible to prove, on a balance of probabilities, that the life expectancy of the injured person — and consequently also his working life expectancy — has been reduced (see J.G. Fleming, 'The Lost Years: A Problem in the Computation and Distribution of Damages,' 50 *Cal. L. Rev.* 598 (1962), at pp. 598-600). The result, somewhat paradoxically, is that in legal systems where compensation is awarded for loss of earnings according to working life expectancy *after the accident* (i.e., when the 'lost years' are not recognized), scientific advancement, and with it the possibility of proving a reduction of life expectancy, has reduced the amount of the damages awarded for the head of loss of earnings. In other words, in those legal systems that do not recognize a right to compensation for the lost years of earning, the proof of a reduction of life expectancy reduces the compensation for loss of earnings. The profits that the injured person could have made in the years of life that have been lost are not claimable in these legal systems. So we find that there are cases in which the tables are turned and it is actually the injured person who argues for a long life expectancy, whereas the tortfeasor argues for a significant reduction of life expectancy (see, for example, CA 2939/92 *General Federation Medical Fund v. Rachman* [12]; CA 4022/98 *The Technion, Israel Technological Institute v. Twister* [9]). Is this strange result consistent with the rules of awarding compensation in the law of torts? As will be seen, the answer to this is no.

13. There is no need to dwell upon the potential harm to the interests of the injured person and his way of life, as a result of a reduction of his life expectancy, and upon the suffering involved in a person knowing that he has lost years of his life expectancy that he would have had if he had not been injured by the tort. We are dealing with another potential outcome of the reduction of life expectancy, namely the harm to the earning capacity of the injured person in the 'lost years.'

The remedial purpose underlying the awarding of damages in the law of torts is, as aforesaid, the removal of damage and compensation for it, in order to return the injured person, in so far as possible, to the position in which he would have been had he not been injured by the tort (see A. Barak, 'Assessing compensation in personal injury: the law of torts as it is and as it should be,' *supra*, at pp. 249-251). The awarding of compensation can be compared to a balance — an external balance and an internal balance. On one pan of the external balance lies a weight marked 'before,' which examines what the position of the injured person would be *had the accident not occurred*. On the other pan of the external balance lies a weight marked 'after,' which examines the position of the injured person *in consequence of the accident*. The compensation serves a single purpose — to balance the scales. To this end, one must also take into account the internal balance that are factors in the 'after' pan of the external balance. On one pan of the internal balance lies a weight marked 'loss.' One must examine the *losses* of the injured person as a result of the accident. On the other pan lies a weight marked 'gain.' One must examine the advantages and gains that the injured person has received — if any — as a result of the accident. Weighing the loss and the gain that were caused to the injured person as a result of the accident gives a complete picture of the injured person's position after the accident, and allows this to be weighed against what the position of the injured person would have been had the accident not occurred. Only then is it possible to award the injured person an amount of damages that will correct the imbalance caused as a result of the accident. It is not for nothing that the English word 'compensation' comes from the Latin word *compensatio*, whose basic meaning is a 'joint weighing' of one thing against another.

14. From this 'remedial' outlook in the laws of compensation we derive the rule that where a person suffers damage as a result of a tort, and this is expressed in a loss of his earning capacity in comparison to the capacity he would have had if it had not been for the tort, the injured person has a right to compensation. The assessment of the compensation is made in accordance with the difference between the earning capacity of the injured person without the tortious act (if the tortious act had not occurred) and his earning capacity as a result of that act (CA 70/52 *Grossman v. Roth* [13], at p. 1251; CA 79/65 *Israel Steel Enterprises Ltd v. Malca* [14], at p. 270). We must therefore examine the difference between the earning capacity that the injured person had *before the accident* and the earning capacity that remains *after the accident*, taking into account his disability (see CA 5794/94 *Ararat Insurance Co. Ltd v. Ben-Shevach* [15]). This leads to the question: what difference is there

between an injured person, who suffers an injury that deprives him of his earning capacity in its entirety, and an injured person whose life expectancy has been shortened and whose earning capacity in the 'lost years' has been lost? Both of these have lost their earning capacity, and they therefore claim pecuniary compensation that will place them — in so far as possible — in the position they would have been in had it not been for the tortious act. Had it not been for the accident, both the one and the other could have earned a certain amount that would have been used by them and their family members, but as a result of the accident they no longer have this possibility.

It appears, therefore, that in so far as 'returning the injured person to his original position' is concerned — from a study of the external balance — it is difficult to find a real reason that justifies a different attitude towards an injured person who lost his earning capacity but whose life expectancy remained as before, as compare with an injured person whose life expectancy has been shortened. With regard to the latter we should also examine the amount that he could have earned had the accident not occurred — i.e., the earning capacity that he would have had *if it had not been for the accident*, taking into account the life expectancy that he anticipated *shortly before it occurred* — and we should compare this amount with the amount that he is able to earn *after the accident*, taking into account the earning capacity and life expectancy that remain. The difference expresses the reduction in earning potential of the injured person as a result of the accident. The reason for this is that it is not possible to speak of earning capacity while ignoring the earning period. This was discussed by D. Katzir:

'Awarding compensation, within the framework of "pecuniary damage" for loss of earning capacity, ought to reflect the full difference in the earning capacity of the injured person before the injury as compared with his earning capacity after it; this earning capacity, in the view of Justice Barak, constitutes an "asset that belongs to its owner"…, which entitles him to compensation in the event that he is injured. It is well-known that this capacity is a function of the length of the period in which it will find expression… no significant difference should be recognized between full loss of earning capacity resulting from the injury, and the *full* loss of certain years in which this capacity will not find expression. Just as in the first case the injured person is entitled to full compensation, so too is he entitled, in principle, to full compensation in the second case' (Katzir, *Compensation for Personal Injury*, *supra*, at pp. 269-270).

It should be noted that the risks that the injured person faces, including the risk of a reduction of life expectancy, are taken into account in the compensation — negatively — only in so far as concerns the question of risks that would that he faced even before the accident. Where these risks are a function of the accident, there is no basis for deducting them from the compensation to which he is entitled. This is an 'absolute rule' that underlies the idea of returning the injured person to his original position. The outcome is that in awarding the compensation for loss of earning capacity, the life expectancy of the injured person *before the accident* should be taken into account.

15. A similar approach has been expressed also in the rulings of courts in other countries. For example, in *Skelton v. Collins* [106], the High Court of Australia held that:

'… what is to be compensated for is the destruction or diminution of something having a monetary equivalent… I cannot see that damages that flow from the destruction or diminution of his capacity [to earn money] are any the less when the period during which the capacity might have been exercised is curtailed because the tort cut short his expected span of life' (at p. 129).

In one case in the United States, the court considered the distressing case of a child who, when he was five years old, was infected with the AIDS virus as a result of an infected blood transfusion. His claim under the Federal Tort Claims Act was accepted, and the Federal Court awarded him compensation for the loss of earning capacity in the years of life that he could have anticipated, had it not been for the accident, after deducting from this amount the living expenses that he required in the 'lost years.' The court wrote in that case, with regard to awarding the compensation for the loss of earning capacity in the lost years of life:

'Using a postinjury rather than a preinjury work life expectancy to calculate lost earning

capacity would violate fundamental principles of the law governing damages and would produce an absurd and unjust result... the measure of damages for lost earning capacity is the amount by which the plaintiff's ability to generate earnings has been diminished as a result of the defendant's negligence. It should make no difference whether that diminution takes the form of a reduction in the salary the plaintiff is able to command or a decrease in the number of years the plaintiff is able to work. In either case the net result is that the ability to generate earnings is lessened because of the defendant's negligence. Depriving a plaintiff of the right to recover for that portion of his loss attributable to a shortened work life expectancy would frustrate the objective of making the plaintiff whole. Moreover, it would permit the tortfeasor to benefit from the consequences of his own wrongful act at the expense of the innocent victim. Such a result would be inconsistent with both law and logic. Indeed, the weight of authority is that loss of earning capacity should be measured over the course of the work life expectancy the plaintiff would have had if no injury had been sustained' (*Doe v. United States* (1990) [80]).

Similarly in England Justice Streatfield criticized the approach whereby the defendant may argue against the injured person, whose life expectancy has been shortened, that the latter has a right to compensation, for loss of earnings, only for the years that the defendant has left him:

'If that indeed is the law, then I respectfully suggest that it would be very unjust, because, after all, the object of damages, as I understand them, is to do the best they can to compensate a man who has been injured, for what he has lost. What he has lost... is not only the ability to earn X Pounds a year, but the ability to earn it over that period of time that he might reasonably expect it' (*Pope v. D. Murphy & Son Ltd* [133]).ב

16. It follows that the basic principle of the law of torts, according to which the compensation awarded should make the damage good and return the injured person, in so far as possible, to the position he would have been in had it not been for the tortious act, supports the awarding of compensation to the living injured person for the loss of earning capacity in the 'lost years.' This is because the loss of earnings is spread over units of time whose length is the length of the working life expectancy that the injured person had before the accident. The compensation for the 'lost years' is therefore capable of remedying the unequal state of affairs that was created as a result of the tortious act. It offers a solution to the injustice that is inherent in the denial of the right of compensation to someone who is not able to realize his earning capacity, because of a reduction of his life expectancy brought about by a tort, while at the same time compensation is awarded to someone whose inability to realize his earning capacity derives from his being injured by a tort. This results in it being cheaper to kill than to wound. It should be noted that we are not concerned with punishing the tortfeasor but with studying the balance and refraining from an unjust reduction of the compensation merely because of the fact that in addition to the harm to the injured person's earning capacity the tortfeasor also caused him a reduction of his life expectancy.

In this spirit it has been held in the United States for many years that the loss of earning capacity of the injured person should be assessed according to the life expectancy that he anticipated *before the injury,* based upon an approach that there is no reason to reduce the pecuniary liability of the tortfeasor merely because of the extreme seriousness of the consequences of his acts (see *Prairie Creek Coal Mining Co. v. Kittrell* [81]; *Littman v. Bell Telephone Co. of Pennsylvania* [82]; Comment: The Measure of Damages for a Shortened Life, 22 *U. Chi. L. Rev.* 505 (1955), at p. 506. Especially apposite in this regard are the remarks of Judge Weinstein in *In re Joint Eastern & Southern District Asbestos Litigation* [83], at p. 428:

'Calculating damages for lost earning capacity based on the victim's pre-injury life expectancy has been criticized as overcompensating the plaintiff, because no deductions are made for his or her living expenses between the time of projected actual death and the time death probably would have occurred had there been no injury. It has been viewed, however, as the "lesser of two evils." The alternative method of awarding damages based on the victim's shortened life expectancy would, in effect, reward the defendant for having successfully injured the plaintiff so severely as to curtail his or her life span, and would under-compensate plaintiff's dependents for the loss of support during those lost years' (at

p. 428).

We can already point out, and we will dwell on this below, that the difficulty inherent in over-compensation, which is raised at the beginning of Judge Weinstein's remarks, is solved in most legal systems by means of a deduction of the living expenses that were required by the injured person in the 'lost years' from the amount of compensation.

17. It is accepted that the law of torts has another purpose, which sits alongside the purpose of doing justice, and that is to provide an effective deterrent (see CA 44/76 *Atta Textile Co. Ltd v. Schwartz* [16]; see also CFH 7794/98 *Ravid v. Clifford* [17]). The law of torts is regarded by many as a tool for furthering the goal of channelling the collective social benefit (for a general discussion, see I. Gilead, 'On the scope of the effective deterrent in the law of torts,' 22 *Mishpatim* 437 (1993)). This is achieved, *inter alia*, by creating a legal system that makes the tortfeasor act carefully by internalizing the consequences that follow from his actions. For this purpose, it is desirable that the tortfeasor should indeed pay for all the damage that he caused by his act. The tortfeasor should pay, at least, the amount of the loss (L) in the Hand formula (see R.A. Posner, *Economic Analysis of Law* (fourth edition, 1992), at p. 176; for calculating the Hand formula, see *United States v. Carroll Towing Co.* (1947) [84]). Indeed, imposing compensation in an amount that exceeds the damage or an amount less than the damage is likely to lead to undesirable results. This was discussed by Polinsky and Shavell, who pointed out that in the system of liability for negligence, which relies on the Hand formula, it is important that the compensation is equivalent to the damage:

'Under the negligence rule, if damages equal harm, potential injurers will be led to comply with the negligence standard... and thus to take appropriate precautions. If a precaution costing $50,000 would prevent a harm of $100,000, the threat of having to pay damages of $100,000 for not taking the precaution would induce a party to spend $50,000 on the precaution. However, if damages are less than harm, the negligence standard might not be met and underdeterrence would result. In the example, if damages are only $40,000 (even though harm is $100,000), the party would not be led to take the precaution costing $50,000' (A.M. Polinsky & S. Shavell, 'Punitive Damages: An Economic Analysis,' 111 *Harv. L. Rev.* 869 (1998), at p. 882).

It follows from the aforesaid that if the tortfeasor is likely to pay compensation that is less than the damage caused, his deterrent is defective, and because of this he is likely to continue his undesirable activity, or to refrain from adopting precautions whose cost is less than the damage (see A. Porat, 'Collective Responsibility in the Law of Torts,' 23 *Mishpatim* 311 (1994)). This can undermine the goal of effective deterrent. In our case, denying compensation for the 'lost years' can create a situation in which, despite the serious damage caused as a result of the tortfeasor's act, he will be exempt from the obligation to pay compensation for a significant part of the damage. There is no doubt that where the working life expectancy of the injured person is shortened, the damage of loss of earning capacity extends also to the 'lost years.' Leaving this damage without compensation means impairing the general deterrent.

Consider, by way of example, two tortious scenarios: in the first scenario, the tortfeasor causes the injured person, by means of a tort, a serious physical handicap, which deprives the injured person of any ability to work and earn money, even if his life expectancy is not shortened. In the second scenario, the tortfeasor, by means of a tortious act, causes, in addition to the serious physical handicap, also a reduction of the life expectancy of the injured person, and consequently to the injured person being unable to work and earn money. In so far as the loss of earning capacity is concerned, there is no substantive difference between the damage that the tortfeasor caused in the first scenario and the damage that the tortfeasor caused in the second scenario (on the assumption that the injured person is the same). In the two cases, the amount of the damage is the amount that the injured person expected to earn throughout the years of his working life that he would have had if it had not been for the accident (for the methods of calculating this amount, see, for example, CA 30/80 *State of Israel v. Asher* [18]; CA 722/86 *Youness v. Israel Car Insurance Pool* [19]). However, according to the approach that denies the right to compensation for the loss of earning capacity in the 'lost years,' there is likely to be a significant difference between the two scenarios, from the viewpoint of the amount of compensation for this damage; the tortfeasor in the second scenario will not be held liable for the full

amount of damage that he caused by means of the tort, and therefore we cannot expect him to consider the consequences of his torts before he acts. The deterrent effect is, consequently, defective. But awarding compensation to the injured person for the loss of his earning capacity in the 'lost years' (while taking into account the expenses that the injured person is 'saved' during those years) will result in a full internalization of the costs arising from the tortfeasor's acts.

It should be noted that the economic consideration that we have been discussing cannot decide the question before us. It can only add an extra dimension to the argument that denying compensation for the 'lost years' is problematic, in view of the guiding principles in the doctrine of compensation and in view of the accepted goals that the law of torts is intended to achieve.

*Is it really true that 'without life there is no loss of capacity'?*

18. There are those who believe that in view of the fact that the injured person will not be alive during the 'lost years,' there is neither a need nor a justification for compensating him for loss of earning capacity in those years. According to this approach, 'it is not earning capacity that the injured person has lost, but he has lost life itself, and without life there is no loss of capacity' (see *Oliver v. Ashman* [134]; for a discussion of this argument see *Estate of Sharon Gavriel v. Gavriel* [1], at p. 548). This argument cannot be accepted. Alongside the loss of years, the injured person also lost the capacity to obtain income during those 'lost years.' We should remember that the law of torts does not purport — since it does not have the power needed to do this — to return the injured to his *actual* original position. 'No money in the world can compensate for the suffering of the body and soul, the loss of opportunities to have a family, or the loss of the pleasures of a normal life. However, since what has been taken has been taken, and what has been lost has been lost, and it is not possible to return the injured person to his original position, and the compensation must be expressed in money, the money ought somehow to answer the question' (see CA 541/63 *Reches v. Hertzberg* [20], at p. 126). 'Returning the injured person to his original position' — so it was written — 'is not possible in the sense that the pain that has been suffered cannot be erased and the life expectancy that was reduced cannot be extended. But this does not prevent returning the injured person to his original position in a certain sense' (A. Barak, *The Law of Torts — General Principles of Torts* (second edition, 1976, G. Tedeschi ed.), at p. 574). Indeed, the very nature of tortious compensation — especially when we are speaking of compensation for personal injury, and even more so when we are speaking of compensation for future damage — means that the compensation has something fictitious, speculative and artificial about it. Money cannot replace a damaged limb, the suffering involved in loss of a place of work, and it can certainly not replace years of life that have been lost. However, this alone cannot undermine the power of the courts to award compensation, in so far as this is necessary in order to bring the injured person as close as possible to the position he would have been in, had the damage not occurred. 'Compensation will not bring the injured person back to life, but it will provide a pecuniary valuation of the pecuniary value of the loss' (*Estate of Sharon Gavriel v. Gavriel* [1], at p. 551). The compensation will not prevent the suffering, but it can make the suffering bearable.

19. An injured person, who on account of a tortious act lost his life or had his life expectancy reduced, is entitled — and there is no dispute as to this in our legal system — to compensation for the *non-pecuniary damage* inherent in the loss or the reduction of life expectancy (see CA 773/81 *Estate of Robert Freilich v. State of Israel* [21]). Depriving the injured person of years of life — the 'lost years' — is considered, therefore, to be non-pecuniary damage that is compensatable. But this loss leads to another loss — the loss of income that would have accrued to the injured person from his work in those 'lost years.' According to this outlook, the injured person has lost an 'asset,' namely his work capacity, which was expected to bring him income. This was discussed by Justice Dickson of the Canadian Supreme Court, who said:

> 'It is not loss of earnings but, rather, loss of earning capacity for which compensation must be made... A capital asset has been lost: what was its value?' (*Andrews v. Grand & Toy Alberta Ltd.* [112], at p. 251).

