## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | | | |
|---|---|---|---|---|
| ESTHER WACHSMAN *ex rel.* | : | | | |
| NACHSHON WACHSMAN *et al.*, | : | | | |
| | : | | | |
| Plaintiffs, | : | Civil Action No.: | 06-0351 (RMU) | |
| | : | | | |
| v. | : | Document No.: | 11 | |
| | : | | | |
| ISLAMIC REPUBLIC OF IRAN *et al.*, | : | | | |
| | : | | | |
| Defendants. | : | | | |

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

### DENYING WITHOUT PREJUDICE THE PLAINTIFFS' MOTION FOR DEFAULT JUDGMENT

## I. INTRODUCTION

In October 1994, members of the terrorist group Hamas abducted and executed Nachshon Wachsman, a 19-year-old U.S. citizen residing in Israel. Esther Wachsman, the mother of Nachshon Wachsman, individually and as a Personal Representative of the decedent's estate, along with her sons Menashe Yecheskel Wachsman, Yitzchak Shlomo Wachsman, Uriel Wachsman, Raphael Wachsman, Eliahu Wachsman and Chaim Zvi Wachsman bring suit against the Islamic Republic of Iran and the Iranian Ministry of Information and Security for the death of Nachshon. The plaintiffs allege that the defendants are responsible because they provided training and support to Hamas. Pursuant to the Foreign Sovereign Immunities Act ("FSIA"), 28 U.S.C. §§ 1602 *et seq.*, and the common and statutory law of the District of Columbia and Israel, the plaintiffs seek compensatory damages, prejudgment interest and costs of bringing the action.

Because the defendants failed to appear or respond to the plaintiffs' complaint, the Clerk of the Court entered default against them. The plaintiffs then filed a motion for default judgment, and the court ordered them to submit evidence supporting their claims. Based on a

review of this evidence, the court makes the following findings of fact and conclusions of law and denies, without prejudice, the plaintiffs' motion for default judgment.

## II.  FINDINGS OF FACT

### A.  Procedural History

1.      The plaintiffs filed suit against the defendants on February 28, 2008.  Despite being properly served with process pursuant to 28 U.S.C. § 1608, the defendants failed to respond or appear in the case.

2.      The Clerk of the Court entered default against the defendants on July 6, 2007.

3.      The court must undertake a review of the evidence before it can enter a judgment by default against the defendants.  *See* 28 U.S.C. § 1608(e) (requiring a claimant to "establish[] his claim or right to relief by evidence satisfactory to the court"); *see also Int'l Road Fed'n v. Democratic Republic of the Congo*, 131 F. Supp. 2d 248, 252 n.4 (D.D.C. 2001) ("accept[ing] as true plaintiffs' uncontroverted factual allegations, which are supported by the documentary and affidavit evidence") (internal quotations and citations omitted).  Accordingly, the court ordered the plaintiffs, "in support of their motion for default judgment, to submit evidence through prior sworn testimony and affidavits."  Minute Order (Aug. 27, 2007).

4.      After the court granted a five-week extension of time, Minute Order (Oct. 19, 2007), the plaintiffs submitted their proposed findings of fact and conclusions of law with accompanying evidentiary support on November 30, 2007.

### B.  The Abduction and Execution

5.      On October 9, 1994, as Nachshon waited on the side of the road for a ride to visit a

friend, four members of Hamas, Salah A-Din Hassan Salem Jadallah, Hassan Natshe,

Abd El Karim Yassin Bader and Jihad Ya'amur, abducted the decedent from a public

street near Lod, Israel.  Pls.' Proposed Findings of Fact and Conclusions of Law ("Pls.'

Mem."), Ex. 3(a) ("Shay Aff.") at 4-5.[1]

6.      Three of the abductors – Jadallah, Natshe and Bader – were already wanted by Israeli

security forces for prior acts of terrorism.  Shay Aff. at 5-6.  These three individuals

recruited Ya'amur, who was not previously known to Israeli security, to provide

logistical support, which included securing black hats and yarmulkes to wear as disguises

and renting video equipment, a van with Israeli license plates, and a safe house where

Nachshon would be held.  *Id.*; Pls.' Mem., Ex. 7(b).

7.      The abductors spotted Nachshon on the side of the road and with the disguises were able

to lure him into the van.  Shay Aff. at 6.  Once in the van, the abductors overpowered,

blindfolded and handcuffed Nachshon and drove him to the safe house in Bir Naballah.

*Id.*

8.      Shortly thereafter, the abductors made a video tape in which Nachshon's identification

card and M-16 rifle, issued by the Israeli army, could be seen.  *Id.* at 7.  In the video tape

the abductors also listed their demands – release of members of Hamas, the Palestinian

Liberation Organization, the Islamic Jihad, the Popular Front for the Liberation of

---

[1]      The facts surrounding the abduction and execution to which Dr. Shaul Shay attests are based on "the documents of the trials of Jihad Ya'amur and Zacaria Lutfi abd al Magid."  Pls.' Proposed Findings of Fact and Conclusions of Law ("Pls.' Mem."), Ex. 3(a) ("Shay Aff.") at 4 n.5.  Given his extensive experience in the Military Intelligence Branch of the Israeli Defense Forces and his numerous books and articles discussing terrorism, the court recognizes Dr. Shay as an expert on Islamic terrorism.  Shay Aff. at 1-3; FED. R. EVID. 702-04.

