**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | | | |
|---|---|---|---|
| ESTHER WACHSMAN *ex rel.* | : | | |
| NACHSHON WACHSMAN *et al.*, | : | | |
| | : | | |
| Plaintiffs, | : | Civil Action No.: | 06-0351 (RMU) |
| | : | | |
| v. | : | Document No.: | 21 |
| | : | | |
| ISLAMIC REPUBLIC OF IRAN *et al.*, | : | | |
| | : | | |
| Defendants. | : | | |

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

### GRANTING THE PLAINTIFFS' MOTION FOR DEFAULT JUDGMENT

## I.  INTRODUCTION

In October 1994, members of the terrorist group Hamas abducted and executed Nachshon Wachsman, a 19-year-old U.S. citizen residing in Israel.  Esther Wachsman, the mother of Nachshon, individually and as personal representative of his estate, along with her sons Menashe Yechezkel Wachsman, Yitzchak "Tzachi" Wachsman, Uriel Wachsman, Raphael Wachsman, Eliahou Wachsman and Chaim "Hayim" Zvi Wachsman, bring suit against the Islamic Republic of Iran and the Iranian Ministry of Information and Security for the death of Nachshon.  The plaintiffs allege that the defendants are responsible for Nachshon's death because they provided training and support to Hamas.  Pursuant to the Foreign Sovereign Immunities Act ("FSIA"), 28 U.S.C. §§ 1602 *et seq.*, and the common and statutory law of the District of Columbia and Israel, the plaintiffs request that the court award them compensatory damages, prejudgment interest and costs incurred in bringing the action.

Because the defendants failed to appear or respond to the plaintiff's complaint, the Clerk of the Court entered default against them.  The plaintiffs then filed a motion for default

judgment, and the court ordered them to submit evidence supporting their claims.  Based on a review of this initial proffer of evidence, the court denied without prejudice the plaintiffs' motion for default judgment because the plaintiffs failed to provide (1) sworn statements describing the emotional distress endured as a result of Nachshon's death; (2) the elements of a wrongful death claim under the law of Israel; and (3) a clear description of the injuries sustained before Nachshon's death for which they seek to recover damages under D.C.'s Survival Act.  Mem. Op. (Feb. 28, 2008) at 18-20.  The plaintiffs filed a renewed motion for default judgment on August 1, 2008 with additional support for their claims.  The following findings of fact and conclusions of law recount relevant portions of the court's previous memorandum opinion and analyze the plaintiffs' claims anew in light of the additional support provided in their renewed motion for default judgment.

## II.  FINDINGS OF FACT

### A.  Procedural History

1.      The plaintiffs filed suit against the defendants on February 28, 2006.  Despite being properly served with process pursuant to 28 U.S.C. § 1608, the defendants failed to respond or appear in the case.

2.      The Clerk of the Court entered default against the defendants on July 6, 2007.

3.      The court must undertake a review of the evidence before it can enter a judgment by default against the defendants.  *See* 28 U.S.C. § 1608(e) (requiring a claimant to "establish[] his claim or right to relief by evidence satisfactory to the court"); *see also Int'l Road Fed'n v. Dem. Rep. Congo*, 131 F. Supp. 2d 248, 252 n.4 (D.D.C. 2001) ("accept[ing] as true plaintiffs' uncontroverted factual allegations, which are supported

by the documentary and affidavit evidence" (internal quotations and citations omitted)).

Accordingly, the court ordered the plaintiffs, "in support of their motion for default

judgment, to submit evidence through prior sworn testimony and affidavits."  Minute

Order (Aug. 27, 2007).

4.     After the court granted a five-week extension of time, Minute Order (Oct. 19, 2007), the

plaintiffs submitted their proposed findings of fact and conclusions of law with

accompanying evidentiary support on November 30, 2007, Pls.' Proposed Findings of

Fact and Conclusions of Law ("Pls.' Proposed Findings").

5.     The court issued a memorandum opinion on February 28, 2008 denying without

prejudice the plaintiffs' motion for default judgment.  Mem. Op. (Feb. 28, 2008).  The

court determined that it had jurisdiction to resolve the plaintiffs' claims; that Israel's

wrongful death statute applied; and that D.C. law applied for the plaintiffs' Intentional

Infliction of Emotional Distress ("IIED") and Survivor Act claims.  *See generally id.*

6.     Nevertheless, the court denied without prejudice the plaintiffs' motion because they

failed to sufficiently develop the record for the court to determine whether they were

entitled to relief.  *Id.* at 18-20.

7.     On March 28, 2008, the plaintiffs requested leave to amend their complaint pursuant to

the National Defense Authorization Act for Fiscal Year 2008, Pub. L. No. 11-181, 1083.

The court denied this motion on July 7, 2008 because the plaintiffs' complaint does not

rely upon, as the Act requires, either 28 U.S.C. § 1605(a)(7) or § 589 of the Foreign

Operations, Export Financing and Related Programs Appropriation Act, 1997 for a cause

of action.  Min. Order (July 7, 2008).

8.      The plaintiffs filed a renewed motion for default judgment on August 1, 2008,

        supplementing the evidentiary record.  Pls.' Am. Proposed Findings of Fact and

        Conclusions of Law ("Pls.' Am. Proposed Findings").