This was repeated in the leading judgment of the House of Lords in *Pickett v. British Rail Engineering Ltd* [135], in which Lord Wilberforce criticized the approach that denied entitlement to compensation for the 'lost years' in this language:

'Does it not ignore the fact that a particular man, in good health, and sound earning, has in these two things an asset of present value quite separate and distinct from the expectation of life which every man possessed?' (at p. 149).

Indeed, when we are speaking of the damage of the loss of earning capacity, we are not speaking of a series of future losses, but of an immediate loss, here and now (see S.M. Waddams, *The Law of Damages* (loose-leaf edition), Toronto, Canada Law Book, 2003, at § 3.710). This was held in England (*Pickett v. British Rail Engineering* [135]), in Canada (*Andrews v. Grand & Toy Alberta Ltd.* [112]; *The Queen in right of Ontario v. Jennings* [113]), in Australia (see *Skelton v. Collins* [106]) and in the United States (for the approach accepted there, see *Mclaughlin v. Chicago, Milwaukee, St. Paul & Pacific Ry. Co.*, (1966) [85]).

20. In this respect, we should reconsider the theoretical and practical distinction between compensation for loss of earnings and compensation for loss of earning capacity. If we are speaking of compensation for loss of earnings, then the only question is what would the injured person have earned *in practice*, had it not been for the accident. Thus, for example, a person who is a qualified engineer, who does not work but cares for his children, is not entitled, according to this approach, to compensation for the head of loss of earnings. This is not the case according to the outlook that regards earning capacity as a valuable asset, which, if taken away from its owner, is compensatable damage. According to this approach, the compensation is given after taking into account what the injured person *could have* earned, had it not been for the injury. Thus, for example, a woman who is a qualified lawyer, is entitled to compensation in accordance with this qualification, even if at the time of the accident she did not work as a lawyer nor even intended to work as such (J. Cassels, *Remedies: The Law of Damages* (2000), at p. 125).

It should be noted that in Israeli law (as well as in other legal systems) the distinction between loss of earnings and loss of earning capacity is not always observed, and it appears that case law moves on both tracks at the same time, or perhaps it is more correct to say — on a middle track (see also Katzir, *Compensation for Personal Injury*, *supra*, at pp. 257-258). Thus, for example, the willingness to award compensation to a child for loss of earnings reflects an approach that recognizes loss of earning capacity as compensatable damage. Moreover, in one case Justice Y. Shilo expressed the opinion that:

'The tortfeasor must [therefore] compensate a person for a reduction in working capacity as a result of a wound, for which he is responsible, and it makes no difference whether the reduction in work capacity leads in the future to a reduction in income or not. The damage that requires compensation is the damage to the person's capacity to work for remuneration, according to the scope determined at the time of giving the judgment, and the arguments of the tortfeasor that the injured person in any event does not make use of this capacity nor will he do so in the future will not be heard' (CA 237/80 *Barsheshet v. Hashash* [22], at p. 296).

Justice Barak, on the other hand, preferred the 'tangible' approach, according to which:

'The value of the earnings that the injured person would have made in the future had it not been for the accident is determined in accordance with the personal details of the injured person, taking into account his desires and intentions. The test is not according to theoretical earnings, which he was likely to earn if he had used all of his abilities. The test is according to tangible earnings, which he was likely to earn by using his abilities in practice. It follows that if for any reason the injured person does not make use of his ability in the present or in the future, there is no injury to his capacity, since this capacity is not utilized in practice' (*ibid*., at p. 300).

Therefore Justice Barak held that 'for compensation of loss of earning capacity one must point to the existence of a possibility, which is not merely hypothetical, that the injured person would have had earnings in the future, had it not been for the accident, and that the accident harmed these earnings' (*ibid*., at p. 307).

It appears that the proper approach is the one delineated by Justice Barak. According to this approach, the harm to earning potential is, indeed, compensatable damage, provided that there exists a possibility, which is not negligible or completely speculative, that this potential would have been

realized. But in any case, there is no dispute that the earning potential is an asset that belongs to its owner. The earning potential, in this sense, reflects the 'economic horizon' of the injured person, and the compensation for loss of earning capacity in the 'lost years' is intended to compensate the injured person for the reduction of this horizon (see *In re Joint Eastern & Southern District Asbestos Litigation* [83], at p. 427). The assessment of the loss is another question.

21. As an additional remark on this subject, the statement of Lord Justice Pearce in *Oliver v. Ashman* [134], that 'what is lost is an expectation, not the thing itself' seems to me problematic. Whenever we speak of loss of earning capacity, we are speaking of the loss of an expectation. The loss of capacity means a loss of the expectation or possibility of realizing the capacity, and this, in fact, is 'the thing itself.' Similarly, the approach shown by Lord Justice Pearce, *ibid.*, that one cannot speak of loss of earnings when a person died early, because 'he is no longer there to earn them, since he had died before they could be earned' seems to me problematic. Even a person who is paralyzed in his four limbs but remains alive is not 'there' in order to earn income, since he was injured before he could earn it. The same is true of any person whose earning capacity is impaired. Indeed, it is not life or death that determine the issue, but the capacity to earn income. In this respect another question arises, namely whether the fact that the injured person cannot enjoy the compensation during the lost period can deny his right to receive it. This question will be considered now.

*Is it really true that when there is no benefit from the compensation there is no compensation?*

22. Depriving the injured person of years of life, which harms his ability to earn, is, therefore, an impairment of his earning capacity, which is an asset that belongs to its owner. Should this injury be left without compensation, merely because the injured person cannot, because of his anticipated death, enjoy the compensation? The answer to this is no.

In *Oliver v. Ashman* [134] Justice Wilmer wrote the following:

'For what has been lost by the person assumed to be dead is the opportunity to enjoy what he would have earned, whether by spending it or saving it. Earnings themselves strike me as being of no significance without reference to the way in which they are used' (at p. 240)

Another approach in this matter was stated by Justice Barak in *Estate of Sharon Gavriel v. Gavriel* [1]:

'It is true that the injured person who is living will not himself be alive during the lost years and will not be able to use the income that he will receive, but this is of no significance, since the question is not what use the injured person will make of his money in the future but what use has he been prevented from making. As a result of the tortious act, the injured person's ability to do what he wishes with his income has been impaired… the pecuniary compensation cannot return to the injured person life itself, but it can return to him the pecuniary value of his earning capacity that was impaired' (*Estate of Sharon Gavriel v. Gavriel* [1], at p. 548).

23. Admittedly, the assumption is that the injured person will not be fortunate enough to live during the 'lost years,' and therefore he cannot enjoy the compensation money for the loss of income in those years. But this is of no significance. Just as we compensate the injured person or his estate for the non-pecuniary damage involved in the reduction or loss of life expectancy, and just as we compensate the injured person who is in a permanent vegetative state or who lost in some other way the ability to derive enjoyment from the compensation money (see *Naim v. Barda* [3], at pp. 783-784; Barak, 'Assessing compensation in personal injury: the law of torts as it is and as it should be,' *supra*, at p. 259; see also CA 141/89 *Mahmoud v. Shamir Insurance Co. Ltd* [23]; *Lim Poh Choo v. Camden & Islington Area Health Authority* (1980) [136]), so too we should not refrain from awarding compensation to an injured person who is alive for the lost years of earning:

'For the purpose of determining the "compensatable damage" — as distinct from determining the amount of the compensation — it is not important, nor does it concern the tortfeasor, whether the injured person can enjoy the money that he received or not… just as an injured person who is in a permanent vegetative state cannot realize his income in the lost years, so too the injured person who is alive; and like the injured person who is in a permanent vegetative state he is entitled, notwithstanding, to compensation for loss of

earnings in these "lost years." Moreover, even if the injured person who is alive cannot use his income "during the lost years," he can make use of his income for the "lost years," in order to ensure that after his death the purposes that are important to him will continue as they would have continued if he had continued to live and work' (*Estate of Sharon Gavriel v. Gavriel* [1], at p. 550).

Take the case of someone aged 50, who works for his living and is expected to continue to do so until the age of 65. This person is reduced to a permanent vegetative state as a result of a tortious act, and his doctors predict his life expectancy to be two years, during which he will remain in the permanent vegetative state and will not open his eyes. According to the prevailing law, this person will be entitled to compensation for the two years during which he will lie in hospital, unconscious, but he will not have a right to compensation for the thirteen years of earning that he would have had but will no longer have. This result is devoid of justice and logic.

The remarks of S.M. Waddams in his book *The Law of Damages*, *supra*, are apposite here:

'Many would say instinctively that a person cannot be said to suffer a financial loss during a period when the person will not be alive to enjoy the use of any compensation that might be awarded for lost earnings. However, this view would lead also to the denial of recovery in the case of a plaintiff rendered permanently unconscious for of such a person it can also be said that the person will not be able to enjoy the use of compensation' (at § 6.800).

In *Croke v. Wiseman* [137], Justice Shaw brought an example which, even though it is not identical to our case, serves to emphasize the claim that the question of the injured person's capacity to enjoy the compensation money is irrelevant to the actual entitlement to the compensation: a very wealthy person whose leg was amputated in an accident will not derive any profit or benefit from the compensation money that his existing resources cannot provide him. But the fact that the compensation money does not give him anything does not deny him of the actual right of receiving it (*ibid.*, at p. 863).

24. Moreover, even if the heirs benefit from the compensation rather than the injured person, this is not a matter for the law of torts to concern itself with. It is merely a consequence of the laws of inheritance. In any event, there is no difference, in this respect, between the compensation for the loss of earnings in the 'lost years' and any other compensation to which the injured person is entitled and which passes to his heirs when the injured person passes away (*Estate of Sharon Gavriel v. Gavriel* [1], at p. 552). Thus, for example, in a case where the injured person was caused pain and suffering as a result of the tortious act, he is entitled to compensation for pain and suffering, and when he dies this right passes to the estate (see, for example, CA 384/74 *Estate of David Azoulay v. Vulcan Casting Enterprises Ltd* [24], where the injured person was severely burnt in a work accident and suffered extreme pain for four days before he died, and the court awarded his estate compensation for pain and suffering and a reduction of his life expectancy; see also CA 2376/93 *Estate of Michal Kedar v. HaSneh Insurance Co.* [25]; and cf. s. 4 of the Compensation Law and r. 4 of the Road Accident Victims Compensation (Calculation of Compensation for Non-Pecuniary Loss) Regulations, 5736-1976). It follows therefore that the estate does not obtain a 'windfall.' This was discussed by Waddams in *The Law of Torts*, *supra*:

'… it can be said that this kind of windfall is an inevitable consequence of the survival of actions legislation. Once the old rule is abandoned and it is accepted that a personal action survives, it inevitably follows that a deceased's estate will receive what some might describe as a windfall. Indeed the real cause of the enrichment is not even the legislation but the very concept of inheritance of wealth' (at § 6.860).

25. Therefore our conclusion is that the assumption that the injured person will not be alive in order to enjoy the compensation money for the 'lost years' cannot undermine the actual right to compensation. The compensation reflects the loss of the injured person's capacity to earn money and to do with his income what he wishes, and the tragic fact of the injured person's untimely death does not negate this loss.

It is appropriate to end this part of the judgment by citing the remarks of Lord Wilberforce, who expressed the other approach, according to which the lack of capacity to enjoy the lost profits denies the right to compensation, in language that puts into clearer perspective the difficulty of that approach:

'Nothing is of value except to a man who is there to spend or save it. The plaintiff will not be there when these earnings hypothetically accrue: so they have no value to him' (*Pickett v. British Rail Engineering* (1980) [135].

The determination is forceful, but problematic.

*The dependants' perspective*

26. Another question of great importance, which we have already hinted at above, concerns the dependants of the injured person whose life expectancy has been shortened. Indeed, hitherto we have considered the question of compensating an injured person who is living for loss of his earning capacity in the 'lost years' mainly in the light of the remedial purpose of the law of torts. The considerations that we discussed derive from a desire to improve the injured person's position and to remove the damage — in so far as this is possible by means of pecuniary relief. These considerations seek to return the injured person to his original position. They are based on an outlook that recognizes the right to compensation for that loss, despite the particular dimension of objectivity inherent in this damage, i.e., the compensation is given to the injured person for the damage of losing the capacity to derive income in the 'lost years' even if he himself is not expected to live during those years and to enjoy the compensation. But these considerations — the 'technical' considerations in the words of Justice Barak in his opinion in *Estate of Sharon Gavriel v. Gavriel* [1] — do not stand alone. Alongside them are additional considerations — which are social in essence (policy considerations). These found expression in *Estate of Sharon Gavriel v. Gavriel* (1), both in the minority opinion and in the majority opinion, and they have guided case law in other countries. We are concerned here with the need to provide a proper solution for the dependants of the deceased injured person, who find themselves, in certain cases, helpless — without support and without compensation.

27. Before we enter into this question in detail, we should first outline, in brief, the statutory framework with regard to the effect of the death of an injured person on liability in torts. When a person who was injured by a tort dies, a right of claim may accrue both to the estate and to his dependants. With regard to the estate, the Torts Ordinance tells us that when a person dies, all the causes of action arising from torts that were available to the deceased continue to be available to his estate (s. 19(a) of the Ordinance). In other words, the rights that a deceased injured person had to sue the tortfeasor, both for pecuniary loss and for non-pecuniary loss, survive if they have not been exhausted, and pass to his heirs (see CA 148/53 *Penetz and Egged Operative Group Ltd v. Feldman* [26], at pp. 1716-1717). It should be noted that in England a different approach was originally accepted, according to which personal claims for a tort did not survive the death of the injured person or of the tortfeasor, even if the death of the injured person was caused by the tortious act (*actio personalis moritur cum persona*). This approach sustained criticism from every direction, until in 1934 the law was changed by the enactment of the Law Reform (Miscellaneous Provisions) Act 1934, which provided for the 'inheritance' of rights and debts as aforesaid by the estate (a similar development began in Canada in the province of Ontario in 1886, within the framework of The Revised Statute respecting Trustees and Executors and the Administration of Estates).

Section 19 of the Ordinance further provides that where the act or omission that created the cause of action is also what led to the death of the injured person, 'the compensation that can be recovered by the estate shall be calculated without taking into account the loss or profit caused to the estate as a result of the death...' (s. 19(b)). The logic underlying this provision is that the claim is not that of the heirs, but of the deceased. An exception to this is funeral expenses, which may be paid (end of s. 19(b)). It is further provided in s. 19 of the Ordinance that the rights granted to the estate are not intended to add to the rights granted to the dependants of the deceased nor to derogate from them (s. 19(d)).

28. The dependants of the injured person have an additional — independent — claim, where the tortious act led to the death of the injured person (see ss. 78-81 of the Ordinance, which provide an arrangement similar to the English law, the Fatal Accident Act, 1846, and subsequently the Fatal Accident Act, 1976). The dependants, who are the spouse, parents and children of the deceased, are entitled to compensation for the pecuniary loss that they suffered as a result of his death (ss. 79 and 80 of the Ordinance; CA 482/89 *Estate of Sarah Abir v. Ferber* [27], at p. 109; CA 506/82 *Sontag v. Estate of David Mendelsohn* [28]). The tortfeasor must compensate the dependants of the deceased for the loss of the economic support to which they had an expectation, had the deceased remained alive (CA 64/89 *Gabbai v. Lausanne* [29]). It should be noted that not all damage caused to the dependants is compensatable, but only the pecuniary damage involved in the loss of pecuniary support deriving from their family dependence on the deceased (CA 206/87 *General Federation Medical Fund v. Estate of Dr Meir Edison* [30], at pp. 79-80; FH 24/81 *Honovitz v. Cohen* [31], at p. 420). The amount of this damage is usually determined by means of the parts method, which expresses an accepted factual presumption (CA 32/60 *Felixberg v. General Manager of the Railway* [32]). The court discussed the principles that apply with regard to a claim of dependants

in *Ararat Insurance Co. Ltd v. Ben-Shevach* [15]:

> 'In a claim made by dependants, the loss of support that will be awarded to them is also derived from the earning capacity of the injured person (the deceased). They are entitled to the loss caused to them as a result of the death of the deceased, who supported them, namely their share in the family "pie" from which they would have benefited, if the deceased had not died. In order to determine this loss, we must determine what would have been the earning capacity of the deceased if he had not died as a result of the accident. Just as in the case where the plaintiff is harmed as a result of being injured in an accident he should be awarded the pecuniary damage caused to him as a result of the accident, including the loss of earning capacity (s. 76 of the Torts Ordinance [New Version]), so too the dependants are also entitled to the "pecuniary loss that they actually suffered or will actually suffer in the future," as stated in s. 80 of the Ordinance' (*ibid.*, at p. 494).

29. Section 78 of the Ordinance provides a qualification that the right of the dependants to compensation arises only where the tort caused the death of the person upon whom they were dependent, *and that person was entitled, at that time, to compensation*. This means that although the right of the dependants to receive compensation from the tortfeasor is an independent right, distinct from the right of the deceased, it is still conditional upon the fact that, had he not died, the deceased would have himself had the right, within the framework of a claim against the tortfeasor, to compensation for his damage (*Gabbai v. Lausanne* [29]). Only when the injured person died *before realizing his right to receive compensation for his damage* is the way paved for the dependants to make a claim (the law in England and many other countries is similar; see, for example, *Pickett v. British Rail Engineering* [135]).