Palestine and all Palestinian women prisoners – and stated that these demands must be met by October 14, 1994 at 9:00 pm or they would execute Nachshon. *Id.* at 6-7, 10; Pls.' Mem., Ex. 5(a). These demands indicate collaboration between Hamas, Hizballah and Iran to achieve common goals. Shay Aff. at 26.

9. On October 10, 1994, Hamas took responsibility for the abduction and delivered copies of their demands to the media. *Id.* at 7 & Exs. 5(c), 4 at 4.

10. Three days later Israeli security forces arrested Ya'amur, one of the abductors. *Id.* at 9. During his interrogation, Ya'amur provided Israeli security forces with the location of the safe house where Nachshon was being held. *Id.*

11. The following day, on October 14, 1994, shortly before the 9:00 pm deadline, an Israeli commando unit raided the safe house. *Id.* at 9. A fire fight ensued during which one Israeli soldier and the three remaining abductors were killed. *Id.*

12. After the fire fight, the Israeli commandos found Nachshon dead in a back room with his hands and legs bound. *Id.* The abductors had shot him several times at close range, as the Israeli soldiers were raiding the house. *Id.*

13. Pictures of Nachshon's body[2] indicate that his abductors bit him prior to his execution. *Id.* at 9; Pls.' Mem., Exs. 7(k)-(s). Bite marks appear on Nachshon's arm and back, while "soot marks" appear on his abdomen along with several "shallow" wounds. Pls.' Mem., Exs. 6(b), 7(k)-(s). Additional bullet wounds, or other traumatic injury, appear on his arm, neck, shoulder, back and head. *Id.*

---

[2] Roland Roth, an attorney for the Wachsman family, attests to the authenticity of these photographs based on his work with the main military prosecutor in Israel who handled the Ya'amur case. Pls.' Mem., Ex. 12. The Israeli government authorized Mr. Roth "to copy every document from all the official files" in that case. *Id.*

## C.  The Relationship Between Iran and Hamas

14.   Hamas, an Islamic militant terrorist organization, has a close relationship with Iran.  *Stern v. Islamic Republic of Iran*, 271 F. Supp. 2d 286, 291 (D.D.C. 2003); *Campuzano v. Islamic Republic of Iran*, 281 F. Supp. 2d 258, 262 (D.D.C. 2003).  Iran's official policy is to support terrorism and to provide support to Hamas through both economic assistance and terrorist training.  *Stern*, 271 F. Supp. 2d at 292; *Campuzano*, 281 F. Supp. 2d at 262; Shay Aff. at 12 (stating that "[s]ince the beginning of 1980, Iran has appeared on the list of states that support terror, compiled by the U.S. State Department").  Iran funnels its financial support through its Ministry of Information and Security and provides professional military and terrorist training through its Revolutionary Guard.  *Stern*, 271 F. Supp. 2d at 292; *Campuzano*, 281 F. Supp. 2d at 262.

15.   Dr. Shaul Shay, an expert in Islamic terrorism, reports that in 1992, Israel deported approximately 400 Hamas operatives living in the Gaza Strip.  Shay Aff. at 11, 20.  Israel deported these operatives to Lebanon where Iran, through its Revolutionary Guard, provided military and terrorist training.  *Id.*  Only after receiving such training did Hamas begin targeting Israelis in suicide bombings and other organized acts of terrorism.  *Id.* at 18, 21; *Stern*, 271 F. Supp. 2d at 291.

16.   Indeed, upon returning to Gaza at the end of 1993, several of these former deportees were instrumental in the abduction and execution of Nachshon Wachsman.  *Id.* at 20.  These individuals included Muhammad Dif, the commander of the Hamas military branch in Gaza who led the negotiations with Israel and Nur a din Salah a din Rada Darawza, one of the commanders of the abduction team.  *Id.* at 8, 10.

17. Another former deportee, Imam Jadallah Jadallah had two sons who were involved in the kidnapping.  They were Salah Jadallah, who was killed during the raid on the safe house, and Ahmad Jadallah, who helped prepare the video cassette of Nachshon in Gaza.  *Id.* at 5, 9-11.

18. Iran's financial support, tactical training and political direction proximately caused the abduction and execution of Nachshon.

### D.  The Plaintiffs

19. Esther Wachsman is the mother of the decedent, Nachshon Wachsman.  She is, and was at the time of Nachshon's abduction and execution, a citizen of the United States.  Pls.' Mem., Ex. 1(a).  She is also representative of the decedent's estate and the mother of the co-plaintiffs.  *Id.*, Ex. 2.