### B. The Abduction and Execution

9.      On October 9, 1994, as Nachshon waited on the side of the road for a ride to visit a

        friend, four members of Hamas, Salah A-Din Hassan Salem Jadallah, Hassan Natshe,

        Abd El Karim Yassin Bader and Jihad Ya'amur, abducted the decedent from a public

        street near Lod, Israel.  Pls.' Proposed Findings, Ex. 3(a) ("Shay Aff.") at 4-5.[1]

10.     Three of the abductors – Jadallah, Natshe and Bader – were already wanted by Israeli

        security forces for prior acts of terrorism.  Shay Aff. at 5-6.  These three individuals

        recruited Ya'amur, who was not previously known to Israeli security, to provide

        logistical support, which included securing black hats and yarmulkes to wear as disguises

        and renting video equipment, a van with Israeli license plates and a safe house where

        Nachshon would be held.  Id.; Pls.' Proposed Findings, Ex. 7(b).

11.     The abductors spotted Nachshon on the side of the road and with the disguises were able

        to lure him into the van.  Shay Aff. at 6.  Once in the van, the abductors overpowered,

        blindfolded and handcuffed Nachshon and drove him to a safe house in Bir Naballah.  Id.

12.     Shortly thereafter, the abductors made a videotape on which they displayed Nachshon's

        identification card and M-16 rifle, issued by the Israeli army.  Id. at 7.  The abductors

        also listed their demands – release of members of Hamas, the Palestinian Liberation

---

[1]     The facts surrounding the abduction and execution to which Dr. Shaul Shay attests are based on
"the documents of the trials of Jihad Ya'amur and Zacaria Lutfi abd al Magid."  Pls.' Proposed
Findings of Fact and Conclusions of Law ("Pls.' Proposed Findings"), Ex. 3(a) ("Shay Aff.") at 4
n.5.  Given his extensive experience in the Military Intelligence Branch of the Israeli Defense
Forces and his numerous books and articles discussing terrorism, the court recognizes Shay as an
expert on Islamic terrorism.  Shay Aff. at 1-3; FED. R. EVID. 702-04.

Organization, the Islamic Jihad, the Popular Front for the Liberation of Palestine and all female Palestinian prisoners – and stated that these demands must be met before October 14, 1994 at 9:00 pm or they would execute Nachshon.  *Id.* at 6-7, 10.  These demands indicate collaboration between Hamas, Hizbollah and Iran to achieve common goals.  Shay Aff. at 26.

13.   On October 10, 1994, Hamas took responsibility for the abduction and delivered copies of their demands to the media.  *Id.* at 7 & Exs. 5(c), 4 at 4.

14.   Three days later Israeli security forces arrested Ya'amur.  *Id.* at 9.  During his interrogation, Ya'amur provided Israeli security forces with the location of the safe house where Nachshon was being held.  *Id.*

15.   The following day, on October 14, 1994, shortly before the 9:00 pm deadline the abductors had set for compliance with their demands, an Israeli commando unit raided the safe house.  *Id.* at 9.  A gun battle ensued during which one Israeli soldier and the three other abductors were killed.  *Id.*

16.   When the dust settled, the Israeli commandos found Nachshon dead in a back room with his hands and legs bound.  *Id.*  The abductors had shot him several times at close range as the Israeli soldiers were raiding the house.  *Id.*

17.   Pictures of Nachshon's body[2] and medical doctors' affidavits indicate that his abductors bit him at least four times (on his back and arm) prior to his execution.  *Id.* at 9; Pls.' Proposed Findings, Exs. 7(k)-(s); Pls.' Am. Proposed Findings, Exs. 20A ¶ 6 & 21 ¶ 13. Bullet wounds, or other traumatic injury, appear on his upper abdomen, arm, neck,

---

[2]   Roland Roth, an attorney for the Wachshon family, attests to the authenticity of these photographs based on his work with the main military prosecutor in Israel in charge of the Ya'amur criminal case.  Pls.' Proposed Findings, Ex. 12.  The Israeli government authorized Roth "to copy every document from all the official files" in that case.  *Id.*

shoulder, back and head; the "soot marks" on his abdomen are "characteristic to the burning dust of a shooting at very close range."  Pls. Proposed Findings, Exs. 6(b), 7(k)-(s); Pls.' Am. Proposed Findings, Ex. 21 ¶ 11.

### C.  The Relationship Between Iran and Hamas

18.     Hamas, an Islamic militant terrorist organization, has a close relationship with Iran.  *Stern v. Islamic Republic of Iran*, 271 F. Supp. 2d 286, 291 (D.D.C. 2003); *Campuzano v. Islamic Republic of Iran*, 281 F. Supp. 2d 258, 262 (D.D.C. 2003).  Iran's official policy is to support terrorism; in furtherance of that mission, Iran provides both economic assistance and terrorist training to Hamas.  *Stern*, 271 F. Supp. 2d at 292; *Campuzano*, 281 F. Supp. 2d at 262; Shaw Aff. at 12 (stating that "[s]ince the beginning of 1980, Iran has appeared on the list of states that support terror, compiled by the U.S. State Department").  Iran funnels its financial support through its Ministry of Information and Security and provides professional military and terrorist training through its Revolutionary Guard.  *Stern*, 271 F. Supp. 2d at 292; *Campuzano*, 281 F. Supp. 2d at 262.