This is the root of the problem, as described by Justice Barak, in *Estate of Sharon Gavriel v. Gavriel* [1]:

> 'The accepted approach is that the right of the dependants is conditional upon the fact that upon the death of the injured person ("at that time") he is entitled to compensation for the tort that was done to him. Therefore, if the injured person realized his right during his lifetime, whether by means of a judgment or by means of a waiver or in another way, he no longer has at the time of his death any right to compensation, and consequently the right of the dependants does not come into being... it follows that if the injured person who is living does not receive compensation, within the framework of his own claim, for loss of earnings in the "lost years," this will seriously harm his dependants. Indeed, according to this approach, the sole hope of the dependants is — and how macabre this hope is — that the living injured person does not file a claim during his lifetime, or if he files a claim, that he will "succeed" in dying before his claim is tried' (*ibid.*, at p. 553).

Indeed, if compensation for the 'lost years' is not awarded, the result obtained from the provisions of s. 78 of the Ordinance, in cases where the deceased does not have, when he died, a claim for compensation, is, from the viewpoint of the dependants, harsh and unjust. Take the case of a person who had a working life expectancy of twenty years, and because of a tortious act his life expectancy is reduced to only two years. The vast majority of the potential earning years, which will not be realized because of the act of the tortfeasor, will not be given any expression in the award of compensation, and the dependants, even if they inherit what he was awarded in his claim, will be left with an empty shell, unless the injured person chose — and to put such a choice before him is inconsistent with criteria of justice and logic — not to file a claim for his damage.

We should remember that the injured person frequently needs the compensation money as early as possible, in order to alleviate his pain and to provide for his needs and those of his family that arise from the damage of the accident. The choice of the injured person to file a claim for his damage should not harm, from a global perspective, his interests and those of his dependants.

30. It appears that the main logic underlying the denial of the possibility of compensation to the dependants, in cases where the injured person realized his right to compensation, is the fear of double compensation. But this fear arises only where the injured person himself has been compensated for loss of earnings in the 'lost years,' since this is the 'area of conflict' between the rights of the dependants and the rights of the injured person. If this is so, the source and logic of s. 78 of the Ordinance lie in a legal reality where compensation is awarded to the living injured person according to the full working life expectancy that he had before the accident. This is exactly what Fleming discusses:

> 'With few exceptions... this conflict has generally been resolved by subjecting the interests of the [dependants] to the risk of extinction by a prior recovery of the deceased, in the

assumed prospect of double liability. This fear would be warranted, however, only if the award to the decedent included compensation for his loss of earnings during the period by which his life has been curtailed, for this segment alone corresponds with the expectancy of support to which his dependants may lay claim in a wrongful death action' (Fleming, 'The Lost Years: A Problem in the Computation and Distribution of Damages,' *supra*, at pp. 598-599).

See also *In re Joint Eastern & Southern District Asbestos Litigation*, at p. 429.

31. The conclusion is that the provisions of s. 78 of the Ordinance in our law of torts are inconsistent unless compensation is awarded to the living injured person for the 'lost years.' Here it should be emphasized, parenthetically, that this is not the only place where one can find, in the Israeli law of torts, 'footprints' of an award of compensation for the 'lost years.' Below we will discuss additional footprints when we consider *Estate of Lily Hananshwili v. Rotem Insurance Co. Ltd* [7]. I would now like to address an additional provision in the arrangement for periodic payments prescribed in the Compensation Law with regard to claims being considered within the framework of that law. Section 6 of the Compensation Law authorizes the Minister of Justice to enact in regulations the 'power of the court to decide that the compensation for loss of earning capacity and continuing expenses, in whole or in part, shall be paid in periodic payments...' and also 'the right of dependants of an injured person who died after he was awarded periodic payments.' Indeed, the power of the court to award periodic payments for the heads of loss of earning power and continuing expenses was regulated in the Road Accident Victims Compensation (Periodic Payments) Regulations, 5738-1978. Regulation 3 provides:

> 'Right of dependants
>
> 3. (a) If an injured person dies after he has been awarded periodic payments, dependants who were completely or partially supported by him before his death shall be paid a pension in the following percentages of the amount awarded, provided that the total of all the pensions does not exceed the amount awarded:
>
> ...'

Thus we see that where someone is injured in a road accident and his life expectancy is shortened, the court may award him compensation by way of a periodic payment, and in such a case the aforesaid r. 3 ensures that after the death of the injured person pensions are also paid to his dependants. This duty to pay the dependants of an injured person who died is not subject to discretion, and it arises whether the injured person died as a result of the accident or not. The sole requirement stipulated in the regulation is that the injured person passed away after he was awarded periodic payments. This regulation, in the context, constitutes a partial solution to the problem of the 'lost years,' and it can be said that 'we can see from it a legislative trend that dependants of a living injured person will be entitled to compensation upon his death, notwithstanding the fact that before he died the injured person won damages of his own' (Justice Barak in *Estate of Sharon Gavriel v. Gavriel* [1], at p. 556). Indeed, there are some who believe that the best way to ensure, on the one hand, the freedom of the injured person to do with his money as he sees fit, and, on the other hand, the support of the dependants, is to determine some mechanism of periodic payments, whereby starting from the date of the injured person's death, the payments will be transferred to the dependants (see, for example, P. Cane & D. Harris, 'Legislation,' 46 *The Modern L. Rev.* 478 (1983), at p. 481).

It should be noted that the interest of dependants of an injured person in a road accident, who died *before he realized his cause of action*, is not subject to the provisions of s. 6 of the Compensation Law, and it is regulated within the framework of s. 78 of the Ordinance (with regard to the power to award periodic payments for dependants of the deceased who has not been awarded a pension, see CA 778/83 *Estate of Sarah Saidi v. Poor* [33]; for a general discussion, see also D. Moore, 'Periodic Payments to Victims of Road Accidents,' 6 *Tel-Aviv University Law Review (Iyyunei Mishpat)* 645 (1978)).

32. Let us return, then, to the provisions of s. 78 of the Ordinance. The anomaly that is created as a result of the provisions of this section, as described above, is not only the law in Israel, but it underlies the uncertainty of the courts in England on the question of compensation for the 'lost years.' In the past, the courts there adopted an

approach whereby the amount of compensation was determined in accordance with the lifespan that the injured person anticipated before he was injured in the accident (see *Phillips v. London & South Western Railway Co.* [138]; *Roach v. Yates* [139]). Several judgments that dealt with this in the middle of the twentieth century presented different approaches to the subject (see *Pope v. D. Murphy & Son Ltd* [133], according to which compensation should be awarded for loss of earning capacity according to the life expectancy before the accident, and, by contrast, *Harris v. Brights Asphalt Contractors Ltd* [1953] 1 Q.B. 617, in which the view expressed was that compensation should not be awarded for the 'lost years'). In 1962 the approach that denies entitlement to compensation for the 'lost years' became established; it found expression in the judgment of the House of Lords in *Oliver v. Ashman* [134]. In the words of Lord Justice Wilmer:

> 'For what has been lost by the person assumed to be dead is the opportunity to enjoy what he would have earned, whether by spending it or saving it. Earnings themselves strike me as being of no significance without reference to the way in which they are used. To inquire what would have been the value to a person in the position of this plaintiff of any earnings which he might have made after the date when *ex hypothesi* he will be dead strikes me as a hopeless task' (at p. 240).

The ruling in *Oliver v. Ashman* [134] was adopted also in other cases (see *Wise v. Kaye* [141]), but it was strongly criticized, especially in view of its serious consequences from the viewpoint of dependants, whose right to claim for loss of support arose only where at the time of the injured person's death he had a right of claim against the tortfeasor (see D. Howarth, *Textbook on Tort* (Butterworths, 1995), at p. 613). The difficult result arising from the ruling in *Oliver v. Ashman* [134] is that the injured person, who is living and who files an action in torts, is unable to recover for the loss of future earnings, even though if he had not fallen victim to the tortious act, he would, it may be assumed, have earned a sum of money which he would have used for various purposes, including the support of his family. At the same time, the filing of the claim by the living injured person raises an insuperable barrier preventing the family members from suing, independently, for the damage they have suffered, i.e., the loss of support. In this sense, a dead injured person is better than a live one. This result brings with it severe consequences from a social viewpoint. A tangible example of this was seen in *McCann v. Sheppard* [142], where a young man aged 24 was injured in a road accident, and he filed a claim for compensation in consequence. While the action was pending, the injured person married and fathered a child. In the judgment, he was awarded compensation in an amount of £15,000 for loss of earnings in the future. The defendant filed an appeal on the amount of the compensation, but then the injured person died as a result of taking an overdose of painkillers. In view of the fact that the injured person had died, the court of appeal ordered the compensation to be reduced, on the head of loss of earnings, to a sum of only £400. Thus the widow and the son were left without support.

The criticism of the ruling in *Oliver v. Ashman* [134] did not escape the attention of the Law Commission, which convened in order to suggest possible ways of correcting the state of affairs. In brief, the Commission recommended the following three possible solutions: (1) changing the ruling in *Oliver v. Ashman* [134] by means of legislation and awarding compensation for the 'lost years,' while deducting the expenses that the injured person would have incurred for his subsistence during those years; (2) recognizing the right of the dependants to compensation-support even if the injured person received compensation during his lifetime; (3) filing the claim of the dependants and the claim of the injured person simultaneously, and payment of a certain sum into court, which will be paid to the dependants after the death of the injured person. The Commission recommended the first solution, saying that notwithstanding the existence of a possibility that the injured person would make use of all the compensation monies and would not leave anything for the dependants, it should not be assumed that many injured parties will indeed do this, and in any event, so the Commission thought, the balance of advantages and disadvantages tips the scales in favour of this solution, which can be implemented most simply and is the closest in principle to the manner in which tortious compensation is awarded — i.e., paying it to the injured person himself (for an analysis of the considerations for and against each of the solutions, see Report on Personal Injury Litigation — Assessment of Damages, *Law Com.* 56, at pp. 17-24; see also the remarks of Justice Barak in *Estate of Sharon Gavriel v. Gavriel* [1], at p. 553, and the remarks of President Kahan, *ibid.*, at p. 571).

Albeit, the Commission's recommendation did not find expression in legislation, but in 1980 the first solution was adopted by the House of Lords, in *Pickett v. British Rail Engineering* [135]. That case concerned a person who contracted cancer as a result of exposure to asbestos, and his life expectancy was shortened to approximately one year only. He died after the judgment of the trial court was given in a claim that he filed, but before the appeal

was heard. His widow continued the proceeding, which reached the House of Lords. The House of Lords overturned *Oliver v. Ashman* [134] and recognized the head of loss of earnings in the 'lost years.' This was both for the legal reason that the plaintiff, whose life expectancy was shortened, suffered immediate damage of loss of earning capacity, and for the social reason that the dependants should not be left without compensation. From then until now, the ruling in this matter has not changed, and the courts in England award the living injured person compensation for the years in which he could have worked and earned money had his life expectancy not been shortened by a tort (it should be noted that the Supreme Court of Canada had already ruled in 1978 that it was not prepared to adopt the rule in *Oliver v. Ashman* [134] (see *Andrews v. Grand & Toy Alberta Ltd.* [112]; the same was held by the High Court of Australia, in 1966: see *Skelton v. Collins* [106]).

33. In the United States the difficulty inherent in the two sides of the question has also been recognized. On the one hand, a legal system which does not recognize a head of the 'lost years' and which denies the right of the dependants to file a claim for their damage leads to a result in which the tortfeasor benefits from the fact that he shortened the life expectancy of the injured person. On the other hand, a legal system in which compensation is awarded for the lost years of earnings and the personal claim of the injured person does not create a barrier to a claim by the dependants means that the tortfeasor will be liable for a double payment. So what is the solution? Most of the States have accepted the approach that in the personal claim of the injured person for loss of earning capacity, the working life expectancy that he had *prior to the accident* is taken into account (see, for example, *In re Joint Eastern & Southern District Asbestos Litigation* [83], at p. 429; *Morrison v. State* [86], at p. 406; *Borcherding v. Eklund* [87] at p. 650; *Crecelius v. Gamble-Skogmo, Inc.* [88]; *Burke v. United States* [89]; *Fein v. Permanente Medical Group* [90]; *Doe v. United States* [80]). The United States Supreme Court discussed the rule prevailing in this matter in the United States in the following manner:

> 'Under the prevailing American rule, a tort victim suing for damages for permanent injuries is permitted to base his recovery "on his prospective earnings for the balance of his life expectancy at the time of his injury undiminished by any shortening of that expectancy as a result of the injury".' (*Sea-Land Services, Inc. v. Gaudet* [91] at p. 594).

In order to prevent double compensation, in those countries they do not allow a claim for wrongful death in cases where the injured person has realized his personal claim, or the claim for wrongful death is set off against the amount paid in the personal claim (see *In re Joint Eastern & Southern District Asbestos Litigation* [83], at p. 430; Fleming, 'The Lost Years: A Problem in the Computation and Distribution of Damages,' *supra*, at p. 614).

However, in several judgments the courts in the United States held that in a personal claim of the injured person, the amount of the compensation for loss of earning capacity should be determined according to the life expectancy that he has *after the accident* (see *Ehlinger v. State* [92] at p. 792; *Hughes v. Chicago, R.I. & P. Ry. Co.*, 129 N.W. 956 (1911)). But this position does not stand alone, because in those places where this was held, it appears that they have adopted the opinion that the personal claim of the injured person cannot prevent the possibility of filing an action for wrongful death after the death of the injured person (see *In re Joint Eastern & Southern District Asbestos Litigation* [83], at p. 430; *Doe v. United States* [80]).

It follows from all of the above that even in the United States, both according to the majority opinion and according to the minority opinion, the dependants are not left, as a rule, without support. The harm to the injured person's income in the 'lost years' finds expression in the award of compensation, whether this is done in the personal claim of the living injured person, or whether it is done in a claim within the framework of the wrongful death laws.

34. In *Estate of Sharon Gavriel v. Gavriel* [1], President Y. Kahan, who wrote the leading majority opinion, was aware of the difficulty that we have discussed, from the viewpoint of the dependants, and he pointed out that 'such a situation can cause injustice.' Similar remarks were made by the other majority judges, Justice Bejski (*ibid.*, at pp. 578-579) and Vice-President Shamgar (*ibid.*, at pp. 576-577). But this problem, so the majority opinion judges thought, should be remedied by way of a change in legislation, and not by awarding compensation for the 'lost years,' since the latter involved miscarriages of justice of its own.

But the legislator tarries. Although more than twenty years have passed since the judgment was given in *Estate of Sharon Gavriel v. Gavriel* [1], the injustice remains as it was. It should be noted that there are, admittedly, legal systems in which the awarding of compensation to the living injured person, for loss of his earning capacity in the 'lost years,' is done pursuant to an express statutory provision. This is the case, for example, in Scotland. The Damages (Scotland) Act provides, in s. 9, that in assessing the damages of the living injured person it should be

assumed that his life expectancy is at it was before the damage occurred. But such an express statutory provision is not essential. In many countries, it is case law that has recognized the damage arising from the loss of earning capacity in the 'lost years' as compensatable damage. This, as we have seen, is how the law has developed in England (see *Pickett v. British Rail Engineering Ltd* [135]; M.A. Jones, *Torts* (eighth edition, 2002) at pp. 682-683). This is also the case in most States in the United States (see *Sea-Land Services, Inc. v. Gaudet* [91], at p. 594, and the discussion *supra*), and in Canada, where the courts have recognized the entitlement of the living injured person to compensation for the 'lost years' (see *Andrews v. Grand & Toy Alberta Ltd.* [112]; *The Queen in right of Ontario v. Jennings* [113]; *Sigouin (Guardian in litem of) v. Wong* [114]; *Dube v. Penlon Ltd.* [115]). The courts in Australia have followed a similar path (see *Skelton v. Collins* [106]; F. Trindade & P. Cane, *The Law of Torts in Australia* (third edition, 2001) at p. 519), and so has case law in New Zealand (see S. Todd et al., *The Law of Torts in New Zealand* (1991) at p. 881) and in Ireland (see *Doherty v. Bowaters Irish Wool Board Ltd* [160]; *Conley v. Strain* [161]).

In other countries, case law has pursued a different path. Thus, for example, in South Africa, the right to compensation for the head of damage for the 'lost years' has been recognized (see *Goldie v. City Council of Johannesburg* [164]), but it was held afterwards that for the purpose of compensation for the loss of earning capacity, the life expectancy remaining to the injured person after the accident was what should be examined (see *Lockhat's Estate v. North British and Mercantile Insurance Co. Ltd* [165]).

35. It can be seen that, even though there is no unanimity on the issue of the 'lost years,' it is possible to say that in many countries case law has recognized the entitlement of the living injured person to compensation for the 'lost years of earning.' A change in legislation is therefore not essential. The award of compensation for the loss of earning capacity in the 'lost years' will find a strong basis in the principles of compensation that have been accepted in Israel, as in other legal systems, for many years. The need to realize the goal of returning the injured person to his original position and the need to solve the difficulties arising from the current legal position justify a change in the prevailing case law on this issue. As for the injustices and difficulties involved, allegedly, in awarding compensation for the loss of earning capacity in the 'lost years,' these, as we have already said and as we shall explain below, can be solved.

*Deduction of expenses*

36. One of the objections raised against awarding compensation for the loss of earning capacity in the 'lost years' is that, alongside the income that the plaintiff was deprived of in those years, he has 'saved' himself the expenses that he would have incurred in those years. It is indeed true — so it is claimed — that the plaintiff would have had earnings as a result of his work in those years, but at the same time he would also have had expenses. Both the former and the latter have been lost as a result of the tortious act (for a discussion of this claim, see, *inter alia*, Fleming, 'The Lost Years: A Problem in the Computation and Distribution of Damages,' *supra*, at p. 603; *In re Joint Eastern & Southern District Asbestos Litigation* [83], at p. 428).