20. These co-plaintiffs – Menashe Yechezkel Wachsman, Yitzchak Shlomo Wachsman, Uriel Wachsman, Raphael Wachsman, Eliahu Wachsman and Chaim Zvi Wachsman – are, and were at the time of Nachshon's abduction and execution, citizens of the United States and of Israel.  *Id.* at 3, Exs. 1(b)-(g).

21. Nachshon Wachsman was born on April 3, 1975 in Jerusalem, Israel, but was a citizen of the United States.  *Id.*, Ex. 1(h).  At 18-years-old, Nachshon began his three year commitment to the Israeli Defense Forces.  He was assigned to the Golani Brigade and was a Corporal at the time of his death.

### III.  CONCLUSIONS OF LAW

### A.  Jurisdiction

### 1.  Legal Standard for a Default Judgment

A court shall not enter a default judgment against a foreign state "unless the claimant establishes his claim or right to relief by evidence satisfactory to the court."  28 U.S.C. § 1608(e); *Roeder v. Islamic Republic of Iran*, 333 F.3d 228, 232 (D.C. Cir. 2003).  This "satisfactory to the court" standard is identical to the standard for entry of default judgments against the United States in Federal Rule of Civil Procedure 55(e).[3]  *Hill v. Republic of Iraq*, 328 F.3d 680, 684 (D.C. Cir. 2003).  In evaluating the plaintiffs' proof, the court may "accept as true the plaintiffs' uncontroverted evidence," *Elahi v. Islamic Republic of Iran*, 124 F. Supp. 2d 97, 100 (D.D.C. 2000), including proof by affidavit, *Weinstein v. Islamic Republic of Iran*, 184 F. Supp. 2d 13, 19 (D.D.C. 2002).

### 2.  Legal Standard for Subject-Matter Jurisdiction

For the court to have subject-matter jurisdiction, the plaintiffs must establish an exception to the defendant foreign state's sovereign immunity.  28 U.S.C. §§ 1604, 1605(a)(7).  The Antiterrorism and Effective Death Penalty Act of 1996 amended the FSIA and waived the sovereign immunity of state sponsors of terrorism when that state provides "material support" for "an act of torture, extrajudicial killing, aircraft sabotage, [or] hostage taking" resulting in personal injury or death.  28 U.S.C. § 1605(a)(7); *Elahi*, 124 F. Supp. 2d at 107.  When an exception to sovereign immunity exists under 28 U.S.C. § 1605(a)(7), this court has original subject-matter jurisdiction pursuant to 28 U.S.C. § 1330(a).  *Argentine Republic v. Amerada Hess Shipping Corp.*, 488 U.S. 428, 435 (1989); *Elahi*, 124 F. Supp. 2d at 106.

---

[3]      Rule 55(e) states that no "default [judgment] shall be entered against the United States or an officer or agency thereof unless the claimant establishes his claim or right to relief by evidence satisfactory to the court."  FED. R. CIV. P. 55(e).

To establish subject-matter jurisdiction pursuant to the FSIA and its amendments, the

plaintiffs must prove with "evidence satisfactory to the court" the following elements:

> (1) that personal injury or death resulted from an act of torture, extrajudicial killing, aircraft sabotage, or hostage taking;
>
> (2) that the act was either perpetrated by a foreign state directly or by a non-state actor which receives material support or resources from the foreign state defendant;
>
> (3) the act or provision of material support or resources is engaged in by an agent, official, or employee of the foreign state while acting within this scope of his or her office, agency, or employment;
>
> (4) that the foreign state be designated as a state sponsor of terrorism either at the time the incident complained of occurred or was later so designated as a result of such act;
>
> (5) that if the incident complained of occurred within the foreign state defendant's territory, plaintiff has offered the defendants a reasonable opportunity to arbitrate the matter;
>
> (6) that either the plaintiff or the victim was a United States national at the time of the incident;
>
> (7) that similar conduct by United States agents, officials, or employees within the United States would be actionable.

28 U.S.C. §§ 1605(a)(7) and 1605 note; *Peterson v. Islamic Republic of Iran*, 264 F. Supp. 2d

45, 60-62 (D.D.C. 2003); *Elahi*, 124 F. Supp. 2d at 106-07.

### 3.  Conclusions of Law Regarding Subject-Matter Jurisdiction

The court applies the Rule 55(e) standard to determine whether the plaintiffs satisfied

their burden of proof pursuant to 28 U.S.C. § 1608(e).  *Hill*, 328 F.3d at 683.  The plaintiffs have

made such a showing in this case because they have proven each of the applicable elements by

"evidence satisfactory to the court."  FED. R. CIV. P. 55(e).  Considering the first of the FSIA

elements, the court determines, as stated in the findings of fact, that the plaintiffs have

demonstrated through pictures, Pls.' Mem., Exs. 7(k)-(s); affidavit, Shay Aff.; video footage,

Pls.' Mem., Ex. 5(a); and news reports, *id.*, Exs. 5(b)-(c), that the abduction and execution of

Nachshon Wachsman clearly fall within the definitions of hostage taking[4] and extrajudicial

killing[5] respectively.