19.     Dr. Shay reports that in 1992, Israel deported approximately 400 Hamas operatives living in the Gaza Strip.  Shay Aff. at 11, 20.  Israel deported these operatives to Lebanon where Iran, through its Revolutionary Guard, provided them with military and terrorist training.  *Id.*  After receiving this training, Hamas began targeting Israelis in suicide bombings and other organized acts of terrorism.  *Id.* at 18, 21; *Stern*, 271 F. Supp. 2d at 291.

20.     Indeed, upon returning to Gaza at the end of 1993, several of these former deportees were instrumental in Nachshon's abduction and execution.  *Id.* at 20.  These individuals included Muhammed Dif, the commander of the Hamas military branch in Gaza, who led

the hostage negotiations with Israel, and Nur a din Salah a din Rada Darawza, one of the commanders of the abduction team.  *Id.* at 8, 10.

21.   Another former deportee, Imam Jadallah Jadallah, had two sons who were involved in the kidnapping.  They were Salah Jadallah, who was killed during the raid on the safe house, and Ahmad Jadallah, who helped prepare the video of Nachshon.  *Id.* at 5, 9-11.

22.   The financial support, tactical training and political direction that Iran provided to Hamas proximately caused the abduction and execution of Nachshon.

### D.  The Plaintiffs

23.   Esther Wachsman is the mother of the decedent, Nachshon.  She is, and was at the time of Nachshon's abduction and execution, a citizen of the United States.  Pls.' Proposed Findings, Ex. 1(a).  She is also the representative of the decedent's estate and the mother of the co-plaintiffs.  *Id.*, Ex. 2.

24.   These co-plaintiffs – Menashe Yechezkel Wachsman, Yitzchak "Tzachi" Wachsman, Uriel Wachsman, Raphael Wachsman, Eliahou Wachsman and Chaim "Hayim" Zvi Wachsman – are, and were at the time of Nachshon's abduction and execution, brothers of the decedent and dual citizens of the United States and Israel.  *Id.* at 3, Exs. 1(b)-(g).

25.   Nachshon Wachsman was born on April 3, 1975 in Jerusalem, Israel, but was a citizen of the United States.  *Id.*, Ex. 1(h).  At 18 years old, Nachshon began a three-year commitment to the Israeli Defense Forces.  Pls.' Am. Proposed Findings at 4.  He was assigned to the Golani Brigade and was a Corporal at the time of his death.  *Id.*

### III.  CONCLUSIONS OF LAW

### A.  Legal Standard for a Default Judgment

A court shall not enter a default judgment against a foreign state "unless the claimant establishes his claim or rights to relief by evidence satisfactory to the court."  28 U.S.C. § 1608(e); *Roeder v. Islamic Republic of Iran*, 333 F.3d 228, 232 (D.C. Cir. 2003).  This "satisfactory to the court" standard is identical to the standard for entry of default judgments against the United States in Federal Rule of Civil Procedure 55(e).[3]  *Hill v. Republic of Iraq*, 328 F.3d 680, 684 (D.C. Cir. 2003).  In evaluating the plaintiffs' proof, the court may "accept as true the plaintiffs' uncontroverted evidence," *Elahi v. Islamic Republic of Iran*, 124 F. Supp. 2d 97, 100 (D.D.C. 2000), including proof by affidavit, *Weinstein v. Islamic Republic of Iran*, 184 F. Supp. 2d 13, 19 (D.D.C. 2002).

### B.  Summary of the Court's Prior Holdings

### 1.  Jurisdiction

Applying the Rule 55(e) standard, the court has subject matter jurisdiction over the plaintiffs' claims because the plaintiffs demonstrated that (1) the abduction and execution of Nachshon fall within the FSIA's definition of "extrajudicial killing" and "hostage taking"; (2) Iran's material support to Hamas proximately caused Nachshon's kidnapping and execution; (3) this support was provided through the Iran's Ministry of Information and Security and the Revolutionary Guard; (4) Iran has been a state sponsor of terrorism since 1984; (5) the actions giving rise to the claims did not take place in Iran; (6) both the plaintiffs and the victim were U.S. citizens at the time of the incident; and (7) "similar conduct by United States agents, officials, or employees within the United States would be actionable."  Mem. Op. (Feb. 28,

---

[3]      Rule 55(e) states that no "default [judgment] shall be entered against the United States or an officer or agency thereof unless the claimant establishes his claim or right to relief by evidence satisfactory to the court."  FED. R. CIV. P. 55(e).

2008) at 7-11.  The court further notes that the plaintiffs' claims were brought within the ten year statute of limitations provided in 28 U.S.C. § 1605A(b)(1) and that the FSIA establishes personal jurisdiction over a foreign-state defendant once the plaintiffs demonstrate that an exception to immunity applies and effect service of process.  *Id.* at 11.