This objection relates to the *internal* balance by which the compensation is assessed. This balance considers the loss and the gain resulting from the accident. Indeed, compensating the injured person in an amount that reflects his entire earnings in the 'lost years' means overcompensation, since it ignores the fact that in order to produce this income, the deceased would have needed to use various amounts for his subsistence. These amounts will no longer be incurred after the death, unlike, for example, in a case where the accident causes disability and not death, when the injured person must incur expenses to continue to live during the period of his disability (see R.A. Posner, *Economic Analysis of Law* (third edition, 1986), at p. 182). This was discussed by the Supreme Court of Canada:

'There can be no capacity to earn without a life. The maintenance of that life requires expenditure for personal living expenses. Hence the earnings which the award represents are conditional on personal living expenses having been incurred. It follows that such expenses may appropriately be deducted from the award. Against this, it is argued that if [the plaintiff] had been born a millionaire, her personal living expenses during the "lost years" would have been met from other sources. But this does not negate the fact that in order to earn income one must live and incur the attendant expenses' (*Toneguzzo-Norvell v. Burnaby Hospital* [116]).

37. We cannot, therefore, ignore the question of the living expenses. But this factor cannot affect the *fundamental* question of the entitlement to compensation, and its only effect is with regard to the *quantum*. In

other words, the solution to the aforesaid difficulty lies in the realm of calculation; the court, when determining the quantum of damages, must deduct from the total income that the injured person would have accrued if he had worked in the 'lost years' those expenses that he would have incurred for his subsistence. This is the internal balance. It does not affect the actual entitlement to compensation but only the method of calculating it. This calculation is merely a normal consequence of our well-established rules, such as, for example, with regard to the claim of the dependants. The rule is that in calculating the loss of the dependants as a result of the death of the deceased, one must also take into account the pecuniary benefit that they received, if any, as a result of his death. This is the 'deduction rule,' which holds that the material benefits arising from the deceased's death must be set off against the damage that the dependants suffered (*Estate of Michal Kedar v. HaSneh Insurance Co.* [25]). Albeit, this rule has been subject to criticism. This was expressed by Justice H.H. Cohn, in sarcastic terms:

'At long last they [the mourners] have achieved a significant saving in that the deceased no longer eats breakfast, lunch or supper, nor does she any longer drink wine or spirits, tea or coffee. What is more, she no longer needs clothes or shoes, cosmetics or jewellery. These are real gains, and who knows whether in the account of the life of a well-groomed and indulgent woman these do not greatly exceed the pecuniary loss caused by her death...' (*Eliyahu Insurance Co. Ltd v. Estate of Violet Tzaig* [34], at pp. 139-140).

Justice Tz. Tal, in the minority, returned in *Estate of Michal Kedar v. HaSneh Insurance Co.* [25] to the criticism of the deduction rule, in so far as it concerns the deduction of the compensation due to the heir of the deceased (in a claim by the estate) from the compensation payable to him as a person dependent on the deceased's livelihood. The criticism there was directed at the deduction rule itself. In my opinion, it should have been directed against the erroneous manner in which the deduction rule was implemented, namely by exempting, in certain circumstances, the tortfeasor from his liability to pay the total damage and by limiting his liability to the 'largest' head of damage.

In any event, notwithstanding the feeling of discomfort arising from the calculation of the pecuniary saving arising from the death of the injured person, the deduction rule, which is founded on s. 80 of the Torts Ordinance and on the principle of returning the injured person to his original position, remains valid (see also CA 5/84 *Yehezkel v. Eliyahu Insurance Co. Ltd* [35]; CA 471/93 *Estate of David Hyams v. Hyams* [36]; CA 1503/94 *Israeli Phoenix Insurance Co. Ltd v. Estate of Baruch Berman* [37]). The provisions of the law that set out the limits of the deduction — such as s. 81(1) of the Ordinance, which provides that amounts that the dependants received or are entitled to receive upon the death of the deceased under an insurance contract shall not be deducted — have been interpreted narrowly on several occasions by case law (see CA 154/70 *Bida v. Rubin* [38]; CA 682/69 *Hamudot v. Shapira* [39]). It need not be said that the 'saving' and the 'benefit' discussed within the context of the deduction rule are entirely in the financial sphere, since in the emotional sphere the death of the injured person only causes his relations suffering.

Following this approach, case law has held, *inter alia*, that from the compensation given to the dependants we should deduct the amount of non-pecuniary compensation that they received by virtue of their being the heirs of the deceased, and that this deduction is not contrary to the provisions of s. 19(d) of the Torts Ordinance (CA 206/87 *General Federation Medical Fund v. Estate of Dr Meir Edison* [30]). It is from this approach also that we derive the position that the needs of the deceased — needs that were 'saved' when he died — should be deducted from the family funds. As Justice Barak said, within the framework of the 'balance of profit and loss' caused to the injured person on the death of the person who supported him: 'We should take into account, on the one hand, the damage caused to the dependants as a result of the loss of the efforts of the mother and spouse... and on the other hand, the lack of expenses that were incurred in the past for his subsistence and needs. This lack is a saving caused to the dependants as a direct result of the death, and it should be taken into account...' (*Eliyahu Insurance Co. Ltd v. Estate of Violet Tzaig* [34]). Therefore the court, when awarding the dependants compensation for the loss of support, is obliged to assess, in the first stage, the amount of income that the deceased would have set aside for the purpose of supporting those dependent on him, while taking into account, in so far as is necessary, special expenses that he would have incurred out of his income; and in the second stage, the court must calculate — by means of the parts method — the size of the deceased's share in the family income (see Katzir, *Compensation for Personal Injury, supra*, at p. 782).

38. It follows that the idea whereby in calculating the loss of income after the death of the injured person one should deduct the financial saving accruing as a result of his passing away is not a new one in Israel, and it should

be applied also with regard to the award of compensation for the loss of earning capacity in the 'lost years.' This is indeed what case law has held in the various legal systems. In England, the House of Lords held, in *Pickett v. British Rail Engineering* [135] that the loss of earning capacity in the 'lost years' is, albeit, damage that may be claimed by the living injured person, but the court must deduct from the compensation the sum that reflects the estimated expenses that the plaintiff would have incurred for his subsistence, had he lived during the 'lost years' (see also *Harris v. Empress Motors Ltd* [143]). Usually the English courts deduct 50%, unless special circumstances justifying a different calculation are proved, such as that the plaintiff could have saved a significant amount (see, for example, *Phipps v. Brooks Dry Cleaning Services Ltd* [144]).

Moreover, the English courts have often held that in cases where the plaintiff does not have dependants, and there is no expectation that he will have any of these — for example, because of his young age at the time of the accident — the amount of the compensation for the lost years may amount to zero. Giving compensation in such cases, so it has been said, would be too speculative (see opinions for and against this view, in *Croke v. Wiseman* [137]; *Connolly v. Camden & Islington Area Health Authority* [145]; *Adsett v. West* [146]; *Gammell v. Wilson* [147]. We will return to this issue.

39. In Ireland, too, the right of the living injured person to compensation for the 'lost years' has been recognized, and the court takes into account in the compensation the amount of the anticipated expenses of the injured person for his subsistence (see *Doherty v. Bowaters Irish Wool Board Ltd* [160]). There is similar case law in Australia (*Skelton v. Collins* [106]), Canada (*Semenoff v. Kokan* [117]; *Toneguzzo-Norvell v. Burnaby Hospital* [116]) and other countries.

A different note, that there is no basis for deducting from the income the amount that reflects the expenses saved in the lost years, has been heard at times in American case law (see *Olivier v. Houghton County St. Ry.* [94]; *In re Joint Eastern & Southern District Asbestos Litigation* [83], at p. 531). The reasoning behind this approach is that it is no concern of the defendant how the plaintiff uses his income. But this reasoning does not stand up to closer inspection, since the purpose of the compensation is to reflect the damage of the injured person — no more and no less — and it is clear that in the context we are discussing, the real economic damage that is caused to the injured person reflects a difference between his expected income in the 'lost years' and the expenses that he would need for his subsistence in those years (see Fleming, 'The Lost Years: A Problem in the Computation and Distribution of Damages,' *supra*, at p. 603).

40. In Israel, in *Estate of Sharon Estate v. Gavriel* [1] Justice Barak adopted the approach, which as aforesaid is accepted in most of the countries that have considered the question of the 'lost years,' that in assessing the damage of the plaintiff on this head, we should take into account the fact that in these years he will 'save' the expenses that he would have incurred had he been alive. The compensation for this head of damage should be calculated, so he proposed, as the difference between the income that he lost and the expenses that he saved. However, Justice Barak emphasized that this cannot deny the right of the injured person to the actual receipt of the compensation (*Estate of Sharon Estate v. Gavriel* [1], at p. 551). I too am of the opinion that, according to our accepted principles, there is no alternative to including, in the calculation of the compensation, the expenses that the injured part would have incurred had he remained alive during the 'lost years.' This principle leads us to the following question: what is the method that we should adopt in calculating the expenses that should be deducted for the purpose of determining the amount of compensation for the loss of earning capacity in the 'lost years'?

*Methods of calculating the expenses*

*Possible methods*

41. In England, Canada and other countries where it is customary to award compensation for the 'lost years,' various methods have been adopted for the calculation of the expenses that should be deducted for the purpose of determining the amount of the compensation (see C.L. Brown, '*Duncan v. Baddeley*: Reconciling the "Lost Years" Deduction with Fatal Accident Cases,' 35 *Alberta L. Rev.* 1108 (1997); *Duncan (Estate of) v. Baddeley* [118]; *Harris v. Empress Motors Ltd* [143]; C. Bruce, 'The "Lost Years" Deduction,' The *Expert Witness* Newsletter, Economica Ltd. (Spring 1997, vol. 2, no. 1)). The deduction percentage varies widely between approximately 30% or even less (see, for example, *Brown v. University of Alberta Hospital* [119]) and approximately 70% (see, for example, *Granger v. Ottawa General Hospital* [120]).

42. One method of calculation that was suggested (and rejected) in Canada is the 'Basic Needs Approach.' This approach is based on a criterion of basic needs, which is unconnected with the income level of the injured person. According to this approach, wherever compensation is awarded for the 'lost years,' an amount shall be

deducted from the compensation to reflect the expenses that a person incurs for his basic needs, by taking into account details such as the question of whether he was married or not, the size of the family, etc.. This approach was criticized, *inter alia*, on the grounds that it does not provide a true assessment of the expenses that a particular person, with a particular level of income, would incur (see Brown, '*Duncan v. Baddeley*: Reconciling the "Lost Years" Deduction with Fatal Accident Cases,' *supra*; *Duncan (Estate of) v. Baddeley* [118]).

43. Another approach for calculating the expenses that should be deducted in order to assess the compensation for the 'lost years' is the 'Standard of Living Approach.' This approach, apparently, is the most accepted in England and Canada. According to this approach, the potential standard of living of the injured person should be taken into account, with regard to his earning capacity. This approach was reflected in the case law of the House of Lords in *Gammell v. Wilson* [147]:

'The loss to the estate is what the deceased would have been likely to have available to save, spend or distribute after meeting the cost of his living at a standard which his job and career prospects at time of death would suggest he was reasonably likely to achieve.'

Similar remarks were expressed by the Court of Appeal in England, in *Harris v. Empress Motors Ltd* [143], while delineating the principles underlying the Standard of Living Approach:

'(1) The ingredients that go to make up "living expenses" are the same whether the victim be young or old, single or married, with or without dependants. (2) The sum to be deducted as living expenses is the proportion of the victim's net earnings that he spends to maintain himself at the standard of life appropriate to his case. (3) Any sums expended to maintain or benefit others do not form part of the victim's living expenses and are not to be deducted from the net earnings' (at p. 228).

See also *White v. London Transport Executive* [148], in which the court said that:

'In the cost of maintaining himself I include the cost of his housing, heating, food, clothing, necessary travelling and insurances and things of that kind...' (at p. 499).

In *Semenoff v. Kokan* [117] the court in the Canadian province of British Columbia adopted the calculation method used in *Harris v. Empress Motors Ltd* [143]. So did the court of appeal in the province of Alberta, in the decisions in *Duncan (Estate of) v. Baddeley* [121] in 1997 and *Duncan (Estate of) v. Baddeley* [118] in 2000). See also the judgment of the Supreme Court of Canada in *Toneguzzo-Norvell v. Burnaby Hospital* [116].

44. A third possible approach to the calculation of the subsistence expenses of the injured person is the 'Savings Approach.' This approach assumes that the amount of income that a person has left, after he lays out the expenses needed to preserve his lifestyle, is the amount that would have been saved by him (see Brown, '*Duncan v. Baddeley*: Reconciling the "Lost Years" Deduction with Fatal Accident Cases,' *supra*; *Granger v. Ottawa General Hospital* [120]; *Marchand v. Public General Hospital of Chatham* [122]; see also Australian case law in *Sharman v. Evans* [107] at pp. 579-583; see also *Sullivan v. West Yorkshire Passenger Transport Executive* [149]). This approach has received criticism, on the grounds that it is not consistent with the purpose that underlies the award of compensation for the 'lost years,' namely giving the plaintiff the possibility of ensuring the future of the dependants (Trindade & Cane, *The Law of Torts in Australia*, *supra*, at p. 519); it has also been claimed that this approach takes into account irrelevant factors (how the injured person would have chosen to use his money), and it does not examine the question of the deduction of expenses from the correct viewpoint — that of the injured person — but from the viewpoint of the heirs, namely what they can expect to receive in the inheritance (see *Duncan (Estate of) v. Baddeley* [118]).

*The proposed approach*

45. What is the method of calculating the expenses that should be adopted in our legal system? The Basic Needs Approach and the Savings Approach were rejected, as aforesaid, by most courts and scholars, and with good reason. These approaches suffer, as we have set out above, from significant defects. The 'Standard of Living Approach' is, from an objective point of view, a more suitable approach, but it too suffers from a major defect, which lies in its great vagueness. It would seem, therefore, that at least in those cases where it is possible to *know* or to *estimate* the family position of the injured person in the 'lost years,' we ought to adopt the method of calculation that is well established in our legal system, namely the 'parts' method, in the absence of particular circumstances that justify following another path. It is possible to 'know' when the family position of the injured person has already been established on the date of the judgment; it is possible to 'estimate' where it has not yet

been established but can be forecast. The 'parts' method applies, where there is no evidence to the contrary, a working assumption — a factual presumption based on experience of life and the life style of the average family. The significance of applying this approach is that after assessing the potential income of the injured person, we should add it to the family income ('the joint kitty') and then, out of the total income, allocate one part as a general fixed expense of the family, and divide the remainder equally between the family members, in such a way that one part is attributed to each person. The part of the person injured by the tortious act should be deducted from his income, and thereby the amount of the compensation is reached (see *Felixberg v. General Manager of the Railway* [32], at p. 1638).

46. This approach has several advantages: *first*, it achieves the purpose of the deduction. When the parts method is used in calculating the damage of the dependants, it produces a figure for the amount that the deceased injured person would have spent on his own subsistence. This amount reflects the 'saving' — in material terms — that is a consequence of the death of the injured person (*Eliyahu Insurance Co. Ltd v. Estate of Violet Tzaig* [34]; CA 501/84 *Migdal Insurance Co. Ltd v. Miron* [40]). We are concerned with this amount — the amount of the material 'saving' arising from the death of the deceased — also when we are dealing with the issue of the 'lost years.' This is therefore a good reason for using the 'parts' method even for calculating the compensation in our case. *Second*, the 'parts' method is a convenient, effective and equal approach:

'Certainly the "parts" method also is not exact and does not distinguish between the expenses incurred for the subsistence of the various family members that are only equal in theory; it also cannot be said that the additional "part" is equal in amount in all families and in all situations; the main advantage of the method is that it makes the method of calculation simple and leaves the court and the litigants a calculating tool that makes it easier for them to determine the pecuniary loss caused to the dependants; and this should not be considered of small importance, for a calculation by means of a formula makes the court's work easier and helps litigants to reach a compromise in suitable cases; indeed, it was held in *Felixberg v. General Manager of the Railway* [32] that where there are no special circumstances in the case that require adopting a different approach, it is best for the court to adopt the "parts" method, "so that one plaintiff will not be awarded a large amount and another plaintiff a small amount, merely because of the approaches of different judges" (CA 610/75 *Rotem v. Nof* [41]).'

When we compare this approach, with its advantages, to others, and take into account the fact that the courts in Israel are accustomed to apply it in tort cases, its preferability to the other vague approaches that we reviewed above is clear (see also CA 1299/92 *Estate of Aliza Mor v. Rom* [42], at p. 702). *Third*, this approach takes into account both the number of persons in the family and its economic status in view of the total level of income (see *Estate of Sarah Abir v. Ferber* [27]; *Gabbai v. Lausanne* [29]; CA 541/88 *Protection of Nature Society v. Estate of Ora Forman* [43], at p. 142). The factors are of importance in so far as calculating the 'saving' resulting from the death of the injured person is concerned. *Fourth*, following the 'parts' approach also in the context of the 'lost years' leads to coherence and harmony in the method of calculating compensation in Israeli law, and it takes into account one of the main reasons — maybe the most important reason of all — for awarding compensation for the 'lost years,' namely ensuring support for the dependants. Adopting this approach brings the amount of the compensation for the 'lost years' closer to the amount that the dependants would have received in an independent claim for loss of support, and thus it reaches a proper result (see Waddams, *The Law of Damages, supra*, at § 3.920). *Fifth*, this approach, according to accepted case law, is not the final word, and it applies as a default method where the litigants do not show any circumstances that justify another calculation (*Felixberg v. General Manager of the Railway* [32], at p. 1637; *Rotem v. Nof* [41]; CA 204/85 *State of Israel v. Mizrahi* [44]; CA 587/87 *Malca v. Aktin* [45]). This is therefore a convenient method of calculating the compensation, and it is possible to depart from it where necessary and to use a different method of calculation that is consistent with the circumstances and the evidence presented in court.