Without more evidence, *e.g.*, a medical examiners report, however, the court cannot

conclude that the abductors tortured Nachshon prior to his death.  Section 1605(e)(1) adopts the

definition of torture contained in the Torture Victim Protection Act of 1991:

> any act, directed against an individual in the offender's custody or physical
> control, by which severe pain or suffering . . . whether physical or mental, is
> intentionally inflicted on that individual for such purposes as obtaining from that
> individual or a third person information or a confession, punishing that individual
> for an act that individual or a third person has committed or is suspected of having
> committed, intimidating or coercing that individual or a third person, or for any
> reason based on discrimination of any kind.

 28 U.S.C. § 1350 note.  This Circuit has held that "[t]he severity requirement is crucial to

ensuring that the conduct . . . is sufficiently extreme and outrageous to warrant the universal

condemnation that the term 'torture' both connotes and invokes."  *Price v. Socialist People's*

*Libyan Arab Jamahiriya*, 294 F.3d 82, 92 (D.C. Cir. 2002).  The Circuit went on to specifically

note that "[t]he more intense, lasting, or heinous the agony, the more likely it is to be torture,"

but that "not *every* instance of excessive force used against prisoners[] is torture under the

FSIA."  *Id.* at 93.  Here, the plaintiffs present an affidavit by Dr. Shay, who concludes that the

abductors tortured Nachshon.  Shay Aff. at 9.  However, it is unclear from whence Dr. Shay

---

[4]     Section 1605(e)(2) defines hostage taking by reference to Article I of the International
Convention Against the Taking of Hostages, which states that "[a]ny person who seizes or detains
and threatens to kill, to injure or to continue to detain another person in order to compel a third
party, namely, a State, an international governmental organization, a natural or judicial person or
a group of persons, to do or abstain from doing any act as an explicit or implicit condition for the
release of the hostage commits the offense of taking hostages within the meaning of the
Convention."  *Price v. Socialist People's Libyan Arab Jamahiriya*, 294 F.3d 82, 94 (D.C. Cir.
2002).

[5]     Section 1605(e)(1) adopts the definition of extrajudicial killing contained in the Torture Victim
Protection Act of 1991: "a deliberated killing not authorized by a previous judgment pronounced
by a regularly constituted court affording all judicial guarantees which are recognized as
indispensable by civilized peoples."  28 U.S.C. § 1350 note.

comes to this conclusion.  The plaintiffs also provide post-mortem pictures of Nachshon, but these pictures alone do not demonstrate that the abductors inflicted "severe pain or suffering" before death.  *See* 28 U.S.C. § 1350 note; Pls.' Mem., Exs. 7(k)-(s).  Accordingly, the court reserves judgment on this issue.  But having already demonstrated that the abductors perpetrated a hostage taking and an extrajudicial killing, the plaintiffs have satisfied the first FSIA element.

Addressing the second FSIA element, based on prior case law, expert testimony, newspapers and government reports and public statements, the plaintiffs have shown that Iran's material support to Hamas proximately caused Nachshon's kidnapping, torture and execution. *See Kilburn v. Socialist People's Libyan Arab Jamahiriya*, 376 F.3d 1123, 1127-30 (D.C. Cir. 2004); *Weinstein*, 184 F. Supp. 2d at 22.  The court has already laid out the basis for such a determination in its findings of fact.  *See supra* ¶¶ 14-18.  Furthermore, the third element is satisfied because Iran provides sanctioned support for terrorism through the Ministry of Information and Security and the Revolutionary Guard.  *See Roeder*, 333 F.3d at 234; *Salazar v. Islamic Republic of Iran*, 370 F. Supp. 2d 105, 116 (D.D.C. 2005).  And due to this support, the United States has designated Iran a state sponsor of terrorism since 1984, satisfying the fourth FSIA element.  31 C.F.R. § 596.201; *Flatow v. Islamic Republic of Iran*, 999 F. Supp. 1, 11 (D.D.C. 1998).

The fifth element is also satisfied because FSIA does not require the plaintiffs to offer the defendants an opportunity to arbitrate when the actions giving rise to the claim did not occur within the defendants' territory.  28 U.S.C. §§ 1605(a)(7) and 1605 note.  As to the sixth element, the plaintiff submitted U.S. passports for each of the plaintiffs and for the victim, indicating that these individuals were U.S. citizens at the time of the abduction and execution. Finally, the court concludes that the seventh FSIA element is satisfied because "if an official of

the United States, acting in his official capacity, provided material support to an organization

such as Hamas in order to cause or facilitate terrorist attacks, he would be liable and unable to

claim a defense of immunity." *Stern*, 271 F. Supp. 2d at 298 (citing 42 U.S.C. § 1983 and *Bivens*

*v. Six Unknown Named Agents*, 403 U.S. 388 (1971)).  Accordingly the defendants are not

immune from this suit, and the court has subject-matter jurisdiction to resolve the plaintiffs'

claims.