### 2.  Applicable Law

D.C.'s choice of law rules lead the court to apply the law of Israel to the plaintiffs' wrongful death claim because the decedent was domiciled there at the time of his death and the injuries leading to his death occurred there.  *Id.* at 15.  And, literally construing the D.C. wrongful death statute limits recovery to injuries resulting in death within the limits of D.C., which would run counter to the purpose of the FSIA – to "give American citizens a financial weapon . . . against outlaw states."  *Id.* at 14, 15-16 (quoting H.R. Rep. No. 104-383, at 62). With respect to the IIED claim, which appears to be barred in Israel, and the Survival Act claim, the court concludes that applying D.C. law is appropriate to guarantee redress.  *Id.* at 16-17.

### C.  Liability

### 1.  Vicarious Liability

The defendants' liability rests on their material support of Hamas, whose members abducted and executed Nachshon.  "One may be liable for acts of another under theories of vicarious liability, such as conspiracy, aiding and abetting and inducement."  *Valore v. Islamic Republic of Iran*, 478 F. Supp. 2d 101, 108 (D.D.C. 2007).  Because the court concludes that civil conspiracy provides a basis for liability, the court declines to address the other bases for liability.

In D.C., the four elements of civil conspiracy are:

(1) an agreement between two or more persons; (2) to participate in an unlawful act, or in a lawful act in an unlawful manner; and (3) an injury caused by an

9

> unlawful overt act performed by one of the parties to the agreement (4) pursuant
> to, and in furtherance of, the common scheme."

*Youming Jin v. Ministry of State Sec.*, 335 F. Supp. 2d 72, 79 (D.D.C. 2004) (quoting *Weishapl v. Sowers*, 771 A.3d 1014, 1023 (D.C. 2001)).  "[S]ponsorship of terrorist activities inherently involves a conspiracy to commit terrorist attacks." *Flatow v. Islamic Republic of Iran*, 999 F. Supp. 1, 27 (D.D.C. 1998).  The court has already determined that the defendants provided material support to fund the terrorist activities of Hamas and that this support was the proximate cause of the decedent's abduction and execution.  *See supra* Part II.C.  This support included training those involved in the abduction and execution, financing terrorist activities, coordinating objectives – such as requesting the release of prisoners – and encouraging politically subversive goals.  *Id.*  Through this collaboration the defendants were involved in a conspiracy and are, therefore, vicariously liable for the death of Nachshon and any resulting injury to his immediate family members.

## 2.  Intentional Infliction of Emotional Distress

To establish IIED, the plaintiffs must show "(1) extreme and outrageous conduct on the part of the defendants, which (2) intentionally or recklessly (3) causes the plaintiff severe emotional distress." *Turner v. District of Columbia*, 383 F. Supp. 2d 157, 180 (D.D.C. 2005) (quoting *Futrell v. Dep't of Labor Fed. Credit Union*, 816 A.2d 793, 808 (D.C. 2003)).  D.C.'s highest court has not determined whether, in a terrorist attack, presence is required for a victim to recover on an IIED claim.  Therefore, the court will not infer such a requirement.  *Heiser v. Islamic Republic of Iran*, 466 F. Supp. 2d 229, 305 (D.D.C. 2006).

"[T]he act of engaging in terrorism by means of material support and civil conspiracy is extreme, and goes beyond all possible bounds of decency.  Terrorists seek to cause extreme suffering in order to achieve political ends; accordingly, they perpetrate acts that are deliberately

outrageous." *Greenbaum v. Islamic Republic of Iran*, 451 F. Supp. 2d 90, 104 (D.D.C. 2006); *accord Reed v. Islamic Republic of Iran*, 439 F. Supp. 2d 53, 67 (D.D.C. 2006); *see also* RESTATEMENT (SECOND) OF TORTS § 46 cmt. d (1965) (stating that the acts must be "so outrageous in character, and so extreme in degree, as to go beyond all possible grounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community"). Furthermore, "[c]ourts have uniformly held that a terrorist attack – by its nature – is directed not only at the victims but also at the victims' families." *Salazar v. Islamic Republic of Iran*, 370 F. Supp. 2d 105, 115 n.12 (D.D.C. 2005).  Thus, the plaintiffs have established the first two elements.

The final element is whether the abduction and execution of the decedent caused the plaintiffs severe emotional distress.  Proximate cause is easily established given the foreseeability that the family members would suffer emotional harm from the abductors' heinous acts.  *See Sutherland v. Islamic Republic of Iran*, 151 F. Supp. 2d 27, 50 (D.D.C. 2001) (concluding that "when an organization takes someone hostage, it is implicitly intending to cause emotional distress among the members of that hostage's immediate family").  Having satisfied the causation prong, the plaintiffs must still prove that they suffered severe emotional distress. In this effort, the plaintiffs provide declarations as to the emotional trauma they have endured and also declarations of psychologists that at least two of the plaintiffs have contacted for treatment.  Pls.' Am. Proposed Findings, Exs. 14-21.