47. Hitherto we have proposed the 'parts' method as a means of assessing the amount that should be deducted from the amount of compensation for the 'lost years.' Notwithstanding, the use of this method requires two adjustments: *first*, there is a difference between the award of compensation to dependants, for loss of support, and the award of compensation to a living injured person, for the 'lost years.' Whereas in the first case — awarding compensation to dependants — the amount that the injured person would have saved should not be included in the support compensation, since the dependants would not be benefiting from him as *dependants*, in the second case

this amount should be part of the compensation, and there is no justification for deducting it. Indeed, when speaking of compensation for the living injured person for the 'lost years,' we should deduct from the amount of compensation the 'subsistence part' of the deceased (the amount that would have been needed for his subsistence), but we should leave as part of the compensation both the amount of the support and also the amount of the saving. Therefore, it appears that we ought to adapt the 'parts' method so that in the absence of circumstances indicating the contrary, a certain amount that represents the share of the injured person's part that he would have devoted to savings should be excluded from the deduction. In other words, from the amount of the earnings we should deduct not the whole part, but only some of it, which reflects the subsistence expenses but not the savings. This division could be determined in two ways: *one*, dividing the injured person's part into two, with one half reflecting the amount of savings (half as a suitable average amount) and the *other*, adding an additional 'conceptual' part to the accepted number of parts and deducting it. This second method, which increases by one part the number of parts, for the purpose of locating the 'subsistence part' that will be deducted from the amount of the compensation, has the advantage that, like the 'ordinary' parts method, it constitutes a proportional approach, based on life experience, all of which when there is no evidence to the contrary.

*Second*, we have already hinted above that the 'parts' method is appropriate mainly in those cases where it is possible to know or to estimate what the family status of the injured person would have been, had it not been for the accident, in the 'lost years.' This knowledge, or estimate, allows us to make the calculation according to the number of persons in the family. However, when this figure is not obtainable — for example, where it is clear that the plaintiff will not have dependants because of a very short life expectancy or a persistent comatose state — a difficulty is likely to arise in applying this method of calculation. In such a case, we can resort to several other methods: it is possible, for example, to estimate the injured person's 'conceptual' family position in the 'lost years' on the basis of statistical figures, and to make the calculation according to the 'parts' method described above (see and cf. *Semenoff v. Kokan* [117], where the court assumed that the injured person, who was a bachelor, could have had two children). Another method is to assume that we are dealing with an injured person without dependants, and to deduct larger expenses from the compensation. In such a case, the amount that will be attributed to personal living expenses, and to savings, will be increased (see Waddams, *The Law of Damages*, *supra*, at § 3.930). We will add to this in our discussion concerning compensation for the 'lost years' of a child.

*Compensation for the 'lost years' of a child*

48. Although the awarding of compensation for the 'lost years' is designed, *inter alia*, to realize the social goal of protecting dependants, still there is no guarantee that the injured person will make use of the compensation money on their behalf. There is a concern that the injured person will enjoy the compensation money, in full, during the lifespan that remains, or will devote it to other purposes until there remains nothing for the dependants (this concern was regarded by the Law Commission, apparently rightly, as quite remote). Moreover, the right of the injured person to compensation is not denied where he has no dependants at all, or where his current dependants are not those persons who would have been likely to be his dependants when he passes away, had it not been for the damage that he suffered (M.A. Jones, *Torts, supra*, at p. 682).

A striking example of a situation of this kind can be seen in accidents where the injured person is a young child. When this is the case, the significance of one of the main reasons for awarding damages for the 'lost years' — namely the consideration of preventing injustice to the dependants — is reduced. Lord Denning wrote a minority opinion in a certain case that where the life expectancy of an infant is shortened as a result of an accident, awarding compensation for loss of earnings is absurd, since the compensation will go to his parents, or, if these are not alive, to another relation (*Croke v. Wiseman* [137]). It should be noted that, according to Lord Denning's approach, compensation should not be awarded for loss of earnings, either in the years of life or in the 'lost years,' also for a child who suffers, as a result of the accident, serious brain damage (*ibid.*). English case law has continued to discuss, in additional cases, the great difficulty that may arise when attempting to determine the nature of the future earning potential of a child, or to estimate the amount that he would have spent on his subsistence had it not been for the accident.

49. Notwithstanding these difficulties, English case law has not denied the actual right to compensation in such cases for the head of damage of the 'lost years.' Even in *Croke v. Wiseman* [137], the majority opinion expressed reservations as to Lord Denning's fundamental position that in so far as a small child is concerned, there is no basis for compensation for the head of damage of loss of earnings. Notwithstanding, on several occasions the courts in England have held that the amount of compensation for the loss of earnings of a child in the 'lost years'

may be very modest, or even nil, because of the speculative nature of awarding them. In *Gammell v. Wilson* [147], the court held as follows:

> 'In the case of a young child, the lost years of earning capacity will ordinarily be so distant that assessment is mere speculation. No estimate being possible, no award, not even a "conventional" award, should ordinarily be made.'

Notwithstanding, in *Gammell v. Wilson* [147], the court recognized exceptions to this rule, as for example where the career of a young television star is interrupted. In *Connolly v. Camden & Islington Area Health Authority* [145], it was held that the award of compensation, when dealing with a child, stands or falls by the possibility of proving it:

> 'It is difficult enough in the case of a teenager or middle aged person to prove something for the lost years. It is more difficult for a child but I can envisage, with respect, far more examples than the Shirley Temple case or that of a television star. I can envisage the only son of a father who owns a prosperous business. I can envisage the son who is born to a father who is able to leave the estate to the son. I can envisage a number of situations where the court can look at something and find there are lost years to be compensated for... but what I hold and hold clearly is that *Pickett* and *Gammell*... give this little boy a head of claim for lost years, but on the material before me I am going to state... not that there is no claim but that there is a claim which I assess at nil.'

See also *Adsett v. West* [146]; *Harris v. Empress Motors Ltd* [143]. Indeed, the speculation may find expression in the question of the extent of the 'savings' that the child would have accumulated, as well as in the question of the identity of his dependants at the relevant times. But the speculation is a constraint that the tortious claim must address — not by means of abandoning the principle, but by an appropriate choice of the manner of applying it. Thus, for example, it is possible to suggest, in the claim of the minor, that increased expenses should be deducted from the compensation in the absence of dependants, and this method should be preferred over the more speculative assumption concerning the (future) existence and number of dependants, by deducting the part of the injured person.

50. In practice, the difficulty of assessing the damage for the loss of earnings, in the case of an injured person who is a child, is not unique to the issue of the 'lost years.' Many times, when a child is injured as a result of a negligent act, this can harm his future earning capacity or the possibility of finding a place in the work market. The court is required to award him compensation on the basis of assumptions and estimates, and the degree to which these are based on reality may vary from case to case. Indeed, in the case of a child, a difficulty may arise in measuring the extent of the loss of earnings, since often details are lacking with regard to the earning potential of the injured person, and the court finds itself in the dark. '... Determining the loss of the future earnings of a minor, who has not yet actually entered into the work market, is always a guess, which is greater the younger the minor is' (Justice Y. Malz, in CA 311/85 *Efraimov v. Gabbai* [46], at p. 194). Frequently, at the time of the injury, and also at the time of the trial, the injured minor has not yet chosen his profession, has not yet begun a course of professional training, and the difficulty of estimating what the future holds for him is obvious (see the remarks of Justice T. Or in CA 634/88 *Attiya v. Zaguri* [47], at p. 101). Nonetheless, this difficulty cannot, as a rule, prevent the actual award of compensation for the harm to earning potential, which is an asset that belongs to its owner. 'The special difficulty in estimating the compensation for a child at this age should not completely prevent a determination in some amount' (CA 209/53 *Weizman v. Zucker* [48]; *Naim v. Barda* [3], at p. 786; see also *Croke v. Wiseman* [137]). The court is not intimidated from attempting to determine amounts that will reflect, to some degree or other, the damage caused to the injured person, and this has on several occasions been done by determining a global amount (CA 685/79 *Atrash v. Maalof* [49], at p. 630; CA 335/59 *Reichani v. Tzidki* [50]; CA 326/88 *Zimmerman v. Gavrielov* [51], at p. 360) or by relying on the amount of the average salary in the economy (CA 142/89 *Gamliel v. Oshiot Insurance Co. Ltd* [52]).

It would appear that similar considerations should also guide the award of compensation in cases where we are concerned with the loss of earnings in the 'lost years' of a child. In *Estate of Sharon Gavriel v. Gavriel* [1], at pp. 557-558, Justice Barak expressed the opinion that:

> 'We should not establish a legal principle to the effect that the compensation to which a young child is entitled is always minimal or even nothing. No hard and fast rules should be determined in this respect. Everything depends upon the circumstances of each individual case, i.e., on the factual basis

that is presented before the court considering the matter, and they may be cases in which the compensation will be significant (see: *Rose v. Motor Vehicle Insurance Trust* [108]) (*Estate of Sharon Gavriel v. Gavriel* [1], at pp. 557-558).

Thus, the mere fact that the injured person is a minor should not, in principle, affect the question of the entitlement to compensation, even though it is possible that it will have significance in determining the amount of the compensation. The plaintiff who is a minor will be entitled to claim compensation and this right remains unassailable even where the assessment of the compensation is very modest.

*Interim summary: the claim of the living injured person*

51. The various legal systems have directed their attention to the issue of the 'lost years.' Different approaches have adopted by the different systems, but it can certainly be said that in many countries — some of which have common principles with the Israeli legal system in this context — the head of damage of the 'lost years' is recognized as damage for which the living injured person can sue. This is the case in England, Canada, Australia, Ireland, Scotland, New Zealand and the United States. A similar approach should also be adopted by us, in so far as the claim of the living injured person is concerned. Thereby we will be giving expression to the basic principles of the law of compensation, both for the goals that the law of torts seeks to realize, and also for the social purpose that involves ensuring the status of the dependants.

Should the law also be applied in this way with regard to a claim of the estate?

*Compensation for the 'lost years:' claim of the estate*

52. We have hitherto examined the entitlement of the living injured person, whose life expectancy has been reduced, to compensation for the loss of his earning capacity in the 'lost years.' Let us now consider the other question, which concerns the right of the estate to claim this head of damage, where the life expectancy of the injured person was shortened to such a degree that he did not manage to claim his damage. We have discussed how the rights of action of the deceased injured person against the tortfeasor — both for pecuniary loss and for non-pecuniary loss — 'survive' his death and pass to his estate. *Prima facie*, no question arises therefore with regard to the existence of a right of action of the estate for the damage of the loss of earning capacity in the 'lost years.' Notwithstanding, some of the countries that have recognized the entitlement of the living injured person to compensation for this head of damage, have not recognized a similar right of the estate.

53. In England, the court originally held that the provisions of the law did not allow a distinction between the claim of the living injured person and the claim of the estate. Consequently, once it had been established in *Pickett v. British Rail Engineering Ltd* [135] that the living injured person, whose life expectancy has been shortened by a tortious act, had a right to compensation for the loss of earning capacity in the 'lost years,' the courts applied the rule also with regard to claims of an estate (see *Gammell v. Wilson* [147]; *Kandalla v. British European Airways Corp.* [150]). The courts in England were not always comfortable with this result, and they emphasized that the difficulty that was created as a result of the ruling in *Oliver v. Ashman* [134], and which was overturned in *Pickett v. British Rail Engineering Ltd* [135], does not exist when the injured person himself did not file a claim in his lifetime. This is the case because in such a case the estate's claim and the dependants' claim do not exclude one another; in other words, the dependants have an independent claim for loss of support. As Justice Griffiths said in *Kandalla v. British European Airways Corp.* [150]:

> 'The same dilemma does not arise in a case such as the present where the wage earner has been killed in the accident and claims are brought both under the Law Reform Act for damages on behalf of the estate and under the Fatal Accidents Acts, for both actions can run concurrently. Justice can be done to the parents by an award under the Fatal Accidents Acts and any sums for the "lost years" awarded under the Law Reform Act which exceed the value of the Fatal Accidents Act damages will be a pure windfall for the parents' (at pp. 168-169).

A change of legislation in England put an end to the possibility of the estates of deceased injured persons making a claim for the 'lost years' (see the Administration of Justice Act 1982, s. 4, following the recommendations of the Law Commission and the Pearson Royal Commission). The main reason for this legislative change was the desire to prevent a situation of a windfall for the dependants, as occurred, allegedly, in *Gammell v. Wilson* [147].

54. This approach of the English legislature has not escaped criticism, which has been expressed, *inter alia*, on

the grounds that this is not the only case in which the relatives of the injured person enjoy a 'windfall' of this kind, and denying compensation for this reason, only for the head of damage of the 'lost years,' is somewhat arbitrary. Consider, for example, the compensation awarded to the estate for the pain and suffering of the deceased before he died, or the pecuniary benefit of the relatives of the injured person who is in a permanent vegetative state and who is entitled in his lifetime to compensation for the loss of earning capacity.

Another criticism that has been made in England with regard to the provisions of s. 4 of the Administration of Justice Act 1982 is that the right of claim of the estate for the 'lost years' has been denied, in accordance with this provision, also in cases where the dependants do not have a right of claim for loss of support. This, for example, is the case where the earning capacity of the injured person is reduced by a tortious act, but the injured person died before trial for a reason unconnected with the tort. The dependants remain, in this situation, without support and without compensation (see Cane & Harris, 'Legislation,' *supra*).

A similar process to the one that took place in England can also be seen in Australia. At first the court there held that in the absence of legislation providing otherwise, the right of the injured person to sue for the loss of earning capacity in the 'lost years' passes to the estate (see *Fitch v. Hyde-Cates* [109]). However, this ruling was overturned by the legislature in most states and territories (see Fleming, *The Law of Torts* (seventh edition, 1987) at p. 640, and also Trindade & Cane, *The Law of Torts in Australia*, *supra*, at pp. 548-549). In Scotland also the legislator has denied the right of claim by the estate for the loss of the deceased's earnings after his death (see Damages (Scotland) Act 1976, s. 2).

55. In Canada, there is no uniform response to the question of the 'survivability' of a claim for the loss of earnings. As a rule, when the death of a person is caused by a tort, the estate has a claim for the loss of earnings in the period that *preceded* the death. However, this is not necessarily the case with regard to the loss of earning capacity in the 'lost years.' In the province of Saskatchewan the legislature provided, expressly, that the damage of loss of income after the death of the injured person is not claimable under the Survival of Actions Act (see s. 6 (2)(b) of the Act). This was also provided by the legislature of the province of British Columbia (see the Estate Administration Act [RSBC 1996], s. 59(3)(c)). The reason underlying these provisions of statute is the desire to prevent compensation on two parallel tracks — the claim of the estate and the claim of dependants, which would mean a windfall for the estate (Cassels, *Remedies: The Law of Damages*, *supra*, at p. 192).

A similar approach has been adopted by case law in other provinces, such as New Brunswick (see *Saint John Regional Hospital v. Comeau* [123]), the province of Ontario (see *Balkos v. Cook* [261]) and the province of Prince Edward Island (see *Rayner v. Knickle* [125]). However, in the province of Manitoba, the court recognized in one case a claim of an estate for the loss of earning capacity in the 'lost years' (see *Woollard v. Coles* [126]).

56. An interesting development on this issue occurred in the province of Alberta in Canada, where case law recognized the claim of an estate for compensation for the lost years of earnings. *Duncan (Estate of) v. Baddeley* [121], which led to much discussion, considered the claim of the estate of a sixteen year old boy who was killed in a road accident, without leaving any dependants. The court held that:

'... in Alberta a claim for loss of future earnings does survive the death of the victim. And, with two important qualifications, that claim should be assessed as would any claim for loss of future earnings.'

The court in Alberta held, therefore, that the claim for compensation for the loss of earning capacity 'survives' the death of the injured person. In giving its reasons for this conclusion, the court said, *inter alia*, that just as the estate is entitled to compensation for an asset that was destroyed in the accident in which the deceased lost his life (for example, a watch that the deceased wore on his wrist), so should compensation be awarded to the estate for the asset included in the loss of earning capacity. The court also was of the opinion that there is no justification for distinguishing between an injured person who has 'succeeded' in remaining alive until the date when the judgment is given, and an injured part who died a day before judgment was given, where in the first case the entitlement to compensation for the 'lost years' has been established, and the relatives are entitled to inherit the compensation money after the death of the injured person, while in the second case, the tortfeasor who has made death imminent or who has been able to delay the proceedings is not required to pay compensation. The two qualifications to which the court alludes in the aforesaid citation concern the deduction of the living expenses and income tax — during the reduction of the life expectancy — from the amount of the compensation (for further discussion of the judgment, see, for example, C.L. Brown, 'Duncan v. Baddeley: Reconciling the "Lost Years" Deduction with Fatal Accident Cases,' *supra*; for similar case law, also in the province of Alberta, see *Galand*

*Estate v. Stewart* [127]; *Brooks (Estate of) v. Stefura* [128].

57. But in Alberta too the law in this respect was changed, when in the year 2000 the legislature accepted the recommendations of the Alberta Law Reform Institute, which were published in 1998 (Report no. 76), and amended the Survival of Actions Act in such a way that the estate cannot recover for:

> 'damages in relation to future earnings, including damages for loss of earning capacity, ability to earn or chance of future earnings' (s. 5(2)(c))

It should be noted that the Alberta Law Reform Institute reached its conclusion on the basis of a process of thought involving six stages: *first*, the basis for the payment of compensation for the loss of a chance of future earnings is compensation for the injured person; *second*, payment of money cannot compensate someone who has died, and loss of the deceased's chance of future earnings does not cause the estate any loss. Therefore, payment of compensation for loss of a chance of future earnings does not compensation anyone; *third*, justice does not require a payment of money for loss of a chance of future earnings for any purpose other than compensation; *fourth*, doing justice to the family members, whom the deceased left behind, is done most directly and effectively by means of an action of the dependants, and justice does not require this by way of an action of an estate for loss of a chance of future earnings; *fifth*, the chance of future earnings is not an asset that can be bequeathed; *sixth*, the valuation for a loss of a chance of future earnings is difficult and requires 'gazing into a crystal ball.'