### 4.  Personal Jurisdiction

The FSIA provides for personal jurisdiction over a foreign-state defendant once the

plaintiffs establish an exception to immunity pursuant to 28 U.S.C. § 1605 and accomplish

service of process pursuant to 28 U.S.C. § 1608.  28 U.S.C. §§ 1330(b), 1605, 1608; *Foremost-*

*McKesson v. Islamic Republic of Iran*, 905 F.2d 438, 442 (D.C. Cir. 1990) (holding that

"[p]ersonal jurisdiction under FSIA exists so long as subject-matter jurisdiction exists and

service has been properly made pursuant to 28 U.S.C. § 1608").  Because the plaintiffs have

established an exception to the defendants' immunity pursuant to 28 U.S.C. § 1605 and thereby

established subject-matter jurisdiction, and because the plaintiffs properly served the defendants

pursuant to 28 U.S.C. § 1608, the court has personal jurisdiction over the defendants.  *Foremost-*

*McKesson*, 905 F.2d at 442.

### B.  Choice of Law

The FSIA does not provide a cause of action against foreign States.[6]  *Cicippio-Puleo v.*

*Islamic Republic of Iran*, 353 F.3d 1024, 1033 (D.C. Cir. 2004).  The plaintiffs must provide a

---

[6]     Although the D.C. Circuit has stated which sources of law *cannot* provide causes of action
against a foreign nation in suits brought pursuant to § 1605(a)(7), it has never clarified which
sources of law *can* provide causes of action.  *Price v. Socialist People's Libyan Arab Jamahiriya*,
389 F.3d 192, 200 (D.C. Cir. 2004) (declining to rule on the appropriate cause of action in a suit
brought pursuant to 28 U.S.C. § 1605(a)(7)); *Kilburn v. Socialist People's Libyan Arab
Jamahiriya*, 376 F.3d 1123, 1134 (D.C. Cir. 2004).  The D.C. Circuit has now made clear that

particular cause of action usually found in state statutes or common law. *Nikbin v. Islamic Republic of Iran*, 517 F. Supp. 2d 416, 426 (D.D.C. 2007). The plaintiffs bring claims for wrongful death, survival, intentional infliction of emotional distress ("IIED") and claims for various violations of Israeli statutory duties.[7] *See generally* Am. Compl. To determine which law should apply, the court applies the D.C. choice of law provisions. *See Reed v. Islamic Republic of Iran*, 439 F. Supp. 2d 53, 63 n.4 (D.D.C. 2006).

### 1.  Legal Standard for District of Columbia Choice of Law Analysis

As a threshold inquiry, District of Columbia choice of law analysis requires a determination of whether a "true conflict" exists. *GEICO v. Fetisoff*, 958 F.2d 1137, 1141 (D.C. Cir. 1992). The true conflict test asks whether more than one jurisdiction has a potential interest in having its law applied, and, if so, whether the law of the competing jurisdiction is different. *See id.*

A false conflict exists when either (1) the laws of interested states are the same; (2) when those laws, though different, produce the same result when applied to the facts at issue; or (3) when the policies of one state would be advanced by the application of its laws and the policies of the states whose laws are claimed to conflict would not be advanced by the application of their law. *Long v. Sears Roebuck & Co.*, 877 F. Supp. 8, 11 (D.D.C. 1995); *accord Biscoe v. Arlington County*, 738 F.2d 1352, 1360 (D.C. Cir. 1984).

If a true conflict exists, the court follows the District of Columbia's choice-of-law principles, which utilize "constructive blending" of two distinct analyses; the "governmental interests" analysis and the "most significant relationship" test. *Hercules & Co. v. Shama Rest.*

---

federal common law and generic formulations of common law cannot furnish a cause of action. *Acree v. Republic of Iraq*, 370 F.3d 41, 55 (D.C. Cir. 2004).

[7]     The plaintiffs abandon all their claims arising out of violations of Israeli law, *i.e.*, Counts V-VII, except for wrongful death. *See* Am. Compl. ¶¶ 37-45; Pls.' Mem. at 33.

*Corp.*, 566 A.2d 31, 41 n.18 (D.C. 1989); *see also Stephen A. Goldberg Co. v. Remsen Partners, Ltd.*, 170 F.3d 191, 194 (D.C. Cir. 1999); *Virtual Def. & Dev. Int'l, Inc. v. Republic of Moldova*, 133 F. Supp. 2d 9, 15 (D.D.C. 2001).  "Under the governmental interests analysis as so refined, we must evaluate the governmental policies underlying the applicable laws and determine which jurisdiction's policy would be most advanced by having its law applied to the facts of the case under review."  *Hercules & Co.*, 566 A.2d at 40.  In determining which jurisdiction has the most significant relationship to the dispute, there are four relevant factors under the Restatement: (1) "the place where the injury occurred"; (2) "the place where the conduct causing the injury occurred"; (3) "the domicile, residence, nationality, place of incorporation and place of business of the parties"; and (4) "the place where the relationship, if any, between the parties is centered."