Plaintiff Esther Wachsman, in her declaration, indicates that she saw the videotape made by the abductors, showing her son "bound hand and foot with a gun aimed at his temple." *Id.*, Ex. 14 ("Esther Decl.") ¶ 7.  This tape included the abductors' threat that they would kill Nachshon if their demands were not met.  *Id.*  This, plaintiff Esther describes, was "emotionally

devastating"; she was "horrified, terrified, [and] dysfunctional."  Esther Decl. ¶ 8.  When an

Israeli General came to tell her that Nachshon had, in fact, been killed by the abductors, plaintiff

Esther reports that "our house had ceased to be one of laughter and joy."  *Id.* ¶ 13.  Dr. Gary

Quinn has been a psychiatrist in Jerusalem for 29 years and has been treating plaintiff Esther

since December 2003.  Pls.' Am. Proposed Findings, Ex. 9 ("Quinn Decl.") at 1-2.  Dr. Quinn

declares that plaintiff Esther suffers "extreme emotional distress" as a result of her son's murder.

Quinn Decl. at 2.  Specifically, he has diagnosed her with Post Traumatic Stress Disorder and

depression.  *Id.*  Dr. Quinn notes that the recurrence of her son's story and image in the Israeli

press "aggravate[s] her depression."  *Id.*  He has prescribed plaintiff Esther several medications

to assuage her maladies.  *Id.*

     Dr. Avshalom Baumann, a clinical psychologist in private practice in Jerusalem, attests to

working with plaintiff Yitzchak "Tzachi" Wachsman, one of Nachshon's brothers, since 2001.

Pls.' Am. Proposed Findings, Ex. 10 ("Baumann Decl.") ¶¶ 2, 5.  Dr. Baumann indicates that

plaintiff Tzachi has had "deep posttraumatic depression" resulting in "suicidal gestures."

Baumann Decl. ¶ 5.  According to Dr. Baumann, plaintiff Tzachi cannot "function in a normal

manner" and requires psychiatric medication.  *Id.* ¶ 6.  The "main cause" or "critical trigger" for

these problems, Dr. Baumann concludes, was the "kidnapping and murder of [] his brother."  *Id.*

¶ 5.  Plaintiff Tzachi adds that he was Nachshon's "closest brother in age and friendship" and

that since Nachshon's death, he has attempted suicide three times due to the loss of friendship

and depression.  Pls.' Am. Proposed Findings, Ex. 15.

     Plaintiff Menashe Wachsman reminisces that he was also very close to Nachshon.  *Id.*,

Ex. 17 ¶ 2.  The two were close in age, and plaintiff Menashe had difficulty accepting the fact

that Nachshon was dead.  *Id.* ¶ 3.  In fact, although he "insisted on identifying [Nachshon's]

body," he continued to live in "total denial." *Id.*   Even after all these years, plaintiff Menashe

states that he "live[s] in constant fear" and "yearn[s] for the peace and quiet and tranquility and

calm that [he] lost in that crazy week 13 years ago." *Id.* ¶ 5.   He reports that after his brother's

death, he "felt confused, [] had no self-confidence, a feeling of emptiness, distress, [and] lack of

meaning of life." *Id.* ¶ 7.   He asserts that it took years to "pull [him]self together and feel

human." *Id.*   There are "hours of each day," he declares, that he is "overwhelmed with grief"

and with the thoughts of the week of Nachshon's abduction.  *Id.*

      Plaintiff Hayim Wachsman states in his declaration that his self-confidence and sense of

security have been negatively impacted by the death of Nachshon.  *Id.*, Ex. 16 ¶ 2.   Specifically,

he states that he could not sleep, eat or function the week of the kidnapping and that since he

learned that Nachshon was killed, his "easy-going spirit, [] joy of life, as well as [his] sense of

optimism[] have disappeared." *Id.* ¶¶ 3-4.   Now, plaintiff Hayim indicates that he suffers from

depression and nervousness, referring to himself as a "great worrier." *Id.* ¶ 5.

      Plaintiff Eliahou Wachsman recalls in his declaration that his brother was killed when he

was twelve years old, and that year he "could not concentrate on [his] studies, and [his] grades

were low." *Id.*, Ex. 19 ¶ 2.   In addition, while his brother was being held in the safe house,

plaintiff Eliahou states that he "felt as if everything that was happening was unreal" and after he

was told his brother had been killed, he "was in shock" and felt "the world [is] a great unjust

place." *Id.* ¶ 3.   To this day, he is paranoid that people are lying to him and "feel[s] very bad to

the depths of [his] soul." *Id.* ¶ 5.

      Plaintiffs Uriel and Raphael Wachsman are twins and were eight years old when

Nachshon was kidnapped and killed.  Esther Decl. ¶ 4.   Plaintiff Uriel recalls in his declaration

that although he was young, he "felt great shock, confusion, [and] anxiety."  Pls.' Am. Proposed

Findings, Ex. 18 ¶ 2.  He further states that "with all those people in the house, it all made me feel alone, lonely and unstable."  *Id.*  In addition, he remembers feeling "broken and crying" and because of that he gets "nervous [and] angry" and has "self-confidence, and trust problems and insecurities."  *Id.*  The greatest influence has been the depression and withdrawal of his mother on whom he depended.  *Id.* ¶ 3.  This left him "unstable with no one to turn to," a feeling that continues "even today."  *Id.*

Likewise, plaintiff Raphael, who has Down's Syndrome, was eight years old when Nachshon was kidnapped and killed.  Esther Decl. ¶ 4.  When he learned that he was no longer going to see Nachshon, according to his mother, he suffered "great emotional distress," which he manifested when he returned home from Nachshon's funeral and took a framed picture of Nachshon off the wall and smashed it on the ground.  *Id.* ¶ 15.  He "began to regress as a result of this tragedy" and, at the age of eighteen, began attending a school for mentally challenged children where he is "progressing very nicely."  *Id.* ¶ 4.