58. The path delineated by the Alberta Law Reform Institute is not without difficulties. We will not elaborate on this, but at the same time we will not remain silent on this issue, especially in view of the fact that the Institute's arguments reflect the position of those who deny the compensation, and we should point to several counterarguments that challenge this position. The compensation for the loss of earning capacity is, indeed, compensation for damage that is caused, in the nature of things, to the injured person. We have already discussed how the earning potential is an 'asset' that belongs to a person, whose financial value is estimated according to the 'value of the output that he is likely to produce while he is alive, i.e., according to the value of the earnings receivable from making use of the skill' (Barak, 'Assessing compensation in personal injury: the law of torts as it is and as it should be,' *supra*, at p. 257). The harm to this potential gives rise to an entitlement to compensation, and as stated the fact that the injured person will not be alive in the 'lost years' does not negate this entitlement. With regard to the estate, it should be remembered that had the injured person realized his earning potential, it is certainly possible that his estate would have been larger. In this sense, it can be said that the death of the injured person caused a loss to the estate (see *In re Joint Eastern & Southern District Asbestos Litigation* [83], at p. 428).

The following can also be said: most of the arguments of the Alberta Law Reform Institute are not inconsistent, in my opinion, with the recognition, which has been widespread in Canada for many years, of the right of the living injured person to compensation for the 'lost years.' Thus, for example, the Institute thought that there was no basis for awarding compensation when the injured person himself is not able to enjoy it. But we have seen that even with regard to the living injured person the assumption is that he will not be alive in those years, and in any event he too will not be able to enjoy the compensation attributed to the lost period. Admittedly, from a *practical* viewpoint the living injured person can make use of all the amount of the compensation during the years of life that he has left, since in general (although not always) the compensation is awarded by means of a capitalized lump sum payment. But this cannot affect the nature of the compensation, which is compensation that is given for the lost years of life, and therefore from a *theoretical* point of view, the aforesaid argument concerning the inability of the injured person to enjoy the compensation for the 'lost years' is valid to a large extent also with regard to the living injured person. As has been explained above, this argument cannot withhold the compensation from the living injured person — this has also been held in Canada — and the report of the Institute contains no convincing reason why it should result in denying the compensation to the estate. And if we are making a comparison with the case of the living injured person, it is fitting to cite the remarks of the Albertan court in *Duncan (Estate of) v. Baddeley* [121]:

> 'When the injured person survives until judgment, he is given substantial damages. The fact that he dies the day after judgment does not reduce the damages, nor remove his beneficiaries' right to inherit them. Indeed the very reason for the damages is the accurate foresight that he would die young...
>
> Why should the tortfeasor escape scot-free if the plaintiff dies the day before judgment is pronounced? Worse still, why should the tortfeasor who has made death imminent escape scot-free if he manages to drag out the litigation long enough that he produces the very

death in question, before judgment?

In my view, the issues here transcend questions of social utility or inheritance. They involve justice.'

With regard to the dependants, albeit where we are speaking of a claim by an estate, and the injured person himself did not file a claim when he was alive, the dependants have an independent claim for loss of support, so that awarding compensation for the 'lost years' does not serve the purpose of protecting their interest. However, it should be remembered that the estate stands in the stead of the injured person himself, and its right derives from the right of the injured person; therefore, recognition of the right of the living injured person to compensation for the 'lost years' necessitates, in the absence of a statutory provision to the contrary, a recognition of this right in the claim of the estate. Moreover, as aforesaid, it is difficult to find a material difference — in so far as the estate receiving a 'windfall' is concerned — between a right of claim for loss of earning capacity in the 'lost years' and a right of claim for other damage caused to the injured person, such as the non-pecuniary damage of pain and suffering and loss of life expectancy, with regard to which it is accepted in our legal system that the estate has a right of claim (see *Estate of David Azoulay v. Vulcan Casting Enterprises Ltd* [24], at p. 560). The 'survivability' of both one and the other is not intended to compensate the dependants — for this purpose they have a separate right of claim — but to have the estate include the wealth reflected in the deceased rights of claim, as s. 19 of the Ordinance directs. It appears that it is in fact the compensation for loss of earning capacity — which as aforesaid is an asset that belongs to its owner — that is more suitable for being bequeathed than the compensation for pain and suffering, which is of a special 'personal' character. In any event, it is clear that had the injured person been alive, filed a claim and obtained a judgment in his favour, and then died as a result of an external factor, whether tortious or not, the compensation that he would have been awarded would constitute a part of his estate, and no-one would regard this as a 'windfall' more than any other asset of the deceased that passes to his heirs. The enrichment of the heirs is a result of two things: first, the legal rule that provides that a claim of the injured person survives after his death, if he has not exhausted it; and second, the concept of the inheritance of wealth, which has been accepted since time immemorial in human society. The head of damage concerning the loss of earning capacity is, from this viewpoint, not at all unique. And as for the claim that the difficulty is double compensation, below it will be explained that the amount to which the dependants are entitled in their independent claim should be set off against the amount that is receivable by the estate.

Finally, even the argument raised by the Alberta Law Reform Institute with regard to the difficulty in estimating the damage does not necessarily lead to the conclusion that one should deny, absolutely and in every case, the right of the estate to compensation. This argument is correct in many cases where compensation is awarded for future damage — 'the doctrine of compensation is a doctrine of uncertainty' (CA 237/80 *Barsheshet v. Hashash* [22]). This is correct when we are dealing with a loss of future earning capacity. 'The courts have pointed out many times the difficulty in determining and calculating the loss of the injured person's future earning capacity. This is an attempt to estimate and determine facts where there is no certainty, and facts, guesses and estimates combine together. The main thing is that anything that today is considered expected may turn out, when times and circumstances change, as a totally unreliable way of estimating loss of earning capacity' (*per* Justice T. Or in *Youness v. Israel Car Insurance Pool* [19]). Indeed, whether we are dealing with the loss of earning capacity in general or the loss of earning capacity in the 'lost years' — the art of calculating the compensation is a difficult one, and can be compared to gazing into a crystal ball. But this is not sufficient to deny the actual right to the compensation, even though, as we have already seen, in English law, in some cases where the compensation is too speculative it has been held that the amount of compensation is low or even nothing. So we see that the right to compensation is one thing, and the assessment of the compensation quite another.

59. This is the situation in Canada. In Ireland, the rights of claim of the deceased pass to the estate, subject to several exceptions. The exceptions to the passing of the right do not include a right of claim for loss of earning capacity in the 'lost years' (see Civil Liability Act 1961, s. 7; The Law Reform Commission, Report on Personal Injuries: Periodic Payments and Structured Settlements (1996)). In South Africa, on the other hand, the possibility of the estate filing a claim for loss of earning capacity in the 'lost years' was denied in *Lockhat's Estate v. North British and Mercantile Insurance Co. Ltd* [165].

60. In the United States, the legal position on this issue is complex, and is deeply rooted in the legal system there. There are States that recognize both an independent claim of certain family members for the damage that

they suffered as a result of the deceased's death (a wrongful death action), and also a claim of the estate (or of another lawful representative) for the deceased's causes of action that 'survived' his death (survival statute). Among those States, some recognize the possibility of including in the surviving claim the head of damage of loss of the deceased's future income. The meaning of this recognition is what leads to a fear of double compensation: both compensation of the family members in a wrongful death action for that part of the deceased's future income that would have been devoted to their support, and also compensation for loss of future income of the deceased within the framework of the survival action (see *Hindmarsh v. Sulpho Saline Bath Co.* [95], at p. 808). But at the same time, this recognition, according to those States, is capable of preventing a tortfeasor who by his act brought about the death of the injured person from having to pay out a windfall (see James O. Pearson Jr., 'Recovery, In Action for Benefit of Decedent's Estate in Jurisdiction Which Has Both Wrongful Death and Survival Statutes, of Value of Earnings Decedent Would Have Made After Death' 76 *A.L.R.* 3d 125 (1977)). Since the living injured person is entitled to claim compensation for the loss of his income during his normal (unreduced) life expectancy, and since the survival laws are intended to preserve the cause of actions of the deceased injured person, it follows that, according to the case law of some courts in the United States, the survival claim for loss of income that the deceased would have had if he had lived a normal life expectancy should be recognized (see *Balmer v. Dilley* [96] at p. 458).

Thus, for example, in the District of Columbia, the case was considered where a man died by drowning, when his car fell from a bridge as a result of a road accident. The court held, in that case, that there was nothing to prevent recovering under both laws, since:

> 'loss to the estate is represented by that part of the deceased's net probable future earnings that probably would have been utilized by the deceased to enlarge his estate, whereas loss to the spouse and next of kin is represented by the loss of a source of maintenance for such things as food, clothing, shelter, educational expenses, and the like' (*Runyon v. District of Columbia* [97] at p. 1323).

In the State of Pennsylvania it was held, in the case of a five year old girl who was killed in a road accident, that her estate:

> '... is entitled to the present value of the decedent's prospective earnings for the period of her work-life expectancy after reaching the age of twenty-one, less her anticipated maintenance expenses, plus recovery for her pain and suffering' (*Weaver v. Ford Motor Co.* [98], at p. 1077).

This is also the law in the State of Texas (*Hope v. Seahorse, Inc.* [99], at p. 990) and in the State of Washington (*Balmer v. Dilley* [96], at pp. 458-459); for a review and additional references, see Pearson's article, *supra*.

The courts that awarded damages to the estate for loss of earnings in the 'lost years' were of the opinion, in general, that the living expenses that the injured person would have needed if he had lived, as well as the expenses that he would have incurred for the support of others, should be deducted from the amount of the income that would have accrued to the injured person in those years. The purpose of this, so it was held, was to prevent a windfall to the estate of the payment of double compensation to the dependants (see Pearson's article, *supra*, and also *Murray v. Philadelphia Transp. Co.* [100], at p. 325; *Ferne v. Chadderton* [101], at pp. 107-108).

61. By contrast, there are States in the United States in which the two claim tracks do admittedly exist, but in a claim under the survival statute it is not possible to claim compensation for the loss of the deceased's future income. This is the case, for example, in the States of Hawaii, Kansas, Massachusetts, Missouri, Maryland, Wisconsin and other States (see, *inter alia*, *Greene v. Texeira* [102], at pp. 1172-1173; *Prunty v. Schwantes*, 162 N. W. 2d 34, 37-38 (1968); Eric W. Gunderson, 'Personal Injury Damages Under the Maryland Survival Statute: Advocating Damage Recovery for a Decedent's Future Lost Earning,' 29 *U. Balt. L. Rev.* 97 (1999)).

There are also States in the United States where there only exist statutes of a nature of a survival statute. This is the case, for example, in Connecticut, Georgia, Florida, Mississippi and Tennessee. In these States also it has on several occasions been held that the head of damage of the loss of income capacity may be included in the claim (see, for example, *Sanderson v. Steve Snyder Enterprises, Inc.* [104], at p. 397).

62. Returning to Israel, s. 19(a) of the Torts Ordinance provides, as we have already seen, that causes of action in torts that a person who died could have brought or could have had brought against him continue to remain valid for or against the estate of that person. It seems, therefore, that in Israeli law the existing law is clear; it is that no

distinction should be made between the personal claim of the living injured person and the claim of the estate of the deceased injured person. Therefore, once we have determined that we should recognize a right of the living injured person to a claim for the loss of earning capacity in the 'lost years,' we must automatically, in the absence of a statutory provision to the contrary, recognize also the right of the estate to the same cause of action. Indeed, 'if we recognize the right of the living injured person, whose life expectancy has been reduced, to receive compensation in his lifetime for the 'lost years,' it is very difficult, on a "technical" level, not to recognize the right of the estate' (*Estate of Sharon Gavriel v. Gavriel* [1], at p. 560). This is the case with regard to the non-pecuniary loss involved in the loss of years of life (within the framework of the head of damage of loss of life expectancy), and it should also be the case with regard to the pecuniary loss involved in the same damage. 'In both cases, we are concerned with compensation for the years of "non-life;" in both cases we are concerned with compensation for loss, which will occur after the death of the injured person, and in both cases we are concerned with objective loss and not with compensation for the subjective feeling of the injured person in his lifetime about his death' (*ibid.*). This approach, according to which the same law applies to the estate as to the living injured person, is accepted, in practice, by everyone, and in England it led, as aforesaid, to the recognition, in case law, of compensation for the 'lost years' also in the claim of the estate (until the law was changed in this regard; see mainly *Gammell v. Wilson* [147]).

63. Our conclusion is, therefore, that once we have determined that we should recognize the right of the living injured person to compensation for loss of his earning capacity in the 'lost years,' we also should recognize a similar right of his estate. This is the 'Gordian knot' that ties the law applying to the estate to the law applying to the living injured person, which Justice Barak also discussed in *Estate of Sharon Gavriel v. Gavriel* [1], and this knot — whether it is desirable law or not — cannot be untied without a change in legislation.

We shall now seek to address two additional matters, which are connected with the question of the entitlement of the estate to compensation for the loss of the deceased's earnings in the 'lost years.' The *first* concerns the ruling in *Estate of Lily Hananshwili v. Rotem Insurance Co. Ltd* [7], and the *second* concerns the question of the fear that the tortfeasor will be found liable for double compensation.

*The Hananshwili ruling*

64. In *Estate of Lily Hananshwili v. Rotem Insurance Co. Ltd* [7], a person was injured in a road accident. As a result of the accident, he suffered a 28% permanent disability, and his earning capacity was reduced. Before he filed a claim for his damage, he had the misfortune to be injured in another road accident, in which he lost his life. His widow and children filed a claim, as heirs and as dependants, against the insurance companies liable for the damage in the accidents, and the question arose as to who was liable for the loss of the 28% of the injured person's earning capacity during the period from the date of the second accident until the end of the injured person's life expectancy. The Supreme Court held that the second accident denied the injured person the possibility of suing the first tortfeasor for compensation, for the loss of the earning capacity in the aforesaid period. Therefore, it was held that the second tortfeasor was liable to compensate the estate for this damage. In the words of Justice Netanyahu:

'The second tortfeasor takes the injured person as he is, for better or for worse. He found the injured person who had been injured in the first accident and his work capacity was reduced (in our case by 28%). He brought the injured person to a situation where he had a 100% loss of work capacity. He is not liable to compensate the dependants for loss of support to the extent that it was caused by the first accident. Therefore his liability will not be in an amount of 100% but in an amount of 72%. But he also found an injured person with a right of claim against the first tortfeasor for a loss of future earnings in an amount of 28%, which occurred and accumulated also in the interim period. This right of claim was lost to the estate as a result of the deceased's death. He must compensate the estate for this loss' (*ibid.*, at p. 551).

We have already pointed to the 'footprints' of compensation awards for the 'lost years' in out legal system. Here you have additional footprints. Admittedly, the court pointed out that in view of the rule in *Estate of Sharon Gavriel v. Gavriel* [1] the first tortfeasor was not liable to compensate the estate for the loss of the injured person's earning capacity after his death (*ibid.*). However, the court saw fit to find the second tortfeasor, who caused the injured person's death, liable for compensation for loss of work capacity, notwithstanding the regrettable fact that the injured person would not be alive in that period of lost earnings. The court did this on the basis of the 'claimable damage' inherent in the loss of the possibility of filing a claim against the first tortfeasor,

but this cannot change the fact that in practice compensation was awarded here for the loss of earning capacity in the years of non-life (in an amount of 28% of the expected income of the deceased in those years; this amount was added to the compensation that was awarded to the dependents for loss of support). The connection — and the possible conflict — between the judgment in *Estate of Sharon Gavriel v. Gavriel* [1] and the judgment in *Estate of Lily Hananshwili v. Rotem Insurance Co. Ltd* [7] was discussed by Prof. A. Porat in the following terms:

'The inability of a person to claim compensation for the "lost years," either from the first tortfeasor or from the second tortfeasor, derives from the ruling of the Supreme Court [in *Estate of Sharon Gavriel v. Gavriel*] which is based on the approach that *in the "lost years" the injured person did not suffer any damage of a reduction in his earning capacity!* In the absence of damage, there is no compensation. In *Hananshwili* the Supreme Court resorted to this very approach, in order to explain the unambiguous inability of the estate to claim any compensation from the first tortfeasor, for harm to the earning capacity relating to the interim period, which is none other than the "lost years."

If this is the case, then the injured person in *Hananshwili* lost his cause of action against the first tortfeasor primarily for the reason that after the death *there is no longer any damage* as a result of a reduction in the earning capacity. Granting any compensation to the injured person for loss of earning capacity relating to the "lost years" will give him overcompensation in excess of his damage…

[The *Hananshwili* ruling] may, possibly, raise an additional question mark to the ones already raised as to the correctness of the "lost years" rule' (A. Porat, 'Law of Torts,' *Israel Law Annual* 222 (1991), at pp. 255-256.

Note that in *Estate of Lily Hananshwili v. Rotem Insurance Co. Ltd* [7] the Supreme Court awarded the estate compensation as aforesaid, even though it was incapable of benefiting the injured person — who was no longer alive — but only his dependants and heirs.

*The fear of double payment*

65. One of the main arguments raised against awarding compensation to the estate for the 'lost years' is that doing so will cause injustice to the defendant, who will be required to pay twice — once in the dependants' claim for the damage of loss of support and a second time in the claim of the estate for loss of earnings in the 'lost years.' Such a danger does not exist in the claim of the living injured person, since in this case there is no claim of the dependants. However, where the deceased has not exhausted his claim in his lifetime, the defendants' claim is not barred, and it may stand alongside the claim of the estate. This is what leads to the fear that the tortfeasor may be found liable to make a double payment.

In practice, there are several different scenarios of the relationship between the dependants' claim and the estate's claim, and consequently of the way in which the amount of compensation payable to the estate for the 'lost years' should be calculated. We will seek to show that in all these scenarios, there is no real danger of imposing a liability for overcompensation on the tortfeasor.

66. The first scenario, which is the most common, is the one where the heirs are also the persons who were dependent on the deceased for their livelihood. In such a case, which as aforesaid is the usual one, there is no fear of double compensation. This is because of the deduction rule, which directs us to deduct from the claim of the dependents the benefit that they received from the estate, including the compensation for the 'lost years.'