RESTATEMENT (SECOND) OF CONFLICT OF LAWS § 145 (1971); *Hercules*, 566 A.2d at 42 (adopting the RESTATEMENT (SECOND) OF CONFLICT OF LAWS § 145).  Section 145 also references § 6 of the Restatement for the courts to consider:

> When there is no [state statutory directive on choice of law,] the factors relevant to the choice of the applicable rule of law include (a) the needs of the interstate and international systems, (b) the relevant policies of the forum, (c) the relevant policies of other interested states and the relative interests of those states in the determination of the particular issue, (d) the protection of justified expectations, (e) the basic policies underlying the particular field of law, (f) certainty, predictability and uniformity or result, and (g) ease in the determination of the law to be applied.

RESTATEMENT (SECOND) OF CONFLICT OF LAWS § 6 (1971); *Dunkwu v. Neville*, 575 A.2d 293, 296 (D.C. 1990) (adopting the RESTATEMENT (SECOND) OF CONFLICT OF LAWS § 6 (1971)).

## 2. Wrongful Death

The plaintiffs propose two possible sources of law: (1) the law of the forum, the District of Columbia, or (2) the law of the Israel,[8] where the plaintiffs are domiciled and where the acts giving rise to the claims occurred. The two laws conflict in that the D.C. wrongful death statute only provides recovery for injuries resulting in death "within the limits of the District," D.C. Code § 16-2701, whereas the law in Israel apparently has no such requirement. *See* Pls.' Mem., Ex. 13 ("CA 140/00 *In re Michael Ettinger* [2004]") at 18 (stating that "[t]he dependants of the injured person have an additional – independent – claim, where the tortuous act led to the death of the injured person).

Stepping to the "constructive blending" phase of the choice of law analysis, the court looks to the governmental interests involved. *Hercules & Co.*, 566 A.2d at 41 n.18. Congress enacted the state-sponsored terrorism exception in the FSIA "to influence the sovereign conduct of foreign states," *Flatow*, 999 F. Supp. at 14, and to "give American citizens an important economic and financial weapon against . . . outlaw states," H.R. Rep. No. 104-383, at 62. This expressed interest also extends to families who suffer injuries as a result of terrorist acts committed against a member of that family. *Id.* (stating that "the Committee has determined that allowing suits in the federal courts against countries responsible for terrorist acts where Americans and/or their loved ones suffer injury or death at the hands of the terrorist states is warranted").

In furtherance of these goals, the United States has a unique interest in applying its own law, rather than the unfamiliar law of a foreign nation, to determine liability involved in a state-sponsored terrorist attack on one of its citizens, particularly when such an attack is directed

---

[8]    *See Dammarell v. Islamic Republic of Iran*, 2005 WL 756090, at *11 (D.D.C. Mar. 29, 2005) (noting that foreign law may be applied to claims under section 1605(a)(7) of the FSIA).

against its national interests. *Dammarell v. Islamic Republic of Iran*, 2005 WL 756090, at *20 (D.D.C. Mar. 29, 2005) (noting that "the United States has an interest in projecting its laws overseas for 'certain conduct outside its territory by persons not its nationals that is directed against the security of the state or against a limited class of other state interests'" (quoting RESTATEMENT (THIRD) OF FOREIGN RELATIONS LAW § 402(3) (1987))). This "consideration 'elevates the interests of the United States to nearly [their] highest point.'" *Oveissi v. Islamic Republic of Iran*, 498 F. Supp. 2d 268, 281 (D.D.C. 2007) (quoting *Dammarell*, 2005 WL 756090, at *19-20).

But with respect to wrongful death claims, Israel has a unique interest as well. *See Oveissi*, 498 F. Supp. 2d at 279 n.6 (D.D.C. 2007) (applying foreign law to the plaintiff's wrongful death claim because a foreign State has a "weighty" interest in compensating its residents for tortious harm). A wrongful death cause of action is "derivative in nature and thus coterminous with the decedent's rights." *Id.* (citing RESTATEMENT (SECOND) OF TORTS § 925 cmt. a (1971)). Here, the decedent suffered injury and death in Israel and lived his entire life in Israel. Pls.' Mem. at 22. Thus, whether this court applies the law where decedent was domiciled at the time of his death, *Heiser*, 466 F. Supp. 2d at 271-356; *Dammarell*, 2005 WL 756090, at *21, or the state where the injuries leading to death occurred, RESTATEMENT (SECOND) OF CONFLICT OF LAWS § 175 (1971), the law of Israel applies, *see Harris v. Polskie Linie Lotnicze*, 820 F.2d 1000, 1003-04 (9th Cir. 1987) (utilizing federal-common-law principles to apply Polish law in a case brought under § 1605(a)(2)). Moreover, applying the D.C. wrongful death statute, with its geographical limitations, would prevent recovery, and thereby run counter to the purpose of the FSIA, which is to "give American citizens a financial weapon . . . against outlaw states."

H.R. Rep. No. 104-383, at 62.  Accordingly, the court applies the law of Israel to govern the plaintiffs' wrongful death claim.