Clearly, the plaintiffs have suffered a great deal of distress in the aftermath of Nachshon's kidnapping and murder.  Plaintiffs Esther and Tzachi have had their lives drastically altered, requiring therapy and medication.  *Nikbin v. Islamic Republic of Iran*, 517 F. Supp. 2d 416, 429 (D.D.C. 2007) (allowing recovery for IIED for a plaintiff diagnosed with depression and post traumatic stress disorder).  All the plaintiffs were caught in "agonizing limbo" while Nachshon was held captive; and, to varying degrees, each has been unable to cope with Nachshon's death.  *Levin v. Islamic Republic of Iran*, 529 F. Supp. 2d 1, 18 (D.D.C. 2007) (holding that the wife of a hostage was allowed to recover for IIED).  Even children, who only have vague recollections of their loved ones, are able to recover for IIED.  *Ben-Rafael v. Islamic Republic of Iran*, 540 F. Supp. 2d 39, 57 (D.D.C. 2008) (allowing recovery for IIED to a three-

year-old who lost her father in a terrorist attack).  Furthermore, although the extent of Raphael's

emotional harm may be unclear, the law permits recovery for aggravation of preexisting

conditions.  *Id.*  Consequently, the court concludes that all the plaintiffs may recover for their

IIED claims.  *Heiser*, 466 F. Supp. 2d at 298 (reasoning that a terrorist victim's brother is

entitled to recover for IIED because of the pain and suffering caused by the decedent being

"taken away . . . in such a tragic and horrific manner").

### 3.  Survival Act

The D.C. Survival Act allows the decedent's estate to pursue any cause of action that

accrued prior to the decedent's death.  D.C. CODE § 12-101.  Prior to the decedent's death, the

plaintiffs contend that he could have sued for assault, battery, IIED and false arrest and

imprisonment.  Pls.' Am. Proposed Findings at 31-34.  As discussed in the previous section,

IIED requires a showing of "(1) extreme and outrageous conduct on the part of the defendants,

which (2) intentionally or recklessly (3) causes the plaintiff severe emotional distress."  *Turner*,

383 F. Supp. 2d at 180 (quoting *Futrell*, 816 A.2d at 808).  For the same reasons provided in the

previous section, the defendants' conduct satisfies the first two elements.  Additionally, the court

has little difficulty concluding that being taken hostage for several days would cause severe

emotional distress.  *See Massie v. Democratic People's Republic of Korea*, 592 F. Supp. 2d 57,

76 (D.D.C. 2008).

Assault is "an intentional and unlawful attempt or threat, either by word or by acts to do

physical harm."  *Haim v. Islamic Republic of Iran*, 425 F. Supp. 2d 56, 70 (D.D.C. 2006)

(quoting *District of Columbia v. Chinn*, 839 A.2d 701, 705 (D.C. 2004)).  And battery is "an

intentional unpermitted, harmful or offensive contact with [the victim's] person or something

attached to it."  *Id.* (quoting *Marshall v. District of Columbia*, 391 A.2d 1374, 1380 (D.C.

1978)).  Plainly, the uncontroverted facts in this case – that the abductors beat and threatened to

execute Nachshon – qualify as assault and battery.  Shay Aff. at 6, 9.  Furthermore, the

kidnapping and chaining of Nachshon satisfy the elements of false arrest and imprisonment,

which is defined as the "unlawful detention of a person . . . for any length of time whereby he is

deprived of his personal liberty . . . by actual force, or by fear of force, or even by words."

*Levin*, 529 F. Supp. 2d at 16 (quoting *Dent v. May Dep't Stores Co.*, 459 A.2d 1042, 1044 (D.C.

1982)).

### 4.  Wrongful Death

Israel's wrongful death statute provides:

> Where the death of any person is caused by any civil wrong and such person
> would, if death had not ensued, have been entitled at the time of his death under
> the provisions of this Ordinance to compensation in respect of bodily injury
> caused to him by such civil wrong, the spouse, parent and child of such deceased
> person will be entitled to compensation from the person responsible for such civil
> wrong.

Pls.' Am. Proposed Findings, Ex. 23 ("Israel Tort Ordinance") § 78.  A wrongful death claim

may be lodged by "the executor, administrator or heirs of the deceased person for the benefit of

the spouse, parent and child."  Israel Tort Ordinance § 79.  The compensatory aim of the statute

is to account for the "pecuniary loss suffered by [the plaintiffs] owing to the death of the

deceased person; and compensation will be awarded in respect of the pecuniary loss which has

been or will be actually suffered by them, including the burial expenses of the deceased person."