Notwithstanding, it should be noted that occasionally, where the heirs are also the dependants, the fear of double compensation is solved in another way, namely not by means of the deduction rule. This group of scenarios includes several possibilities: first, it is possible that the dependants-heirs do not have any dependants' claim. This will be the case where the deceased died as a result of another tortfeasor and also where he died not as a result of a tortious act. In these two cases, the death was not caused by the tort that was done by the tortfeasor who harmed the deceased's earning capacity, i.e., the source of the dependants' livelihood; in any event the claim of dependants does not arise and in any event there is no fear of double compensation. In the absence of a dependants' claim there is no basis for reducing the value of the estate's claim, not even conceptually. Another scenario that belongs to this groups of cases is where there is a dependants' claim, and the dependants are the heirs, but they are not able to recover from the estate, because it is not solvent. In such a case, there is no practical application of the deduction rule, since in practice the dependants have not received, in their capacity as heirs, any benefit from the death of the deceased. *Prima facie*, this is the situation where the fear of double payment arises from the tortfeasor's point of view. In practice, this fear will be realized rarely, since an estate that is bankrupt is,

usually, the estate of someone who in his lifetime was unable to support the dependants with his own efforts, and this will naturally be taken into account in their claim.

67. Another scenario that requires consideration is the case where the heirs are *not* the people who were dependent on the deceased for their livelihood. This scenario, as aforesaid, is not the usual one, but here too we can solve the problem of the double compensation. It appears that the proper way of doing this, within the framework of the existing system, is to deduct from the estate's claim the amount that the injured person would have spent on his dependants. The logic for this lies in the assumption that the injured person would have devoted this amount to the support of his dependants, whereas his heirs are no longer required to do this, since the dependants' claim will be directed against the tortfeasor. This was well described by Justice Barak in *Estate of Sharon Gavriel v. Gavriel* [1]:

'This solution is based on the distinction… between the right to compensation and the assessment of the compensation. According to this approach, the right of the estate to compensation is like the right of the living injured person to compensation, since "the estate is compared to a polished mirror," which reflects the right of the injured person itself, but just because the actual right is identical does not mean that the amount of the compensation is identical. Just as when assessing the damage to the living injured person we must take into account the expenses that the living injured person spent on himself, and that were saved in the years of "non-life"… so too in assessing the damage to the estate we should take these expenses into account, as well as expenses that the injured person would have spent on his dependants and which he will no longer be required to pay, since the liability to compensate for them has been imposed on the tortfeasor… according to this approach, the tortfeasor will no longer pay double compensation, since the amount of the compensation that will be awarded to the estate will not include the amount that will be awarded to the dependants (*ibid.*, at p. 564, and see the references cited there, at pp. 565-568).

A similar solution was adopted in several Australian judgments. This, for example, was held by Justice Taylor in the leading judgment in *Skelton v. Collins* (1966) 115 C.L.R. 94:

'As to the possibility of the duplication of damages I observe that if an injured person has, himself, recovered damages no further action will lie for the benefit of his dependants in the event of his subsequent death whilst in the case where an action is brought, not by the injured person himself but, upon his death, by his legal personal representative for the benefit of his estate, the damages would be assessed having regard to the gain, if any, which would have accrued to the deceased from his future probable earnings after taking into account the expenditure which he would have incurred, if he had survived, in maintaining himself and his dependants, if any' (at p. 114).

This solution to the problem of double payment is not in conflict with the provisions of statute. As Justice Barak held, in *Estate of Sharon Gavriel v. Gavriel* [1], the approach whereby the amounts of support devoted to the dependants are deducted from the estate's claim can also be resolved with the rather vague provision of s. 19 (b) of the Torts Ordinance, which states that 'if a cause of action continues to exist as aforesaid in favour of the estate of the deceased, and the act or the omission that created the cause of action led to his death, the compensation that can be recovered by the estate shall be calculated without taking into account the loss or profit caused to the estate as a result of the death…'. This provision, so Justice Barak elucidated, concerns the loss or profit of the estate, whereas we are dealing with the loss or profit of the injured person before his death. When the dependants have an independent cause of action against the tortfeasor, for loss of support, the deceased is no longer required, prior to his death, to pay this expense (*ibid.*, at p. 566).

Moreover, s. 19(d) of the Ordinance, which provides that 'the rights given under this Ordinance to the estate of the deceased are intended to add to the rights given to the dependants of the deceased under this Ordinance or any other legislation and not to detract from them,' concerns, according to well-established case law, the actual right to compensation, and not the amount of the compensation (*ibid.*, see also *General Federation Medical Fund v. Estate of Dr Meir Edison* [30], at p. 80; *Estate of Michal Kedar v. HaSneh Insurance Co.* [25], at pp. 606-607). Therefore, even the provisions of this section do not preclude the possibility of adopting the solution set out above in our legal system.

68. It should be noted that the approach that the problem of double compensation should be solved by means of deducting the claim of the dependants from the claim of the estate has received criticism. The main criticism

arises from the fact that in the claim of the living injured person the claim of the dependants is not deducted — we should remember that one of the main reasons underlying the awarding of compensation for the 'lost years' is to ensure the dependants' interests — and there is no reason, so the criticism goes, to have different compensation principles for the claim of the estate (see Waddams, *The Law of Damages*, at § 12.220). The response to this claim is that the compensation principles are indeed different. The calculation of the damage arising from the lost years of earnings is made in the same way — both for the claim of the living injured person and for the claim of the estate. However, when awarding the compensation, the court should — here as in other cases — take into account the question of the double compensation and the savings accruing to the estate from the very existence of the dependants' claim that is directed at the tortfeasor. The significance is that where compensation has already been given for the same damage, the court will not award additional compensation. This is only done in order to realize the rule of returning the injured person to his original position.

From all of the above it transpires that even the argument about the fear of double payment by the tortfeasor cannot change the conclusion that we have reached, whereby according to the existing law a right of claim by the estate for loss of earning capacity of the deceased in the 'lost years' should be recognized.

In calculating the compensation for the estate, an amount reflecting the expenses that the deceased would have incurred for his livelihood 'in the lost years' should be deducted (see also, in this regard, what we said above in respect of the compensation for the living injured person), as well as — in appropriate cases — an amount reflecting the expenses that he would have incurred for his dependants. An additional outcome of this compensation system is that, in the final analysis, the additional amount that the tortfeasor is required to pay — over and beyond what he would have been liable to pay in any case if the head of the 'lost years' had not been recognized — is quite modest. We are speaking of an amount that reflects the savings that the injured person would have accumulated in the 'lost years.'

69. It should be emphasized that the solution proposed for our legal system to the difficulty inherent in the double compensation is not the only possible solution. As we have said, this difficulty has constituted a main stumbling block for making the tortfeasor liable, in a claim of the estate, to pay compensation for the lost years of earnings. Various countries have indeed denied the estate the possibility of claiming this head of damage. Thus, in those countries, the fear of double payment was averted. We discussed above the theoretical and practical difficulties inherent in that solution. In any event, it cannot be implemented in Israel without a change of legislation. But in my opinion, if the legislature is called upon to make a major change in the compensation system, this is not the change that I think it ought to choose. It appears that there would be an advantage to a change in exactly the opposite direction, namely the cancellation of the claim of the dependants and enriching the claim of the estate. This solution was proposed by Professor Waddams. In his opinion, the independent claim of the dependants that derives from the loss of the deceased's earning capacity should be cancelled, and only one claim should be allowed — the claim of the estate — for these losses also. According to this approach, the compensation that will be paid for loss of earning capacity will be identical, whether the injured person remains disabled or whether he is killed in the tortious act, and whether he has dependants or not. As Professor Waddams explains, the solution is not new, and it was already suggested in England in the nineteenth century. This solution is attractive, *inter alia* because it removes the stain associated with the outcome that the law of torts is more lenient to the tortfeasor who kills than to the tortfeasor who wounds, and because it negates the fear of double compensation arising from double claims (see Waddams, *The Law of Damages*, at § 6.760). Notwithstanding, this solution also has a difficulty, and in any event it cannot be implemented in the legal system practised in Israel. The difficulty lies mainly in the need to refer the claim of the dependants for their damage to the estate, and the need to ensure that they will recover from the estate, even if it is insolvent and if the deceased disinherited them in his will. It follows that adopting this arrangement in full requires legislation. We therefore return to the compensation arrangement that has been delineated above, which brings the claim of the estate, within the limits of the existing system, to optimal results.

*The lost years: summary*

70. Approximately twenty years have passed since judgment was given in *Estate of Sharon Gavriel v. Gavriel* [1]. The change in legislation that was desired has failed to come, but a change in the legal climate has indeed occurred. It appears that the time has come to recognize in our legal system the head of damage of loss of earning capacity in the 'lost years.'

A survey of the arguments made against the awarding of compensation for the 'lost years' shows that in

practice these arguments fall under two main objections: the *first* is that the death of the injured person removes the foundation for awarding the compensation — 'where there is no life, there is no loss of capacity' or 'where there is no enjoyment of the compensation, there is no compensation.' The *second* is that there is a difficulty in assessing the damage and protecting the interest of the tortfeasor not to pay double compensation. The first main objection raises the question of the external balance — had it not been for the accident, the injured person would have earned a certain amount, and now, as a result of the accident, he cannot earn that amount. Does the awarding of compensation balance the scales? The second main objection concerns the internal balance. The accident gives rise — on the material plane — to gains and losses. Can both of these be taken into account in calculating the compensation?

My answer to both questions is yes. With regard to the first main argument, I believe that the award of compensation for the loss of earning in the 'lost years' corrects — admittedly not in the full sense of the word but in important senses — the major imbalance in the external balance that was caused by the wrongful act of the tortfeasor. The injured person has been deprived, by the wrongful act, of the ability to earn income and to make use of it for his needs and for those of his family. Awarding compensation addresses the need to take this into account, and ensures that the lack of balance caused by the tort will not remain unaddressed *especially* in cases where the result of the tortious act is particularly serious. Awarding compensation reflects the approach that as a result of the tortious act, the injured person is deprived of an asset — his earning potential — that he would have had if it had not been for the tortious act. The dispute revolves, in practice, around the question of the number of units of time in which this damage should be recognized. However, the time element is also a significant part of the 'after' pan in the external balance, since had it not been for the tort, the earning capacity would be expected to continue throughout the working life expectancy of the injured person. In other words, there can be no dispute as to what are the units of time in which the injured person would have continued to earn, had it not been for the tortious act, and what are the units of time in which he will in practice be able to earn as a result of this act.

Moreover, the award of compensation for the 'lost years' prevents the arbitrary results according to which compensation is not awarded for the loss of earnings to an injured person whose life expectancy is shortened, while compensation on this head of damage is awarded to an injured person in a permanent vegetative state, or to the estate for pain and suffering and reduction of life expectancy, all of which without any really adequate justification for the distinction. We should emphasize that also with regard to the injured person in a permanent vegetative state, the loss of earning capacity extends over units of time in which his physical and financial welfare is diminished and he is unable to enjoy the compensation money. This is certainly also the case with regard to the deceased injured person, in so far as concerns the non-pecuniary damages recognized in our legal system. Notwithstanding, case law has held that balancing the scales requires awarding compensation in these cases, and a coherent approach requires also awarding compensation here for loss of earning capacity in the 'lost years.' Perhaps most importantly of all, the awarding of the compensation for the 'lost years' (to the living injured person) ensures that a situation will not arise in which, although the dependants have been deprived by the tortious act of the support of the injured person — support that they would have received had it not been for that act — this damage will remain unremedied.

The second main objection concerns, as aforesaid, the internal balance and the need to prevent a double payment. The courts are accustomed to deal with claims of this kind, which means that the awarding of compensation must be done while taking into account the pecuniary gain and loss that arise from the tortious act, and with safeguards to prevent double compensation. We discussed above the rules that should be applied in this regard. This is the sole significance of the second main objection, and it has no effect on the substantive question concerning the right to compensation.

71. What emerges from all of the aforesaid leads us to one clear conclusion, namely that we should recognize the entitlement of the injured person to compensation for the lost years of earnings. This applies both to the claim of the living injured person and to the claim of the estate. It cannot be denied that the issue of the 'lost years' can be solved in other ways. There is also no doubt that one of the strongest reasons for awarding damages to the living injured person for the 'lost years,' namely the reason that concerns ensuring the future of the dependants, does not apply to a claim of the estate, in view of the fact that s. 78 of the Ordinance does not prevent the dependants from filing a claim for loss of support. In a claim of an estate, like the one before us, in which the injured person who died was a young child, there are special difficulties, as we have set out above. There is no obstacle, of course, to the legislature changing the legal position, whether on the issue of the 'lost years' in

general, or on the issue of the right of the estate to compensation for this head of damage. But I am of the opinion that until such a change, if any, is made, we should adopt the approach that has been accepted, as aforesaid, in many other legal systems, according to which the living injured person, or his estate, is entitled to compensation for the damage of loss of earning capacity in the 'lost years.' A proper assessment of the compensation will balance the undesirable consequences of the fundamental determination.

72. The result is that the appeal in CA 140/00, in so far as it concerns the question of the entitlement of the deceased's estate to compensation for loss of the deceased's earning capacity in the 'lost years' should be allowed. The case is therefore returned to the District Court, so that it may determine the amount of the compensation for this head of damage.

Now let us turn to the other questions that arose in the appeals before us.

*Punitive damages*

73. Section 76 of the Torts Ordinance provides, with regard to the compensation for carrying out a tortious wrong, as follows:

> 'Compensation may be awarded on its own or in additional to, or instead of, an injunction; but if (1) the plaintiff suffered damage, compensation may be awarded only for that damage that is likely to result naturally in the normal course of things and that resulted directly from the tort of the defendant.'

It has already been said that the word 'compensation,' as it appears in the Torts Ordinance, tells us tortious relief is not declaratory or penal, but remedial, and it is intended to remove the damage and remedy it (CA 1977/97 *Barzani v. Bezeq, the Israel Telecommunication Corp. Ltd* [53]; Barak, 'Assessing compensation in personal injury: the law of torts as it is and as it should be,' *supra*). Indeed, as we have pointed out above, the purpose of compensation is to return the injured person, in so far as this is possible by means of a payment of money, to the same position he would have been in at the time of the tortious act, had there been no tortious act. This purpose is part of the fabric of the principle that a person is only liable for compensation for damage that he caused. This principle finds expression in making liability in torts conditional upon the existence of damage that the injured person suffered and upon a causal link between the tortious act and that damage.

74. Nonetheless, there are legal systems that recognize a relief of punitive, exemplary or vindictive damages, namely 'damages that the tortfeasor must pay to the injured person in an amount that does not reflect an assessment of the damage that the tortfeasor caused to the injured person by the tort, but that intends to punish the tortfeasor for his dangerous conduct and thereby to express revulsion at it' (A. Barak, *Law of Torts — General Principles of Torts, supra,* at p. 579). The punitive damages are distinguished from aggravated damages, which also take into account the seriousness of the tortfeasor's conduct, but express 'a genuine assessment of the damage caused [to the injured person], when this damage has been aggravated by the tortfeasor's improper conduct' (*ibid.* at p. 579; see also *Khodaparast v. Shad* [151]; *Vorvis v. Insurance Corp. of British Columbia* [129]; A. Beever, 'The Structure of Aggravated and Exemplary Damages' 23 *Oxford J. L. Stud.* 87 (2003)). The distinction between punitive damages and aggravated damages was described by Justice Kennedy as follows:

> 'aggravated damage for conduct that shocks the plaintiff; exemplary (or punitive) damages for conduct which shocks the jury' (*Muir v. Alberta* [130], at p. 714).

Punitive damages, therefore, do not rely upon a foundation of 'remedy' or 'reparation.' The rationale behind these is to punish and deter (see *Hill v. Church of Scientology of Toronto* [131], at p. 1208). On the essence of punitive damages, and the purpose underlying them, the House of Lords made the following remarks:

> 'Exemplary damages or punitive damages, the terms are synonymous, stand apart from awards of compensatory damages. They are additional to an award which is intended to compensate a plaintiff fully for the loss he has suffered, both pecuniary and non-pecuniary. They are intended to punish and deter' (*Kuddus v. Chief Constable of Leicestershire Constabulary* [152]).

75. The non-remedial nature of punitive damages constitutes a challenge for the classical clear-cut distinction between civil law — which focuses on compensation — and criminal law — which focuses on punishment. Civil law has always been regarded as seeking mainly to regulate relationships between individuals, and from this perspective punitive damages are classified as an anomaly. In this vein, concern has been expressed more than once that recognizing a power to award punitive damages introduces into civil law a function that is reserved for

criminal law, while 'compromising' on the rules of evidence, the burden of proof and the rules of procedure that apply in criminal proceedings. Moreover, it has been claimed that awarding punitive damages imposes on the tortfeasor a risk of a 'double sanction,' where these are in addition to criminal sanctions. It has also been said that punitive damages are a windfall for the injured person, since they are intended to add to the remedial compensation that he has been awarded for his damage. Following this line of reasoning, it can be argued that even if it is justified to fine the tortfeasor, it does not necessarily follow that it is right that the injured person, rather than the State, should receive the sum (see Cassels, *Remedies: The Law of Damages, supra*, at p. 258; Beever, 'The Structure of Aggravated and Exemplary Damages,' *supra*; *Cassell & Co. Ltd v. Broome* [153]).