### 3.  Intentional Infliction of Emotional Distress and Survival[9]

Although the general rule when applying D.C. choice of law rules is to apply the law of the plaintiffs' domicile at the time of the events giving rise to the claims, and here all the plaintiffs resided in Israel at the time of the abduction and execution, the "paramount interest in guaranteeing redress to [U.S.] citizens" persuades this court to apply the law of the District of Columbia.  *Dammarell*, 2005 WL 756090, at *19, 22; *accord Oveissi*, 498 F. Supp. 2d at 281 (after undergoing a D.C. choice-of-law analysis the court applied U.S. law for the plaintiff's IIED claim despite having been domiciled in France at the time of the acts giving rise to the claim); *Greenbaum v. Islamic Republic of Iran*, 451 F. Supp. 2d 90, 101-02 (D.D.C. 2006) (applying U.S. law "rather than the law of the place where the tort or any other foreign law . . . because the United States has a 'unique interest' in having its domestic law apply in cases involving terrorist attacks on United States citizens"); *Haim v. Islamic Republic of Iran*, 425 F.

---

[9]   Notwithstanding the court's determination that the law of District of Columbia applies to these claims, there appears to be no conflict between the Survival statute in the District of Columbia and the claims afforded by Israeli law.  *Compare* D.C. Code § 12-101 (stating that "[o]n the death of a person in favor or against whom a right of action has accrued for any cause prior to his death, the right of action, for all such cases, survives in favor or against the legal representative of the deceased) *with Martindale-Hubbell*, Israel Law Digest, DEATH (2007) (stating that "[w]here death is caused by a civil wrong and such person would, had not death ensued, have been entitled at the time of his death to recover compensation in respect of bodily injury caused to him by such civil wrong, the husband, wife, parent and child of such deceased person may recover compensation from person responsible for such civil wrong") *and* Pls.' Mem., Ex. 13 ("CA 140/00 *In re Michael Ettinger* [2004]") at 18 (recognizing that "the rights that a deceased injured person had to sue the tortfeasor, both for pecuniary loss and for non-pecuniary loss, survive if they have not been exhausted, and pass to his heirs").

There does, however, appear to be a conflict between the IIED recovery provided in the law of the District of Columbia and what appears to be a prohibition of such recovery in Israel.  *See* CA 140/00 *In re Michael Ettinger* [2004] at 18 (noting that "not all damage caused to the dependants is compensatable, but only the pecuniary damage involved in the loss of pecuniary support deriving from their family dependence on the deceased").

Supp. 2d 56, 69 (D.D.C. 2006) (applying the law of the District of Columbia when the plaintiffs had no domicile in the United States).  Notably the law of the forum does not proscribe recovery for these claims.  *See* D.C. Code §§ 16-2701, 12-101.

## C.  Liability

### 1.  Vicarious Liability

The defendants' liability rests on their material support of Hamas, whose members abducted and executed Nachshon Wachsman.  "One may be liable for acts of another under theories of vicarious liability, such as conspiracy, aiding and abetting and inducement."  *Valore v. Islamic Republic of Iran*, 478 F. Supp. 2d 101, 108 (D.D.C. 2007).  Because the court concludes that civil conspiracy provides a basis for liability, the court declines to address the other bases for liability.

In the District of Columbia, the four elements of civil conspiracy are:  "(1) an agreement between two or more persons; (2) to participate in an unlawful act, or in a lawful act in an unlawful manner; and (3) an injury caused by an unlawful overt act performed by one of the parties to the agreement (4) pursuant to, and in furtherance of, the common scheme."  *Youming Jin v. Ministry of State Sec.*, 335 F. Supp. 2d 72, 79 (D.D.C. 2004) (quoting *Weishapl v. Sowers*, 771 A.2d 1014, 1023 (D.C. 2001)).  In *Flatow*, the court held that "sponsorship of terrorist activities inherently involves a conspiracy to commit terrorist attacks."  *Flatow*, 999 F. Supp. at 27.  This court has already determined that the defendants provided material support to fund the terrorist activities of Hamas and that this support was the proximate cause of the decedent's abduction and execution.  *See supra* ¶¶ 8, 14-18.  This support included training those involved in the abduction and execution, financing terrorist activities, coordinating objectives – such as requesting the release of prisoners – and encouraging politically subversive goals.  *Id.*  Through

this collaboration the defendants were involved in a conspiracy and are liable for the death of

Nachshon Wachsman and any resulting injury to his immediate family members.

## 2.  Intentional Infliction of Emotional Distress

To establish intentional infliction of emotional distress the plaintiffs must show "(1)

extreme and outrageous conduct on the part of the defendants, which (2) intentionally or

recklessly (3) causes the plaintiff severe emotional distress."  *Turner v. District of Columbia*, 383

F. Supp. 2d 157, 180 (D.D.C. 2005) (quoting *Futrell v. Dep't of Labor Fed. Credit Union*, 816

A.2d 793, 808 (D.C. 2003)).  First, "the act of engaging in terrorism by means of material

support and civil conspiracy is extreme, and goes beyond all possible bounds of decency.