*Id.* § 80.

Plaintiff Esther, the personal representative of the decedent's estate, Pls.' Proposed

Findings, Ex. 2, brings this claim seeking recovery for her benefit and the benefit of her six

remaining sons, *see generally* Compl.  In light of the record in this case, the plaintiffs have made

out a valid claim of wrongful death under Israeli law for which the defendants are liable.  *Cf.*

*Peterson v. Islamic Republic of Iran*, 515 F. Supp. 2d 25, 38-40 (D.D.C. 2007) (concluding that "[b]ased upon the evidence presented to the special masters and the Court, each of the deceased servicemen has made out a valid claim for wrongful death under North Carolina law").

## IV.  DAMAGES

### A.  Compensatory Damages

#### 1.  Legal Standard for Compensatory Damages

To recover damages, "a FSIA default winner must prove damages 'in the same manner and to the same extent' as any other default winner." *Hill*, 328 F.3d at 684-85 (citing *Alameda v. Sec'y of Health, Educ. & Welfare*, 622 F.2d 1044, 1048 (1st Cir. 1980)); 28 U.S.C. § 1606 (stating that a "foreign state shall be liable in the same manner and to the same extent as a private individual under like circumstances").  The plaintiffs must prove future damages to a "reasonable certainty," in other words, a preponderance of the evidence, and must prove the amount of damages by a reasonable estimate. *Id.*  To be awarded damages for past economic losses, the plaintiffs need only "reasonably prove" the amount of damages they request and the court should consider any "special problems of proof arising from the defendant's absence." *Id.*  Using this framework, the court considers whether the following types of compensatory damages are available: severe emotional distress, pain and suffering and loss of prospective income.

#### 2.  Severe Emotional Distress

Courts in this district have reached a degree of consistency in awarding family members of terrorist victims damages for emotional distress. *Ben-Rafael*, 540 F. Supp. 2d at 59 (awarding damages for emotional distress: $10 million to decedent's widow, $10 million to his father, $5 million to his daughter and $2.5 million to each of decedent's two sisters); *Bodoff v. Islamic*

*Republic of Iran*, 424 F. Supp. 2d 74, 86 (D.D.C. 2006) (noting that damages for emotional distress are typically $5 million to each parent and $2.5 million to each sibling); *Heiser*, 466 F. Supp. 2d at 271-356 (awarding parents and children of a terrorist attack victim $5 million for emotional distress and awarding siblings $2.5 million); *Peterson*, 515 F. Supp. 2d at 52 (same); *Bennett v. Islamic Replublic of Iran*, 507 F. Supp. 2d 117, 130 (D.D.C. 2007) (same). Accordingly, the court awards plaintiff Esther $5 million and each of Nachshon's brothers $2.5 million for the emotional distress caused by Nachshon's death.

### 3. Survival Act

This Circuit has held that "it is proper for the estate of the deceased to recover an amount based on probable net future earnings, discounted to present worth." *Runyon v. District of Columbia*, 463 F.2d 1319, 1321 (D.C. Cir. 1972). Thus, the recovery provided under the Wrongful Death statute, discussed *infra*, is equally recoverable under the Survivor Act. *Id.* Additional recovery under the Survivor Act is available for the decedent's pain and suffering. *Dickens v. District of Columbia*, 502 F. Supp. 2d 90, 93 (D.D.C. 2007) (citing *Graves v. United States*, 517 F. Supp. 95, 99 (D.D.C. 1981)). The amount recoverable depends on the circumstances of the case, but the award typically increases the longer a victim experiences pain and suffering before death. *See, e.g.*, *Haim*, 425 F. Supp. 2d at 71-72 (observing that "[w]hen the period of the victim's pain was longer than a few hours, the awards are increased"). In fashioning the appropriate amount for the circumstances of this case, the court analyzes "the length of time that the victim endured physical suffering [and] the victim's mental anguish from the knowledge that death was imminent." *Id.* at 72. Two analogous cases also aid the court in calculating an appropriate award.

In *Peterson*, a case arising out of the bombing of U.S. Marine barracks in Lebanon, the court awarded $7 million and $7.5 million in pain and suffering damages for victims who were alive and conscious for seven days and nearly eight days after the bombing, respectively. *Peterson*, 515 F. Supp. 2d at 53.  Additionally, the court awarded $1 million for a victim who was alive six hours after the attack and $500,000 for a victim alive for "a short but unknown amount of time" after the attack.  *Id.* at 53-54.

In *Stethem*, terrorists hijacked an airplane, executed one U.S. citizen after repeatedly beating him and held six other U.S. citizens hostage for sixteen days.  *Stethem v. Islamic Republic of Iran*, 201 F. Supp. 2d 78, 80 (D.D.C. 2002).  The court awarded $500,000 to the estate of the executed victim for the beatings and an additional $1 million for "the several minutes of anguish and pain [the victim] endured as and immediately after being shot by [a terrorist] and thrown from the airplane."  *Id.* at 89.  The court determined that, of the six other hostages who survived the ordeal, two were entitled to $1.5 million and four were entitled to $1 million for their pain and suffering.  *Id.* at 92.