But contrary to all of the aforesaid there are significant reasons in favour of recognition of a power to award punitive damages, in those cases where the conduct of the tortfeasor is especially grave or it involved a serious infringement of constitutional rights. On a theoretical level it is argued that the distinction between civil law and criminal law is not so clear-cut, and these two branches spread out towards one another and intertwine, and it is even possible to distinguish a 'grey area' of 'punitive civil law' (see, for example, LCrimA 2976/01 *Assaf v. State of Israel* [54]; K. Mann, 'Punitive criminal sanctions,' 16 *Tel-Aviv University Law Review (Iyyunei Mishpat)* 243 (1991)). In the practical sphere, the added value inherent in awarding punitive damage has been emphasized especially in the deterrent effect and education against acts that should be censured, and in strengthening the protection of rights that deserve protection (see *Conway v. INTO* [162]). This is often the case in contexts or circumstances which the criminal trial cannot reach. Even the argument concerning the injured person receiving a windfall has been given a certain answer that 'he can only profit from the windfall if the wind was blowing his way;' in other words, the injured person who took the trouble to promote the public interest inherent in the awarding of punitive damages is the most appropriate person to receive them (see *Cassell & Co. Ltd v. Broome* [153]). It should also be noted that where a criminal proceeding also took place with regard to the tortious act, its outcome can be taken into account in the punitive damages (for these and other considerations, see also the detailed report of the Law Reform Commission in Ireland, which was published in the year 2000, with the title *Report on Aggravated, Exemplary and Restitutionary Damages*.

76. The economic analysis of the law of torts gives punitive damages an important role in promoting the purpose of effective deterrent. As we have stated within the framework of the discussion about the issue of the 'lost years,' it is customary to say that one should aim for compensation that reflects the damage that was caused. But an additional parameter affects the calculation, and this is the chance that no liability will be imposed at all for the tortious act. Indeed, not every tortious act leads to a claim in tort. Various factors play a part in this, including the costs of the claim or the injured person's uncertainty as to whether his damage was caused by a tortious act or as to who the tortfeasor was. There are therefore some who think that punitive damages ought to be awarded, in cases where if this is not done, the deterrent will be defective because of the possibility that tortfeasors will evade liability. The amount of the punitive damages must, according to this approach, reflect the chance that the tortfeasor will not be found liable for his tort. Thus, for example, if there is a 25% chance that the tortfeasor will indeed be found liable for the damage that he caused, and the damage is in an amount of NIS 100,000, then the amount of the total compensation should be in an amount of NIS 400,000, of which NIS 100,000 are 'remedial' damages, and the remainder — NIS 300,000 — are 'punitive' damages (see A.M. Polinsky & S. Shavell, 'Punitive Damages: An Economic Analysis,' 111 *Harv. L.Rev.* 869, at p. 882).

77. The question of punitive damages is, therefore, a multifaceted one. In any event, in view of the unique nature of punitive damages, case law has usually treated them with reservations, or at least caution, even though it is possible to find, in the various legal systems, different approaches to the issue. Case law in England held, in the past, that the court may award punitive damages in any case of tort (*Loudon v. Ryder* [154]), but in 1964 the House of Lords, *per* Lord Justice Devlin, sought to limit punitive damages to certain cases only, on the grounds that such damages can lead to an overlap of the roles of civil and criminal law. Therefore Lord Devlin was of the opinion that punitive damages should not be awarded except where there is an express provision of statute and in two additional categories of cases: the first, cases where civil servants acted oppressively, arbitrarily or unconstitutionally, and the second, where the tortious act of the tortfeasor was planned by him with the purpose of procuring for him, the tortfeasor, a benefit in an amount exceeding the amount of the expected compensation. The purpose of the latter category is to deprive the defendant of the fruits of his tort, and to make it clear to him — and to others — that 'tort does not pay' (see *Rookes v. Barnard* [155]); this approach was expressed again by the House of Lords in *Cassell & Co. Ltd v. Broome* [153]). In one case it was held that the awarding of punitive damages should be reduced even further, so that punitive damages will be awarded only where the cause of action

was recognized, for this purpose, before the judgment in *Rookes v. Barnard* [155] was given (see *A.B. v. South West Water Services Ltd* [1993] Q.B. 507; [1993] 1 All ER 609) but this restriction was rejected recently in *Kuddus v. Chief Constable of Leicestershire Constabulary* [152]. In *Kuddus*, as in many previous judgments, the judges were divided in their opinion as to whether punitive damages are an important tool in dealing with defective conduct of tortfeasors and infringement of the rights of injured persons (Lord Nicholls and Lord Hutton), or whether it was an anomaly that ought not to be recognized in the law of torts (Lord Scott). The Law Commission proposed that punitive damages should continue to be recognized, but their scope should be redefined, so that it would be possible to award them in any case of torts where the defendant ignored the rights of the plaintiff deliberately and outrageously (see UK Law Commission, *Aggravated, Exemplary and Restitutionary Damages*, Law Com. no. 247 (1997). The matter has not yet been dealt with in legislation (see W.V.H. Rogers, *Winfield & Jolowicz on Tort* (sixteenth edition, 2002) at p. 757).

78. The restrictions that were delineated in *Rookes v. Barnard* [155] were not adopted *verbatim* in countries such as Canada, Australia and New Zealand (see *Vorvis v. Insurance Corp. of British Columbia* [129]; *Uren v. John Fairfax & Sons Pty Ltd* [110] — a judgment that was upheld by the Privy Council in *Australian Consolidated Press v. Uren* [157]; *Taylor v. Beere* [163]; see also in Ireland, *Conway v. INTO* [162]). Notwithstanding, the courts there restricted the awarding of punitive damages to exceptional cases, especially those in which the conduct of the defendant is outrageous or deliberate to a degree that justifies his being penalized by means of finding him liable to pay the plaintiff a kind of 'civil fine.' The purpose of this is to give expression to the disgust of the court, and so that the tortfeasor and others may see and be afraid (see *Hill v. Church of Scientology of Toronto* [131], at p. 1208). A broader approach, with regard to punitive damages, is found in case law in the United States, from the viewpoint of the grounds for awarding them and from the viewpoint of the willingness to make use of them as a deterrent, as well as from the viewpoint of the size of the amounts awarded (see and cf. *B.M.W. of North America Inc., v. Gore* [105]).

It should be noted that an award of punitive damages focuses usually on torts involving intent, where the conduct of the tortfeasor deserves condemnation. Various legal systems have recognized the possibility of awarding punitive damages also in claims based on the tort of negligence, but the courts do this, as a rule, in limited and exceptional cases (see P.H. Osborne, *The Law of Torts* (Toronto, 2000) at p. 104; Trindade & Cane, *The Law of Torts in Australia, supra*, at p. 530; *Lamb v. Cotogno* [111]; *Coughlin v. Kuntz* [132]). The Privy Council recently held, in an appeal on the Court of Appeal in New Zealand, by a majority of three judges against two, that, in principle, punitive damages may be awarded also in cases of negligence that do not involve intent or awareness, provided that the basic condition of outrageous conduct exists. The majority opinion regarded the mental state of the tortfeasor as of great importance, in view of the approach that the purpose of damages of this kind is to punish, and not to express the dissatisfaction of the court at the conduct (*A. v. Bottrill* [158]; A. Phang & P.W. Lee, 'Exemplary Damages — Two Commonwealth Cases,' 62(1) *C.L.J.* 32 (2003)).

79. The courts in Israel have recognized the possibility of finding a tortfeasor liable for punitive damages. Already in CA 216/54 *Schneider v. Glick* [55], it was held that:

> 'The attack of the appellant on the respondent was deliberate, not preceded by immediate provocation, and it was carried out with a savageness that was intended to shame the respondent in public. The court may take into account these special factors, such as the evil intent of the attacker and the shame that the victim suffered, in determining punitive damages... taking into account all of these factors, we find that the circumstances justified imposing a substantial amount as general damages...' (*ibid.*, at p. 1335).

Case law has repeatedly held that the courts in Israel have the power to award punitive damages (see CA 81/55 *Kochavi v. Becker* [56], at p. 234; CA 277/55 *Rabinowitz v. Sela* [57]; CA 30/72 *Friedman v. Segal* [58], at p. 237; CA 670/79 *HaAretz Newspaper Publishing Ltd v. Mizrahi* [59], at p. 205), even though this approach has been criticized (I. Englard, A. Barak, M. Cheshin, *The Law of Torts — General Principles of Torts*, second edition, G. Tedeschi ed. (1976), at pp. 583-584; see also the remarks of Justice Kister in CA 711/72 *Meir v. Governors of the Jewish Agency for Israel* [60]). There are those who think that we should consider the effect of the Basic Laws on this issue (CC (TA) 1549/96 *Levy v. Hadassah Medical Organization* [78]). In practice, the courts in Israel are not accustomed to award punitive damages, and they certainly do not do this frequently (CA 3654/97 *Kartin v. Ateret Securities (2000) Ltd* [61], at p. 406). It should be noted that Israeli law has express statutory provisions that specify, in certain contexts, an express power to award punitive damages (see for

example s. 183 of the Patents Law, 5727-1967). The draft law of MK Nechama Ronen, in 2001, according to which a provision concerning punitive damages would be added to the Torts Ordinance, did not become legislation (draft Torts Ordinance [New Version] (Amendment — Punitive Damages) Law, 5762-2001). According to the draft law, the court might find the defendant liable for damages, in addition to the damages awarded under s. 76 of the Ordinance, 'if it was held that the defendant acted in a way deserving of censure, and one of the following: (1) with the purpose of causing damage to another; (2) while deliberately and knowingly ignoring the rights or security of the other; (3) with gross negligence.' It was also provided in the draft that by determining the proper quantum of punitive damages the court may consider, *inter alia*, the foreseeability — in theory and in practice — of the damage that was caused as a result of the acts or omissions of the defendant and the period of time during which the defendant carried out the acts or omissions that caused the plaintiff his damage.

80. In our case, the District Court was of the opinion that 'the omissions for which the defendants who were convicted in the judgment were responsible are very serious omissions,' but at the same time it emphasized that there are those who cast doubt upon the actual power to award punitive damages, and he said that, as a rule, 'the courts only award punitive damages for torts that require intent or a deliberate act.' It seems to me that we should not intervene in the conclusion of the trial court in this regard. The negligence of the respondents, as reflected in the judgment convicting them, is indeed shocking and led to a tragic outcome. Notwithstanding, it appears that even if the courts in our legal system have power to award punitive damages — and we are not required to decide this issue today — there is insufficient cause, in this case, to intervene in the decision of the District Court not to award the appellants punitive damages.

*Reduction of life expectancy*

81. In the category of non-pecuniary loss for personal injury are two main heads of damage, pain and suffering and reduction of life expectancy or loss of life expectancy. The head of damage of loss of life amenities is not recognized, in Israeli law, as an independent head of damage (see *Weizman v. Zucker* [48]; CA 372/65 *Dehan v. Francis* [62]; *Estate of Robert Freilich v. State of Israel* [21]; it should be noted that in England the head of damage of reduction of life expectancy has been rejected as an independent head of damage, by the Administration and Justice Act 1982, and now it falls within the scope of pain and suffering).

There are those who recoil from awarding compensation for non-pecuniary loss, because of the difficulty in estimating the amount thereof. It has already been said that in cases such as these 'there is more speculation than calculation,' since 'how is it possible to assess, accurately or even approximately, in money or money's worth, the pain and suffering or the anguish and humiliation of a person whose hand or leg has been amputated, or who walks around with anxiety in his heart because his days on earth are numbered' (*Grossman v. Roth* [13], at p. 1254). It has also been written that this head of damage 'will not be determined by weights and measures of logic but with morality and emotion,' since 'no money is equal to the loss of life nor will it compensate for deprivation of the pleasures of life' (CA 15/66 *Shinar v. Hassan* [63], at pp. 460, 463; see also CA 283/89 *Municipality of Haifa v. Moskowitz* [64], at p. 732).

82. Nonetheless, the compensation for the head of damage of reduction or loss of life expectancy is firmly established in out legal system; even the somewhat paradoxical approach whereby compensation for this head of damage should be minimized precisely because of the difficulty in assessing its amount has become discredited. The need for measured compensation is not necessarily equivalent to a need for modest compensation. Indeed, in some legislation, the assessment of non-pecuniary loss is done on a universal rather than an individual basis (see the Road Accident Victims Compensation Law, 5735-1975; Road Accident Victims Compensation (Calculation of Compensation for Non-Pecuniary Loss) Regulations, 5736-1976; Liability for Defective Products Law, 5740-1980; CA 235/78 *Hornstein v. Ohavi* [65], at p. 349; CA 184/80 *Eigler v. HaMagen* [66]; CA 2801/96 *El-Al Israel Airlines Ltd v. Yifrach* [67]). This is the reverse side of the coin whose obverse is the strict liability arrangement that these statutes provide (see also CA 675/82 *Asadi v. Cohen* [68]). However, the maximum rate prescribed in the Compensation Law or in the strict liability statutes cannot constrain the court when it is awarding compensation for non-pecuniary loss of a plaintiff who was injured by a wrongful act under the Torts Ordinance (CA 180/88 *Ozeri v. Sarufi* [69]; CA 3843/90 *Ohayon v. State of Israel, Ministry of Defence* [70]). Indeed, when we are concerned with the general law of torts, 'the law is based on focusing on the individual damage that occurred to the injured person, and for which the tortfeasor is responsible, and the need to return the injured person to his original position' (*Naim v. Barda* [3], at p. 775). In so far as the head of damage of reduction

or loss of life expectancy is concerned, an important factor is the length of the period of the 'lost years,' even though obviously one should not adopt a 'mathematical' calculation that determines a 'rate' for each year of life (see and cf. *Shinar v. Hassan* [63]; CA 286/55 *Wolfovitz v. Fisher* [71]; CA 402/75 *Estate of Yisrael Mashiach v. Rosenblum* [72]; *Estate of David Azoulay v. Vulcan Casting Enterprises Ltd* [24]).

83. Abandoning 'modest' compensation in favour of proper compensation is naturally expressed, in Israeli law as in other legal systems, in an increase in the amount of compensation for non-pecuniary heads of damage. This trend has found expression in case law (see, for example, CA 2517/93 *A v. Katahin*, Takdin [73]; CA 6978/96 *Amar v. General Federation Medical Fund* [74]; CA 2055/99 *A v. Israel Chief Rabbinate* [75]; E. Rivlin, 'Compensation for Intangible Loss and Non-Pecuniary Loss — Broadening Trends,' *Shamgar Book*, part 3, 51-62 (2003)). This trend received expression in England, where a comprehensive examination was made of this issue by the Law Commission, and in a report published in 1999 the Commission recommended that compensation for pain and suffering and loss of life amenities should be increased, where 'serious personal injury' is caused. Only a short time passed until, in 2000, the Court of Appeal in England was presented with this issue, in *Heil v. Rankin* [159]. The court adopted, in that case, most of the Commission's recommendations, and stated that the principle concerning full — i.e., proper, reasonable and just — compensation applies both to pecuniary loss and non-pecuniary loss. Notwithstanding, the court emphasized that it did not intend to change the accepted principles underlying the assessment of loss, but only to propose revised guidelines that would give modern validity to the traditional principles concerning the purpose of awarding compensation. In practice, the court in England determined the range of the compensation for non-pecuniary personal injury, in severe cases, in amounts varying between £150,000 and £200,000.

The trend that we have discussed has not overlooked the awarding of compensation for reduction or loss of life expectancy. Case law has held for some time that compensation for this head of damage should be substantial, since it is concerned with the loss of something that is the most valuable thing of all (*Estate of David Azoulay v. Vulcan Casting Enterprises Ltd* [24]; *Estate of Yisrael Mashiach v. Rosenblum* [72]). Indeed, in several judgments given recently, compensation for a reduction of life expectancy has been awarded in larger amounts than those customary in the past (see *The Technion, Israel Technological Institute v. Twister* [9]; see also CA 163/99 *Estate of Diav Mizawi v. Dori Engineering Works Co. Ltd* [76]; CA 5938/97 *Peleg v. Tardiman* [77]; CC (Hf) 1581/94 *Hattib v. State of Israel* [79]).

The judgment of the District Court in our case is consistent with this trend, and the amount of compensation that was awarded for the head of damage of loss of the life expectancy — when the deceased passed away at twelve years of age and his life expectancy was reduced by 59 years — does not justify intervention in either direction. In this determination I have taken into account the fact that, according to our approach, compensation should be awarded to the estate for the loss of the deceased's earning capacity in the 'lost years.'

Therefore the counter-appeal should be dismissed, as well as the arguments raised in this regard in CA 550/01.

84. All the other arguments raised in CA 550/01 do not justify, in my opinion, intervention in the judgment of the District Court. I would like to say a few words on the appellants' claim that the estate should be warded compensation for pain and suffering. In principle, the compensation for this head of damage is awarded, in Israeli law, according to the subjective-functional approach. The ruling that was given by the majority in *Dehan v. Francis* [62] is that compensation should not be awarded for pain and suffering, where the injured person was unconscious from the moment of the injury until the moment of death. In CA 773/81 *Estate of Robert Freilich v. State of Israel* [21] Justice Barak held that 'the loss of consciousness is compensatable damage, since the loss of consciousness is comparable to a reduction in life expectancy, and the latter is compensatable. The compensation is not for the pain and suffering resulting from awareness of the damage but the loss of all life apart from the breath of life in the period of loss of consciousness.' In our case, it was not proved that the deceased suffered pain and suffering from the accident, and even if we regard the time that passed from the accident to the death — in which apparently the deceased was unconscious — as falling within the scope of 'reduction of life expectancy', this addition is minimal and it cannot change the amount of the compensation for this head of damage.

*Conclusion*

85. In view of all of the aforesaid, I am of the opinion that the appeal in CA 140/00 should be allowed, in the sense that the case should be returned to the District Court for the purpose of determining the amount of compensation payable to the estate for loss of the deceased's earning capacity in the 'lost years.' The appeal on the question of punitive damages, the counter-appeal against the amount of the compensation for reduction of life

expectancy, and the appeal in CA 550/01 are denied.

The respondents shall pay the court expenses and the legal fees of the appellants in a sum of NIS 25,000.


**President A. Barak**

I agree.


**Vice-President T. Or**

I agree.


**Justice E. Mazza**

I agree.


**Justice D. Dorner**

I agree.


Appeal allowed in part. Counter-appeal denied.

22 Adar 5754.

15 March 2004.