Terrorists seek to cause extreme suffering in order to achieve political ends; accordingly, they

perpetrate acts that are deliberately outrageous."  *Greenbaum*, 451 F. Supp. 2d at 104; *accord*

*Reed*, 439 F. Supp. 2d at 67); *see also* RESTATEMENT (SECOND) OF TORTS § 46 cmt. d (1965)

(stating that the acts must be "so outrageous in character, and so extreme in degree, as to go

beyond all possible grounds of decency, and to be regarded as atrocious, and utterly intolerable

in a civilized community").  Furthermore, "[c]ourts have uniformly held that a terrorist attack –

by its nature – is directed not only at the victims but also at the victims' families."  *Salazar*, 370

F. Supp. 2d at 115 n.12.  Thus, the plaintiffs have established the first two elements.

The final element is whether the abduction and execution of the decedent caused the

plaintiffs severe emotional distress.  This requires proof both of causation and of severe

emotional distress.  As to causation, proximate cause is easily established given the

foreseeability that the family members would suffer emotional harm from the abductors' heinous

acts.  *See Sutherland v. Islamic Republic of Iran*, 151 F. Supp. 2d 27, 50 (D.D.C. 2001)

(concluding that "when an organization takes someone hostage, it is implicitly intending to cause

emotional distress among the members of that hostage's immediate family"). The plaintiffs' proof of severe emotional distress, however, is deficient. The plaintiffs simply conclude that "[e]ach of Decedent's immediate relatives who are Plaintiffs in this action has established in detail the severe emotional distress that resulted from the terrorist kidnapping and murder of their loved one." Pls.' Mem. at 19. The court notes that this statement is a clear violation of the court's Minute Order issued on August 27, 2007, which required the plaintiffs to "articulat[e] the evidentiary support, with citations to the relevant attachment, for each element of each claim." An independent and thorough review of the evidentiary support yields further deficiencies and violations of the court's directives. First, as to the violations, the plaintiffs submit two letters from Israeli doctors who describe the effects the decedent's abduction and execution have had on Esther Wachsman and Yitzchak Wachsman. Pls.' Mem., Exs. 9 & 10. This violates the court's August 17, 2007 Minute Order which directs the plaintiffs "to submit evidence through prior sworn testimony and affidavits." *See Catrett v. Johns-Manville Sales Corp.*, 826 F.2d 33, 41-42 (D.C. Cir. 1987) (rejecting an unsworn letter as inadmissible); *see also Athridge v. Aetna Gas & Sur. Co.*, 474 F. Supp. 2d 102, 115 (D.D.C. 2007) (same). Second, it is deficient in that it only describes the emotional distress endured by two of the seven plaintiffs. Because of these violations and deficiencies, the court denies, without prejudice, the plaintiffs' claims for IIED.

### 3. Wrongful Death

The plaintiffs again disregard this court's August 27, 2007 Minute Order by not only failing to "articulate[e] the evidentiary support, with citations to the relevant attachment, for each element of [the wrongful death claim]" but also by omitting the text of the Israeli wrongful death statute altogether. The plaintiffs' only citation to Israeli law is to a law digest, which gives a general description of the Israeli law on survival claims – not the elements of a wrongful death

claim.  Pls.' Mem. at 24 (quoting *Martindale-Hubbell*, Israel Law Digest, DEATH (2007) as stating that "[w]here death is caused by a civil wrong and such person would, had not death ensued, have been entitled at the time of his death to recover compensation in respect of bodily injury caused to him by such civil wrong, the husband, wife, parent and child of such deceased person may recover compensation from person responsible for such civil wrong").  This dilatory practice is unacceptable, especially after the court patiently allowed the plaintiffs an extra five weeks to file its Proposed Findings of Fact.  Minute Order (Oct. 19, 2007).  Accordingly, the plaintiffs' wrongful death claim under Israeli law is denied without prejudice.

### 4.  Survival Act

The plaintiffs accurately recite the D.C. Survival Act, which allows the decedent's estate to recover "for any cause prior to his death."  Pls.' Mem. at 25 (quoting D.C. Code § 12-201).  But again, the plaintiffs do not provide the elements and evidentiary support for the claims prior to the decedent's death for which his estate requests recovery.  *See* Pls.' Mem. at 26 (surmising that "tort claims for kidnapping, assault and battery would have been governed by the District of Columbia law").  And, as stated *supra*, without more evidence as to the timing of the decedent's injuries, *i.e.*, whether they occurred before or after death, the court is ill-equipped to determine damages at this time.  Therefore, the court denies, without prejudiced, the plaintiffs' claim.

## V.  CONCLUSION

For the foregoing reasons, the court finds and concludes that the plaintiffs have not established their right to relief and entry of default judgment against the defendants.  An Order and Judgment directing the parties in a manner consistent with these Findings of Fact and Conclusions of Law is separately and contemporaneously issued this 28th day of February, 2008.


RICARDO M. URBINA
United States District Judge