In this case, Nachshon was held captive, shackled, bitten and likely blindfolded for six days under constant threat and fear of death.  *See supra* Part II.B.  Furthermore, he was most likely aware of the raiding Israeli forces which prompted the abductors to conduct a brutal and hasty execution.  *See* Shay Aff. at 9; Pls.' Proposed Findings, Ex. 8 at 30 (noting that the abductors "announced [Nachshon's death] to the soldiers of the force that broke into the room").  The plaintiffs request that the court award the decedent's estate $2 million for the pain and suffering he endured before his death.  The court agrees that this is the appropriate amount where, as here, the plaintiff suffered mental and physical harm for six days as a hostage and

surely knew moments before his death that he was going to be executed.  *See Stethem*, 201 F.

Supp. 2d at 89, 92.

### 4. Wrongful Death

Under the law of Israel, "[t]he tortfeasor must compensate the dependants of the deceased

for the loss of the economic support to which they had an expectation, had the deceased

remained alive."  Pls.' Proposed Findings, Ex. 13 ("*Ettinger* Decision") at 18.  To do this the

court must determine the decedent's earning capacity and calculate the amount of support his

dependents would have received.  *Ettinger* Decision at 19.  In calculating earning capacity,

courts in Israel subtract "the expenses that the injured part[y] would have incurred had he

remained alive during the 'lost years.'"  *Id.* at 25.

The plaintiffs submitted a report from Dov Weinstein, a certified CPA and partner of Dov

Weinstein & Co. who has extensive experience in economic evaluation.  Pls.' Proposed

Findings, Ex. 11 ("Weinstein Report") at 1.  Based on Nachshon's interests and reported goals,

Weinstein reasonably assumed that Nachshon would study medicine and become a doctor.

Weinstein Report at 5; Esther Decl. ¶ 5 (stating that "Nachshon excelled in high school in

subjects of math and biology [and] was a certified medic by the Israel Red Magen David

Emergency Service [where] [h]e volunteered [] faithfully for years with another friend.  They

both intended to become medical doctors; indeed, his friend fulfilled that intention and is a

doctor today").  In making his calculations, he reviewed "[i]nformation concerning educational

and employment history for medical doctors in Israel, including income and benefits, as well as

personal data (*i.e.*, date of birth, level of education) necessary to form reasonable assumptions

regarding Nachshon Wachsman's earning growth rate, work life expectancy, and retirement

plan" and "Israeli Central Bureau of Statistics statistical reports concerning employment studies,

life expectancies, and retirement studies." Weinstein Report at 5. Weinstein estimates that Nachshon's total work life expectancy would be 35.5 years as a medical doctor and calculates the present value of wages Nachshon would have earned during that period based on documents from the Israeli Central Bureau of Statistics and the Israel Medical Association. Weinstein Report at 5-9. As a result, Weinstein determined, and the court agrees, that Nachshon's total economic loss is $3,040,289. *Id.* at 9; *Ben-Rafael*, 540 F. Supp. 2d at 59 (awarding $3,731,839 to decedent's widow for lost income based on the prediction that he would have become an attorney at a large law firm); *Bennett*, 507 F. Supp. 2d at 128 (relying on expert testimony in determining that the financial loss to the decedent's estate was $404,548); *Heiser*, 466 F. Supp. 2d at 273 (awarding $1,598,688 for net economic loss based on testimony from an economic consultant).

## B. Prejudgment Interest

The plaintiffs request that the court award prejudgment interest for their IIED claims. "Prejudgment interest is an element of complete compensation," *West Virginia v. United States*, 479 U.S. 305, 310 (1987), because it "compensates for the time value of money," *Oldham v. Korean Air Lines Co.*, 127 F.3d 43, 54 (D.C. Cir. 1997) (quoting *Motion Picture Ass'n of Am.*, 969 F.2d at 1157). "It is within this court's discretion to award plaintiffs prejudgment interest from the date of the [incident] . . . until the date of final judgment." *Pugh v. Socialist People's Libyan Arab Jamahiriya*, 530 F. Supp. 2d 216, 263 (D.D.C. 2008). Several "courts in this Circuit have awarded prejudgment interest in cases where plaintiffs were delayed in recovering compensation for their injuries-including, specifically, where such injuries were the result of targeted attacks perpetrated by foreign defendants." *See, e.g.*, *id.*; *Ben-Rafael*, 540 F. Supp. 2d at 59. The plaintiff requests, and the court agrees, that a simple interest basis at a six percent per

annum is reasonable from the date of Nachshon's death, October 14, 1994, to the judgment date, March 27, 2009 – 14.45 years. *Ben-Rafael*, 540 F. Supp. 2d at 59.[4]

## V.  CONCLUSION

For the foregoing reasons, the court finds and concludes that the plaintiffs have established their right to relief and entry of default judgment against the defendants.  An Order and Judgment consistent with this Findings of Facts and Conclusions of Law is separately and contemporaneously issued this 27th day of March, 2009.

RICARDO M. URBINA
United States District Judge

---

[4]     The plaintiffs voluntarily withdraw the remaining counts in their complaint.  Pls.' Am. Proposed Findings at 42.